UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 21-245 (APM) |
| | ) |
| SHANE JENKINS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MOTION TO REVOKE DETENTION ORDER

COMES now the defendant, Shane Jenkins, by and through undersigned counsel, and pursuant to 18 U.S.C. §3145(b), and moves this Honorable Court to revoke the order of detention imposed on March 11, 2021 by the Honorable Andrew M. Edison, United States Magistrate Judge for the Southern District of Texas.

## BACKGROUND

On March 5, 2021, Mr. Jenkins was arrested on a complaint alleging charges arising out of the events on January 6, 2021. *See* ECF Dkt. No. 1, 5. A detention hearing was held on March 11, 2021, where the Honorable Andrew M. Edison ordered continued detention based on a finding of dangerousness. *See* ECF Dkt. No. 6, pp. 17-19. In support of the Court's decision, it found the following factors: (1) weight of the evidence, (2) subject to lengthy period of incarceration if convicted, (3) prior criminal history, (4) history of violence or use of weapons, (5) history of alcohol or substance abuse, (6) prior attempt(s) to evade law enforcement, (7) prior violations of probation, parole, or supervised release.[1] *Id.* at pp. 18-19. The Court based

---

[1] According to the pre-trial services report, Mr. Jenkins's last related charge involving substance

1

its findings on testimony that was taken during the preliminary hearing and detention hearing on March 11, 2021. *See* Exhibit 1, Transcript. The Court reasoned further in its order for detention, saying:

> "Mr. Jenkins visited the Capitol grounds on January 6. He brought with him a crowbar/hatchet and used it to smash a window at the US Capitol. He then threw nine items –pole, desk drawer, a pipe/metal rod – at law enforcement officers, trying to hurt them for doing their job and trying to protect the symbol of our great democracy and those public servants inside. In short, he put law enforcement officers in danger of significant harm. In my view, Defendant is a danger to the community because he actively participated in a violent insurrection aimed at overthrowing our democracy. In addition, Defendant has a long criminal history – multiple assault charges, DWI, Terroristic threat, drug charges, evading arrest, assault on a public servant, and resisting arrest. He has had parole revoked previously, demonstrating a clear inability to comply with instructions and follow supervision."

*See* ECF Dkt. No. 6 at pg. 19. The Court relied on the testimony of Special Agent Jeffrey Johannes ("SA Johannes"), who testified that he viewed video surveillance showing Mr. Jenkins (1) smash a window with a tomahawk, and (2) throw objects at officers that struck them. *See* Exhibit 1, Transcript, pp. 18-25. The government did not present the Court with the actual videos, and instead directed SA Johannes to testify regarding his recollection of the videos he viewed at an earlier date as well as still shots taken from the videos. *Id*. Those still shots are also contained in the statement of facts. *See* ECF Dkt. No. 1. SA Johannes further testified that he was taken into custody on March 5, 2021 with no incident and that Mr. Jenkins cooperated with law enforcement during his arrest. *See* Exhibit 1, Transcript, pp. 28-29.

On cross examination, SA Johannes explained that he did not identify any specific officers who were harmed by Mr. Jenkins alleged actions. *Id.* at pg. 31. Further, he testified that

---

abuse was in 2013. *See* PSR, ECF Dkt. No. 9. Furthermore, although Mr. Jenkins is facing a range of 0-20 years if convicted, his estimated guideline range is 63-78 months (46-57 months with acceptance).

none of the items that he allegedly threw were recovered into evidence. *Id.* at pg. 38. There was no testimony that Mr. Jenkins used the tomahawk to throw at officers or used it towards any other individual. Further, there was no testimony that Mr. Jenkins ever went inside the Capitol building. *See* Exhibit 1, Transcript. Lastly, SA Johannes testified that Mr. Jenkins was on parole from June 2018 to December 2019 and that he successfully completed that term of parole. *Id.* at pp. 42-43.

The defense then presented David Trickett as a witness, who testified that he observed Mr. Jenkins's transformation and rehabilitation during his last period of incarceration all the way up until the instant offense. *Id.* at pp. 46-63. Mr. Trickett explained that he mentored Mr. Jenkins through his work at C.H.A.R.M. Prison Ministry and that Mr. Jenkins resided there after he was released from his last period of incarceration.[2] *Id.* He further testified that while he resided there, Mr. Jenkins "exemplified extraordinary leadership," and became a mentor to others. *Id.* at pp. 49-50. Mr. Trickett also testified that he would be welcome back at the house if he were released and agreed to be his third-party custodian. *Id.* at pg. 51, 61-63. *See also* Exhibit 2, Letter from David Trickett. Mr. Trickett further testified that he never observed any violent behavior or any behavioral problems while Mr. Jenkins was residing at this facility. *Id.* at pg. 59. Lastly, he testified that Mr. Jenkins was gainfully employed as a roofer before the instant arrest. *Id.* at pg. 60.

After this hearing, the Court did not find that Mr. Jenkins was a risk of flight but did find that the government met their burden of providing by clear and convincing evidence that there were no conditions or combinations of conditions that could reasonably assure the safety of the

---

[2] David Trickett and his wife founded this ministry to help rehabilitate incarcerated men and women by providing them with housing, job search assistance, food and clothing, transportation, religious studies, and accountability groups. *See* CHARM PRISON MINISTRY - CHARM Prison Ministry

community.  *Id.* at pg. 97.  On March 24, 2021, Mr. Jenkins was indicted and appeared before the Honorable Magistrate Judge G. Michael Harvey on April 15, 2021, where he was arraigned on charges including: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Destruction of Government Property, and Civil Disorder.  *See* ECF Dkt. No. 7.  On April 21, 2021, Mr. Jenkins appeared for his first status conference before this Honorable Court and his next status conference is scheduled for May 25, 2021.  Mr. Jenkins has remained incarcerated at the D.C. Jail, where COVID-19 lockdowns have proven to create harsh conditions for inmates.

I. **Standard of Review**

Pursuant to 18 U.S.C. §3145(b), this Court has the authority to reconsider a detention order issued by a magistrate judge upon motion by the defense.  This Court's review of the magistrate judge's detention order is *de novo*.  *United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017); *United States v. Karni*, 298 F. Supp. 2d 129, 130 (D.D.C. 2004).  The district court must make its own *de novo* determination of the facts with no deference to the findings or legal conclusions of the magistrate judge.  *United States v. Koenig*, 912 F. 2d 1190, 1192 (9th Cir. 1990); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987).

II. **Governing Authority For Detention Hearings Generally**

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  The Bail Reform Act requires the Court to impose the "least restrictive" means of ensuring the appearance of the person and safety to the community.  18 U.S.C. §3142 (c)(1)(B).  Only in "rare circumstances should release be denied," and any "doubts regarding the propriety of release should be resolved in the defendant's favor." *United States v. Gebro*, 948 F.2d 118, 1121 (9th

4

Cir. 1991).

In order to justify detention, the government must establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community, or, by a preponderance of the evidence, that no condition or combinations of conditions will reasonably assure the appearance of the defendant as required.  See 18 U.S.C. § 3142 (e-f).  "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).[3]  In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142 (g)(1)-(4).

"Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021).  To order a defendant detained, a court must "identify an articulable threat posed by the defendant to an individual or the community," and "detention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness." *Id*.

**III.     Argument**

    **a. The government did not prove by clear and convincing evidence that Mr. Jenkins poses an articulable threat to an individual or the community.**

---

[3] The magistrate judge did not find that Mr. Jenkins was a "flight risk" and so this motion only addresses "danger to the community." *See* ECF Dkt. No. 6, pp. 17-19.

The government pointed to Mr. Jenkins's criminal history, prior revocations of parole, and the nature of the instant offense, when it argued that Mr. Jenkins was a "danger to the community." *See* Exhibit 1, Transcript, pp. 82-86.  Firstly, the government argued that Mr. Jenkins has a "long history of violence," however included in that history a charge from 1997 that had an unknown disposition. *Id*. at pg. 85.  If the disposition is unknown, then the government erred in arguing that this constituted a prior act of violence.  Furthermore, the government did not present any facts or circumstances surrounding any of Mr. Jenkins's prior convictions to support its argument that the conduct actually involved violence.  The last conviction that, by its title may suggest violent conduct, was a Resisting Arrest conviction from 2013, over 7 years ago.[4]  *See* PSR, ECF Dkt. No. 9.

The government also argued that Mr. Jenkins would likely not abide by the conditions of the Court because he has had prior parole revocations. *Id*. at pg. 86.  However, the government failed to acknowledge that he successfully completed his most recent term of parole from 7/12/2018 – 12/29/2019.  *See* PSR, ECF Dkt. No. 9.  The recent successful completion of his parole was undoubtedly due to the rehabilitation efforts testified to by David Prickett.  *See* Exhibit 1, Transcript, pp. 46-63.  Mr. Jenkins not only abided by the conditions of his last term of parole, but he also did not incur any more offenses for the following year up until the instant arrest.  Those circumstances weigh in favor of Mr. Jenkins as it shows that in recent years, he has abided by conditions set by the Parole Commission.

Lastly, the government argued that the nature of the instant offense weighed in favor of detention.  In support, the government first provided testimony from SA Johannes that Mr.

---

[4] The magistrate court also seemed to rely on a prior "Terroristic Threat" misdemeanor charge from 2001 even though the court was not presented with any facts surrounding the case.  Mr. Jenkins was 24 years old at the time.  He is now 43 years old.

6

Jenkins was seen on video smashing a window. *See* Exhibit 1, Transcript, pp. 10-12. However, the magistrate court was not provided with the actual video from Twitter which shows Mr. Jenkins beginning to strike the window, however stopping shortly thereafter. In that video, individuals from the crowd "egg" him on to continue striking the window, however he yells back at them, "No, No!" and stops immediately. *See* Exhibit 3, Twitter Video. Next, the government provided testimony from SA Johannes that Mr. Jenkins was seen throwing objects at officers and that those objects struck them. *See* Exhibit 1, Transcript, pp. 18-25. SA Johannes based his testimony on his recollection of body camera footage and photographs from the statement of facts. However, SA Johannes did not provide any support for his assertion that all of these items actually struck the officers in a crowd where multiple individuals were picking up any item they could find to throw.[5]

    Notably, SA Johannes testified that Mr. Jenkins was seen with a tomahawk, however there was no testimony that he ever threw that tomahawk or used it against any individual. *See* Exhibit 1, Transcript at pp. 18-19. If Mr. Jenkins had a tomahawk and did not use it against any individual, this tends to show that he did not intend to harm anyone. It is also notable that Mr. Jenkins was not one of the individuals who actually entered the inside of the Capitol building. This shows that he did not have any intention to harm anyone that was inside of the building. Lastly, there has been no evidence produced thus far that Mr. Jenkins made any statements threatening to harm anyone. So although the magistrate court stated in its reasoning that Mr. Jenkins was involved in a "violent insurrection aimed at overthrowing our democracy," there was no evidence presented that he intended to overthrow the government. The *Munchel* Court

---

[5] The only support that defense counsel has gathered from recent discovery productions is a video that shows a desk drawer land on top of the officers' shields and helmets. There are also videos that show other items being thrown, however it is unclear where they actually land and what the items actually are (including their composition).

7

disagreed with the district court when it reasoned that the defendants posed a danger because "such conduct threatens the republic itself." *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021), *See Munchel* Order at pg. 16. The Circuit Court explained that was not an adequate consideration of whether there was an "articulate and identifiable threat." *Id.* Rather, that allegation was just a general concern that their conduct threatened our democracy. Similarly, the magistrate court here cannot rely on that general allegation that Mr. Jenkins "participated in a violent insurrection to overthrow the government," when reasoning he is a danger to the community.

Looking at the specific actions of Mr. Jenkins is vital when comparing his case to other cases where defendants have engaged in more serious conduct, including violence, who have been released. For example, in *United States v. Chad Jones*, 1:21-mj-076, Mr. Jones was released after being charged with assault on a police officer with the use of a deadly or dangerous weapon or infliction of bodily injury. In that case, the government alleges that he used a flagpole to repeatedly strike and break the glass of the doorway where Ashley Babbitt was shot and killed. The government did not request Mr. Jones's detention and Magistrate Judge Harvey released him on special conditions. Further, in *United States v. Vitali Gossjankowski*, 1:21-cr-123, the defendant has been charged with assaulting a federal officer with a dangerous weapon (Taser). The statement of facts in support of the complaint describes that an officer near the defendant suffered a heart attack after being "Tased" multiple times in the neck. The government did not object to his release. Lastly, in *United States v. Mark Leffingwell*, 1:21-cr-005, the defendant was charged with Assault on a Federal Officer for allegedly pushing past a wall of officers and repeatedly punching an officer with a close fist. He was also released on

conditions.[6]

## b. There are conditions of release that can reasonably assure the safety of the community.

Mr. Jenkins acknowledges that his criminal history does place him in a different position than many defendants who were released (albeit for more serious conduct) who did not have much of a criminal history. However, there are conditions that can assure the safety of the community if Mr. Jenkins is released. The *Munchel* Court emphasized that courts have the ability to "disable the arrestee from executing that threat." *Id*. He has already shown that with proper rehabilitation and steady employment, that he can abide by conditions. The allegations arising out of January 6, 2021 involve a large group of individuals who clearly fed off of each other and could not have engaged in that same conduct in another setting. The Court could set conditions that include: (1) no travel, (2) no use of social media, (3) GPS monitoring, (4) and participation in the High Intensity Supervision Program. If Mr. Jenkins is released on strict conditions, is employed, and continues to participate in the C.H.A.R.M. Prison Ministry program, the court will be assured that he presents no risk to the community.

## c. Conditions at the D.C. Jail have created a harsh environment for inmates and the COVID-19 pandemic will continue to create inevitable delays.

In *United States v. Gregory Williams*, 1:20-cr-054 (ABJ), the Court reconsidered its determination that detention was appropriate in light of the *Munchel* decision and because of the "unusually harsh nature of incarceration during the pandemic." *See* ECF Dkt. No. 105. Mr. Jenkins has been incarcerated since March 5, 2021, mostly at the D.C. Jail. Up until just

---

[6] *See also United States v. Gina Bisignano*, 21-CR-036 (CJN) (alleged to be a "leader" of the insurrection and allegedly exclaimed, "We need weapons!" while pushing against the police line); *United States v. Christopher Alberts*, 1:21-cr-026 (CRC) (found carrying a fully loaded handgun and a bullet-proof vest).

recently, Mr. Jenkins was subject to a 23 hour lockdown. At the present time, inmates are now subject to a 22 hour lockdown. As psychology professor Craig Haney pointed out when interviewed by the Washington Post, there are many psychological and physical harms that prolonged isolation can cause, including: depression, anxiety, heart disease, diabetes or hypertension, and exacerbation of any existing mental illness. *See* [D.C. jail coronavirus lockdown: Inmates confined to their cells 23 hours a day for a year - The Washington Post](#).

Although there have been promising developments that will hopefully lead to the re institution of in person court hearings, the pandemic continues to be cited as a reason to toll time in pending criminal cases. This will inevitably affect Mr. Jenkins's case and he will likely be detained under the above harsh conditions for longer than the typical time it would take for a criminal case to be completed. This delay was also a consideration for the Court in *Williams* to revisit its prior order of detention. *United States v. Gregory Williams*, 1:20-cr-054 (ABJ).

## **CONCLUSION**

For the above reasons, Mr. Jenkins respectfully requests that the Court revoke the order of detention in this matter and release him on strict conditions of pre-trial release.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550

10

Washington, D.C.  20004
(202) 208-7500
Maria_Jacob@fd.org