1

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

3

4

5

6

| UNITED STATES OF AMERICA | § | 4:21-MJ-443-1 |
|---|---|---|
| | § | |
| V. | § | 10:11 A.M. TO 12:20 P.M. |
| | § | |
| SHANE JENKINS | § | MARCH 11, 2021 |

7

8

**DETENTION HEARING AND PRELIMINARY EXAMINATION**
**VIA VIDEO CONFERENCE**
**BEFORE THE HONORABLE ANDREW M. EDISON**
**Volume 1 of 1 Volume**

9

**APPEARANCES:   (All parties appeared via video conference)**

10

11

12

13

**FOR THE UNITED STATES OF AMERICA:**
Ms. Heather Winter
Assistant United States Attorney
1000 Louisiana
Suite 2300
Houston, Texas 77002
(713) 567-9000

14

15

16

17

18

**FOR THE DEFENDANT, SHANE JENKINS:**
Mr. John Dennis Hester
Federal Public Defender's Office
440 Louisiana Street
Suite 1350
Houston, Texas 77002
(713) 718-4600

19

**ALSO IN ATTENDANCE:**
Mr. Shane Jenkins

20

21

Court Reporter:
Laura Wells, RPR, RMR, CRR
515 Rusk Street, Suite 8004
Houston, Texas 77002

22

23

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

24

25

Proceedings

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**VOLUME 1**
**(DETENTION HEARING and PRELIMINARY EXAMINATION)**

March 11, 2021

|  |  | Page |
|---|---|---|
| Announcements................................... | | 3 |
| Agreement to proceed via video.................. | | 7 |
| Government's Exhibit 1.......................... | | 20 |
| Government's Exhibit 2.......................... | | 21 |
| Government Rests............................... | | 45 |
| Defendant's Exhibits 1 through 5................ | | 54 |
| Defendant Rests............................... | | 75 |
| Argument by Government on Probable Cause........ | | 77 |
| Argument by Defendant on Probable Cause......... | | 78 |
| Rebuttal Argument by Government on Probable Cause........................................ | | 81 |
| Rebuttal Argument by the Defendant on Probable Cause........................................ | | 83 |
| Ruling of Court on Probable Cause............... | | 83 |
| Argument by Government on Detention............. | | 84 |
| Argument by Defendant on Detention............. | | 88 |
| Rebuttal Argument by Government on Detention.... | | 91 |
| Ruling of Court on Detention................... | | 92 |
| Reporter's Certificate......................... | | 98 |

**ALPHABETICAL**

| WITNESSES | | Page |
|---|---|---|
| **SPECIAL AGENT JEFFREY F. JOHANNES** | | |
| Direct Examination By Ms. Winter | | 5 |
| Cross-Examination By Mr. Hester | | 30 |
| Redirect Examination By Ms. Winter | | 44 |
| | | |
| **DAVID TRICKETT** | | |
| Direct Examination By Mr. Hester | | 46 |
| Cross-Examination By Ms. Winter | | 63 |

Proceedings                                                                    3

 1       **(The following proceedings held via video conference.)**

 2              THE COURT:  Good morning.  This is United States

 3       District Court for the Southern District of Texas.  I'm

 4       Judge Andrew Edison presiding.  We are here today on the

10:11:14  5     criminal docket for Thursday, March 11, 2021.  The first

 6       matter we have for us today is Case Number 4:21-MJ-443-1,

 7       United States v. Shane Jenkins.

 8          Could I have introductions of counsel, please.  Let's

 9       start with the government.

10:11:33 10             MS. WINTER:  Good morning, Your Honor.  Heather

11       Winter for the United States.

12              THE COURT:  Good morning, Ms. Winter.

13          And for Mr. Jenkins.

14              MR. HESTER:  Dennis Hester, Your Honor.  Good

10:11:42 15     morning.

16              THE COURT:  Hello, Mr. Hester.

17          In Houston, can you hear me, Mr. Jenkins?

18              CASE MANAGER:  Your Honor, they are muted.

19              THE COURT:  And there is nothing -- this is -- I

10:12:01 20     have never had this, Mr. Bostic.  It does not allow me.

21       Every other time it allows me to put a -- it doesn't allow

22       me to do anything.

23              CASE MANAGER:  Give me one moment.

24              MR. HESTER:  Your Honor, while we are waiting, I

10:12:23 25     communicated with the Court earlier that I have a hearing

4

Proceedings

 1   with Judge Lake beginning at 11:15.  And so far I have

 2   done pretty well in not overlapping my hearings; but if

 3   that happens here, I'm not sure what the protocol is, if

 4   we stop here so I can appear in Judge Lake's court or --

10:12:39   5            THE COURT:  I'll make sure I have Mr. Bostic call

 6   Judge Lake's chambers right now and let him know, and I'll

 7   let him make the call.

 8            MR. HESTER:  Thank you, Your Honor.

 9            THE COURT:  Let me do one thing to see if this

10:13:23  10   works.  I'm going to leave, and I will -- Mr. Bostic, are

11   you there?

12            CASE MANAGER:  Yes, sir.  I'm here.

13            THE COURT:  I'm going to be right back.  I'm

14   going to leave the meeting and make you the host.  Okay.

10:14:47  15            THE MARSHAL:  We just figured it out.  Never

16   mind.

17            THE COURT:  I have got that.  That was my fault.

18   You should have sound in Houston.  Mr. Jenkins, can you

19   hear me loud and clear, sir?

10:14:58  20            THE DEFENDANT:  Yes, Your Honor.  I can.

21            THE COURT:  Okay.  Terrific.

22       My understanding, Counsel, is that we are here today

23   on a detention hearing.  Am I correct?

24            MS. WINTER:  Yes, Your Honor.

10:15:09  25            THE COURT:  Is the government ready to proceed?

1          MS. WINTER:  We are.

2          THE COURT:  Is the defense ready to proceed?

3          MR. HESTER:  Yes, Your Honor.  I believe it's

4    both a detention hearing and preliminary hearing for

10:15:20    5    probable cause.

6          THE COURT:  Okay.  I'll let the government

7    proceed.  If you would, call your first witness.

8          MS. WINTER:  Yes, Your Honor.  The government

9    calls Special Agent Jeffery Johannes, and he is appearing

10:15:32    10   via Zoom and is visible on the screen.

11         THE COURT:  Agent Johannes, could you please

12   raise your right hand, sir.

13         AGENT JOHANNES:  (Complying.)

14         THE COURT:  Do you swear the testimony that you

15   are about to give in this court proceeding today is the

16   truth, the whole truth, and nothing but the truth so help

17   you God?

18         THE WITNESS:  I do.

19         THE COURT:  Please proceed.

20         **SPECIAL AGENT JEFFREY F. JOHANNES,**

21   having been first duly sworn, testified via video link as

22   follows:

23                    **DIRECT EXAMINATION**

24   BY MS. WINTER:

10:15:49    25   Q.  Would you please state your name for the record, sir.

1    **A.**   My name is Jeffrey F. Johannes.  The last name is

2    spelled J-o-h-a-n-n-e-s.

3    **Q.**   And how are you employed?

4    **A.**   I am currently employed as a special agent with the

10:16:08   5    Federal Bureau of Investigation at the Washington, D.C.

6    field office.

7    **Q.**   How long have you been an FBI agent?

8    **A.**   Approximately 17 years.

9    **Q.**   And as part of your duties with FBI, are you currently

10:16:20   10   and have you been investigating the riots that took place

11   at the U.S. Capitol on January 20 -- excuse me, January

12   6th, 2021?

13   **A.**   I am.

14   **Q.**   During the course of this investigation was there an

10:16:35   15   individual here in Houston that you worked concurrently

16   with FBI Houston field office?

17   **A.**   Yes, there is.

18   **Q.**   And is that individual Shane Jenkins?

19   **A.**   Yes.

10:16:49   20   **Q.**   I want you to tell the Court what was happening at the

21   U.S. Capitol on January 6th, 2021.

22   **A.**   On January 6th, 2021, at the United States Capitol was

23   the confirmation of the electoral college by the U.S.

24   Senate and as well as the House of Representatives that

10:17:08   25   was presided over by Vice President Michael Pence.

Direct Examination of SA Jeffrey Johannes

1    **Q.** And due to the certification of the vote on that date,

2    was the U.S. Capitol restricted in terms of who was

3    allowed and had authority to enter the U.S. Capitol

4    grounds?

10:17:24    5    **A.** Yes, it was.

6    **Q.** Were there actual physical permanent and temporary

7    security barriers that were surrounding the U.S. Capitol?

8    **A.** Yes, there were.

9    **Q.** And U.S. members of congress, including the vice

10:17:39    10    president, were present there conducting their official

11    duties?

12    **A.** Yes.

13    **Q.** Were U.S. Capitol police there to ensure order and to

14    maintain the restrictions and barriers around the U.S.

10:17:56    15    Capitol that day?

16    **A.** Yes, they were.

17        THE COURT: Ms. Winters, before we go further, I

18    think we have become so accustomed to using Zoom that I

19    forgot to say one thing at the outset.  I want to make

10:18:06    20    sure that I have the agreement from both sides that we are

21    going to proceed today with this preliminary hearing and

22    detention by video as opposed to all being in the

23    courtroom, obviously trying to reduce the spread of COVID.

24        Do I have that agreement on behalf of the government,

10:18:17    25    Ms. Winter?

Direct Examination of SA Jeffrey Johannes

1          MS. WINTER:  Yes, Your Honor.

2          THE COURT:  Mr. Hester, on behalf of the

3   defendant?

4          MR. HESTER:  Yes, Your Honor.

5          THE COURT:  I apologize.  Please proceed.

6          MS. WINTER:  Thank you, Your Honor.

7   BY MS. WINTER:

8   **Q.**   And, Agent Johannes, do you know whether the U.S.

9   Capitol was closed to members of the public that day?

10  **A.**   Yes, it was.

11  **Q.**   All right.  Can you tell the Court at approximately

12  1:00 p.m. in D.C. what happened on January 6th, 2021?

13  **A.**   At approximately 1:00 p.m., several individuals that

14  we classified as protesters and later some of them

15  classified as rioters entered the grounds of the United

16  States Capitol and proceeded to force their way inside the

17  United States Capitol with the intent of disrupting the

18  certification of the electoral college.

19  **Q.**   And were they able to get past the Metropolitan Police

20  Department and the U.S. Capitol Police that were there to

21  secure the building?

22  **A.**   Yes, they were.

23  **Q.**   And, specifically, did this occur around 2:00 p.m.?

24  **A.**   Yes, it did.

25  **Q.**   What did the members of congress and the vice

Direct Examination of SA Jeffrey Johannes

1   president have to do at that time?

2   **A.**   They were forced to temporarily put a hold on the

3   certification process of the electoral college; and they

4   also had to escape, for lack of a better term, to safety

10:19:38   5   to secure confines within the capitol, the U.S. Capitol

6   complex.

7   **Q.**   And I know we have all seen a lot of news coverage,

8   but can you describe for the Court generally the number of

9   protesters and rioters as compared to the number of police

10:19:55   10   and how the rioters and police were outfitted that day

11   when the confrontation occurred?

12   **A.**   To the best of my knowledge, the -- we have -- there

13   was approximately anywhere between 300 to 500 or possibly

14   more protesters that were at the U.S. Capitol.  There was

10:20:13   15   not -- we don't have a confirmed number just yet.

16       And at first, due to the -- your question about the

17   equipage of the police departments, initially the

18   indications were it was to be a protest, which is

19   protected under the First Amendment.  However -- and,

10:20:30   20   therefore, there was no indications of any type of riot or

21   violence that were anticipated that afternoon.  So,

22   therefore, the police officers at the U.S. Capitol Police

23   and the Metropolitan Police Department were police

24   equipped with their standard patrol gear, for the most

10:20:46   25   part.

1    Later on, however, when the confrontation and the

2    riots occurred after 2:00 p.m., the officers had to

3    basically engage in suppressing, and for lack of a better

4    term, that riot with just whatever gear that they had on

10:20:59    5    at that time.

6    Q.   And would you say that the crowd outnumbered the

7    number of police there at the capitol that day?

8    A.   Yes.

9    Q.   And at around 2:00 p.m. they forced entry and were

10:21:12    10   able to get past the U.S. Capitol Police and the

11   Metropolitan Police Department in order to force entry

12   into the capitol?

13   A.   Yes, they were.

14   Q.   And did the individuals there have authority to go

10:21:28    15   into the capitol at that time?

16   A.   No, they did not.

17   Q.   All right.  Now, I want to turn your attention to

18   January 18th, 2021 and a tip that was received by the

19   Houston field office.  Can you generally describe what the

10:21:43    20   tipster provided, what information was provided by that

21   tipster to the FBI?

22   A.   The tipster provided information that they viewed

23   online through social media, as well as social media

24   videos and social media photographs, that were publicly

10:21:59    25   available where they captured an image of an individual

Direct Examination of SA Jeffrey Johannes

1   breaking into a -- or busting, I should say it

2   correctly -- what appears to be smashing the window to one

3   of the capitol -- one of the capitol windows.  And a

4   tipster, through their own online research, provided us a

10:22:20   5   name of -- in that tip of Shane Jenkins.

6   Q.   Did the tipster say whether or not he or she knew

7   Mr. Jenkins?

8   A.   They said that they did not.

9   Q.   So they provided the FBI images and social media sites

10:22:36   10   of Mr. Jenkins related to videos and images from the U.S.

11   Capitol riot on January 6th?

12   A.   That is correct.

13   Q.   In particular, did they provide a screenshot of a

14   video showing Mr. Jenkins pulling out a crowbar or a

10:22:52   15   hatchet and smashing the window of the left tunnel in the

16   lower west terrace area of the U.S. Capitol?

17   A.   Yes, they did.

18   Q.   And did they provide a picture that depicted

19   Mr. Jenkins and any distinctive characteristics about him?

10:23:10   20   A.   Yes, they did.

21   Q.   And could you describe for the Court what are some of

22   those specific characteristics that helped the FBI

23   identify Mr. Jenkins?

24   A.   The specific characteristics that we -- that were

10:23:23   25   provided that we observed, as well, was the tattoos.

1    Specifically, there was a tattoo under the -- on the

2    right side -- under the right eye that appears to be a,

3    for lack of a better term, fleur-de-lis.  The same symbol

4    that they use for the New Orleans Saints.

10:23:43    5        And then, also, there is a tattoo under the neck of

6    Mr. Jenkins that says, and I quote, "Momma Tried,"

7    unquote, written on his neck as a tattoo.

8    **Q.**   And what about on his hands?  Did he have tattoos on

9    his hands, as well?

10:23:56    10   **A.**   Yes.  There were tattoos on his hands, and we also

11   observed there were tattoos on his wrists.

12   **Q.**   And with respect to Mr. Jenkins' appearance, can you

13   describe for him any other distinctive characteristics

14   with respect to facial or hair?

10:24:11    15   **A.**   The -- yes.  We observed that he had a beard that was

16   red in color, and he also had no hair.

17   **Q.**   Now, did this tipster also provide the specific

18   Twitter and Facebook account used by Mr. Jenkins in public

19   social media online?

10:24:30    20   **A.**   Yes, they did.

21   **Q.**   Did FBI then, with this information provided by the

22   tipster, review the social media accounts of Mr. Jenkins?

23   **A.**   Yes, we did.

24   **Q.**   Were those accounts of Mr. Jenkins publicly available?

10:24:45    25   **A.**   Yes, they were.

Direct Examination of SA Jeffrey Johannes

1    Q.   And when you looked at specific accounts of

2    Mr. Jenkins, including Twitter and Facebook, were you able

3    to identify him and compare it to the information provided

4    by the tipster?

10:25:00    5    A.   Yes.   Once we looked at the social media accounts of

6    Mr. Jenkins, we were able to match up the same tattoos

7    and, also, there were several photographs that indicated

8    that he was present on -- at the U.S. -- on the capitol

9    grounds on January 6th, 2021, as well as the clothing that

10:25:19   10   was also matching that was provided -- that also matched

11   the clothing that was provided us by the tipster.

12   Q.   So the publicly available either profile pictures or

13   photographs and videos that Mr. Jenkins posted on his

14   Twitter and Facebook accounts appeared to be the same

10:25:41   15   person that the information was provided to the FBI from

16   the tipster?

17   A.   Yes.

18        MR. HESTER:   Excuse me, Your Honor.   Objection to

19   the characterization that Mr. Jenkins posted these photos.

10:25:52   20   There has been no evidence of that.

21        THE COURT:   Let's rephrase the question,

22   Ms. Winter.

23        MS. WINTER:   Yes, Your Honor.

24   BY MS. WINTER:

10:25:59   25   Q.   The photographs and videos that you observed on

```
 1   Mr. Jenkins' profile, were they the same and did they
 2   depict the same person from the information that was
 3   provided to you by the tipster?
 4   A.   Yes, they did.
 5            MR. HESTER:  Your Honor, objection to the
 6   characterization that it's Mr. Jenkins' profile.  There
 7   has been no evidence of that.
 8            THE COURT:  I'll ask Ms. Winter to rephrase.
 9   Rephrase the question.
10   BY MS. WINTER:
11   Q.   Mr. Johannes, were you aware of and provided
12   information from FBI Houston field office on the date of
13   Mr. Jenkins' arrest, including arrest booking photos of
14   Mr. Jenkins?
15   A.   Yes.
16   Q.   And I know --
17            MS. WINTER:  If I could ask him to please pull
18   his mask down, Your Honor, in the court.
19   BY MS. WINTER:
20   Q.   Are you able to identify Mr. Jenkins from the arrest
21   photos to a person who is appearing here today?
22            THE COURT:  Let me ask the defendant if you would
23   please lower the mask for one moment, please, sir.
24            THE DEFENDANT:  (Complying.)
25   BY MS. WINTER:
```

10:26:11 (line 5)
10:26:24 (line 10)
10:26:38 (line 15)
10:26:45 (line 20)
10:27:02 (line 25)

Direct Examination of SA Jeffrey Johannes

1   **Q.**   Do you recognize Mr. Jenkins, Agent Johannes?

2   **A.**   Yes.  That appears to match the information that we

3   have of Mr. Shane Jenkins.

4          THE COURT:  Okay.  You can put on the mask, sir.

10:27:14   5   Thank you very much.

6          MS. WINTER:  And, Your Honor, will the record

7   please reflect that he has identified the defendant in the

8   courtroom?

9          THE COURT:  Let the record so reflect.

10:27:22   10   BY MS. WINTER:

11   **Q.**   Now, Agent Johannes, based on your observation of the

12   defendant here today, as well as photos received from the

13   date of his arrest, is Mr. Jenkins that's here today and

14   from the date of his arrest the same Mr. Jenkins that's

10:27:37   15   depicted in the profile pictures of his Facebook account

16   at Facebook.com/Shane.Jenkins.7?

17   **A.**   Yes, it is.

18   **Q.**   And is Mr. Jenkins appearing here today in court, as

19   well as from the photos of his arrest, the same person

10:27:56   20   that is the profile of Shane Jenkins on

21   Twitter@RedTattoo179?

22   **A.**   Yes, it is.

23   **Q.**   Now, could you please describe for the Court what you

24   observed that was publicly available to view from these

10:28:15   25   two Facebook and Twitter accounts associated with

Direct Examination of SA Jeffrey Johannes

1    Mr. Jenkins.

2    **A.**   What we were able to view from the public accounts

3    were videos and photographs taken by, again, you know,

4    whoever was utilizing, you know, that Facebook, the

10:28:35    5    photographs of -- which included photographs of

6    Mr. Jenkins being present at the capitol that day, which

7    again, you know, included what -- several self images

8    which also matched up with the same images that we saw

9    from witness one, as well.

10:28:54    10    **Q.**   Can you describe for the Court from those images what

11    was Mr. Jenkins wearing in the pictures that appear to be

12    from the date of January 6th at the capitol riots?

13    **A.**   Yes.   The clothing that we observed Mr. Jenkins

14    wearing on that date was a red Nautica brand, beanie-style

10:29:16    15    cap; a light blue, hooded sweatshirt with the words "1776"

16    on the front in the chest area surrounded by what -- you

17    know, surrounded by stars.   On top of that was a

18    black-colored jacket.   And, also, at times we saw

19    Mr. Jenkins wearing a black-colored or dark-colored

10:29:41    20    balaclava, which covers part of your face and your -- and

21    head.   And we also saw some type of vegetal or some type

22    of camouflage pants as well as a dark-colored backpack.

23    **Q.**   And despite who may have posted these particular

24    photos and videos, is there any doubt that this is

10:29:59    25    Mr. Jenkins at the U.S. Capitol riot?

1    **A.**   No, it's not.

2    **Q.**   And, in fact, the picture posted on his Facebook

3    account wearing the clothes you just described with the

4    tattoos and facial beard, as shown on Page 2 of the

10:30:18   5    statement of facts, he posts or whoever posts associated

6    with the picture says, "A historic day.  A turning point

7    for America"; is that correct?

8    **A.**   That is correct.

9    **Q.**   All right.  I want to turn your attention now to after

10:30:33   10   you have identified Mr. Jenkins, based on the tip and

11   based on FBI's review of his social media accounts, the

12   further investigation done of other videos posted

13   surrounding the property destruction at the U.S. Capitol

14   on that day, specifically on Twitter.

10:30:56   15   **A.**   Yes.  There were other videos posted by other social

16   media users that depicted the violence from various angles

17   that occurred at the U.S. Capitol; and, specifically, what

18   we were observing was the lower terrace area or the tunnel

19   entranceway, which the best way to kind of equate that

10:31:15   20   would be where the president would walk out of during an

21   inauguration.

22       So that area, there were several videos that were

23   publicly -- that were publicly made or were publicly

24   posted on line in which we observed several individuals

10:31:28   25   committing acts of violence against the members of the

1    Metropolitan Police Department and U.S. Capitol Police.

2    And in several of those videos we did capture Mr. Shane

3    Jenkins engaged in such activities.

4    **Q.**   And this specific area where Mr. Jenkins was located

10:31:46   5    at the lower west terrace tunnel, was this area cordoned

6    off and restricted to the public?

7    **A.**   Yes, it was.

8    **Q.**   Was this area specifically being guarded and kept

9    secure by the capitol police?

10:31:59   10    **A.**   Yes, it was.

11    **Q.**   So tell us about the videos that you located and found

12    where you were able to identify Mr. Jenkins.  What was he

13    doing?

14    **A.**   So the videos we observed from social media matched up

10:32:12   15    with the clothing, as well as the tattoos, that were

16    provided by witness one, as well as, also, the social

17    media accounts that were attributed to Shane Jenkins where

18    we observed him at various areas -- in the same area as

19    the lower terrace where at times he is proceeding to walk

10:32:34   20    up towards the -- the right left front window of -- again,

21    excuse me.  I don't know the specific name of the window.

22    But there was a window right next to a lower terrace

23    entranceway where he -- where we observed him walking up,

24    retrieving a -- what was a tomahawk-type instrument, put

10:32:53   25    on a pair of black gloves, and proceed to smash that

Direct Examination of SA Jeffrey Johannes

1   window.  We saw that on a -- one social media video.

2       And then on several other social media videos from

3   different angles we saw Mr. Jenkins retrieving items from

4   the ground right at -- during the -- at the same time that

10:33:09  5   other protesters, i.e., rioters are engaged in violence

6   against the police department -- against the Metropolitan

7   Police Department and the Capitol Police where he is

8   taking up items from the ground and throwing them at those

9   officers.  The location is the west -- the lower terrace

10:33:25  10  tunnel.

11  **Q.**   Great.  And before we get there, I want to take us

12  back to the images where he is retrieving a tomahawk or a

13  hatchet in order to break the window.  Is this from a

14  backpack that he is carrying?

10:33:38  15  **A.**   Yes, it is.

16  **Q.**   And is he distinctive and again wearing the same red

17  Nautica beanie and blue hooded sweatshirt?

18  **A.**   Yes.

19  **Q.**   In addition to retrieving a weapon from his backpack

10:33:54  20  in order to smash the U.S. Capitol window, did he also put

21  on gloves prior to using that weapon to smash the window?

22  **A.**   Yes, he did.

23  **Q.**   Are you able to tell, before he puts on gloves, the

24  hand tattoos that are known to be hand tattoos that

10:34:13  25  Mr. Jenkins possesses?

1   **A.**   Yes.   They matched.

2   **Q.**   And I want to refer the Court and you to the two

3   images on the statement of facts, Page 3, the two

4   screenshots at the top.

10:34:29   5   Does the first image show that he has no glove on as

6   he is retrieving the tomahawk?

7   **A.**   Yes, it does.

8   **Q.**   And then in the second image can you see him using

9   that tomahawk to break the window at the lower west

10:34:43   10   terrace capitol window?

11   **A.**   Yes, it does.

12   THE COURT:   And, Ms. Winter, let me ask you.

13   When you talk about the statement of facts, you are

14   obviously referring to the statement of facts that was

10:34:53   15   attached to the criminal complaint, correct?

16   MS. WINTER:   Yes, Your Honor.   And I apologize.

17   I realize the pages were not numbered; but I did send to

18   your case manager, just so you could have an accessible

19   copy, the statement of facts attached to the criminal

10:35:08   20   complaint, yes, Your Honor.

21   THE COURT:   Let's do this.   Let's mark as

22   Exhibit 1 to this hearing the statement of facts.

23   And, Mr. Hester, you have a copy of that, correct?

24   MR. HESTER:   Yes.   Yes, Your Honor.

10:35:21   25   THE COURT:   And just so the record is clear, the

Direct Examination of SA Jeffrey Johannes

1    other thing, I'm going to mark as Exhibit 2 to this

2    hearing, and make sure it's under seal, is the pretrial

3    report for Mr. Jenkins.  So just so it's clear, you can

4    refer to Exhibit 1, which will be the statement of facts.

10:35:33    5         MS. WINTER:  Thank you, Your Honor.

6    BY MS. WINTER:

7    Q.   Agent Johannes, did the architect at the capitol do a

8    valuation of the approximate amount of damage that was

9    done by Mr. Jenkins in smashing that window?

10:35:49   10   A.   Yes, they did.

11   Q.   Approximately how much is the replacement value of

12   that window?

13   A.   $1,500.

14   Q.   And as is shown in Government's Exhibit 1, the

10:36:00   15   statement of facts, Page 3, there are additional photos

16   depicting clear face shots of Mr. Jenkins; is that

17   correct?

18   A.   There is.

19   Q.   Were these retrieved from videos and images that you

10:36:14   20   have all investigated of the scene on that date?

21   A.   Yes.

22   Q.   Now I want to turn your attention -- I know you

23   referred to it earlier, but I want to take us to around

24   4:30 p.m. the day of the capitol riots.  You said that

10:36:32   25   going through video and body-worn camera footage during

1   your investigation you were able to identify Mr. Jenkins

2   based on his clothing?

3   **A.**   Correct.

4   **Q.**   Now, tell the Court approximately how many objects did

10:36:52   5   Mr. Jenkins throw at Capitol Police and the Metropolitan

6   Police Department?

7   **A.**   At this time, there are nine -- we observed nine

8   objects.

9   **Q.**   Okay.  And I want to refer you to Government's Exhibit

10:37:07   10   Number 1, the statement of facts, on Page 4.  Is this the

11   type of body-worn camera footage that you observed

12   Mr. Jenkins in?

13   **A.**   Yes.

14   **Q.**   Can you please describe for the Court, which they can

10:37:20   15   see, but describe for the record the police and their

16   posture and the crowd and their posture?

17   **A.**   This -- at this time when -- at this specific

18   screenshot from a body-worn camera was at the time when

19   there was ongoing violence committed against the members

10:37:40   20   of the Metropolitan Police Department and U.S. Capitol

21   Police.

22       At this time, the posturing for the police department

23   was to retrieve any helmets that they can to protect

24   themselves from not only, you know, items being thrown at

10:37:52   25   them, clubs, but also from any type of items being thrown

1    at them, as well.  So they were, basically, in the

2    posture, as well, is that they are in a defensive mode

3    where they are trying to hold back the protesters and the

4    rioters from entering -- further entering the capitol

10:38:09   5    through the lower terrace entranceway.

6        So at this stage, they are in a defensive mode and

7    they are, for lack of a better term, engaged in acts of

8    violence against them.

9    **Q.**   And they are in full riot gear at this point with

10:38:21  10    helmets and shields?

11    **A.**   Not every officer had a helmet and shield, but the

12    ones who are -- that were posted up front did have

13    helmets.  Not everybody had a shield.  Some of these

14    shields were taken away, captured -- again, "captured"

10:38:33  15    used for lack of a better term -- by members -- by the

16    protesters and the rioters.

17    **Q.**   And as you can see in the photographs in the

18    Government's Exhibit Number 1, on Pages 4 and 5, you can

19    identify Mr. Jenkins kind of front and center among the

10:38:48  20    crowd; is that correct?

21    **A.**   That is correct.

22    **Q.**   And you testified that he threw approximately nine

23    objects?

24    **A.**   At this time, that is the number that we have.

10:38:58  25    **Q.**   And can you describe for the Court what types of

Direct Examination of SA Jeffrey Johannes

1   objects Mr. Jenkins threw at the police at that time?

2   **A.**   The objects that appear to us, based on that video,

3   are several poles which appear to be metallic and/or

4   wooden.  We have, also, a flag, a white flag with a -- as

10:39:20   5   well as a -- a white flagpole with a flag attached to it

6   that was thrown at the officers.  And we also have a desk

7   drawer that appeared to be picked up and thrown at the

8   officers as well.

9   **Q.**   And did several of these objects appear to be large

10:39:35   10   metal objects?

11   **A.**   Yes, they did.

12   **Q.**   And when he threw these objects, did they strike the

13   officers?

14   **A.**   Yes, they did.

10:39:43   15   **Q.**   And the type of objects that were thrown by

16   Mr. Jenkins, if they were thrown with force at these

17   officers, did it have the potential to inflict serious

18   bodily injury?

19   **A.**   Yes.  Yes.

10:39:57   20        MR. HESTER:  Objection.  Calls for a legal

21   conclusion.

22        THE COURT:  Overruled.

23   BY MS. WINTER:

24   **Q.**   That was a yes, Agent Johannes?

10:40:03   25   **A.**   Yes.  That is correct.

Direct Examination of SA Jeffrey Johannes

1  **Q.**  And in the three photographs in Government's Exhibit

2  Number 1 on Pages 4 and 5, Mr. Jenkins is literally seen

3  -- at four, five, and six, I should say, you can see on

4  four different occasions he is holding a large metal

10:40:24  5  object in this posture of throwing them at the police?

6  **A.**  That is correct.

7  **Q.**  Now, I want to take you to other images that FBI has

8  discovered.  Are there other images later that evening

9  that were identified, based on body-worn camera, of

10:40:46  10  Mr. Jenkins in Washington, D.C.?

11  **A.**  Yes.  There was video recordings made by at least one

12  officer that we observed that had personal or public --

13  personal interaction with Mr. Jenkins later that evening,

14  approximately 9:45 p.m., outside of the Embassy Hotel in

10:41:06  15  Washington -- in Washington, D.C.

16  **Q.**  And the night of the capitol riots or that day did

17  Washington, D.C. impose a curfew on its citizens?

18  **A.**  Yes.  That's correct.  The mayor of D.C. issued a

19  curfew from 6:00 p.m. to 6:00 a.m. from the night -- from

10:41:26  20  the night of January 6th to the morning of January 7th.

21  **Q.**  All right.  And the images of Mr. Jenkins on Pages 6

22  and 7 of Government's Exhibit Number 1, approximately what

23  time were those images obtained from the police officer's

24  body-worn camera?

10:41:39  25  **A.**  It was -- according to the body-worn camera, the

Direct Examination of SA Jeffrey Johannes

1  images were captured at 9:49 p.m.

2  **Q.**  After the imposition of the curfew?

3  **A.**  That is correct.

4  **Q.**  What was Mr. Jenkins doing or why did -- were the

10:41:55  5  officers trying to enforce the curfew when they -- when

6  they encountered Mr. Jenkins?

7  **A.**  Yes.  Correct.  According to the audio that was also

8  recorded on the video body-worn camera, Mr. Jenkins

9  attempted to leave the Embassy Suites Hotel, whereupon he

10:42:12  10  was confronted by officers of the Metropolitan Police

11  Department where they -- where they directed him to return

12  back to the hotel.

13  **Q.**  And can you describe for the Court the clothing that's

14  being worn by Mr. Jenkins at approximately 9:49 p.m. that

10:42:25  15  night past curfew?

16  **A.**  Yes.  The clothing matches the clothing that we saw

17  earlier on other video and photographs of both law

18  enforcement and social media, minus the dark, the black

19  jacket.  And, specifically, we have the blue-hooded

10:42:39  20  sweatshirt with the words -- with the letters -- with the

21  numbers "1776" across the front surrounded by a field of

22  stars as well as a red beanie and camouflage-type

23  trousers -- correction -- a red Nautica-style beanie, as

24  well as wearing black gloves.

10:42:56  25  **Q.**  And these were the same objects or items of clothing

Direct Examination of SA Jeffrey Johannes

1  that were observed in your investigation from videos of

2  him at the capitol as well as those posted on his social

3  media?

4  **A.**  That is correct.

10:43:15  5  **Q.**  All right.  Now I want to take you to the date of

6  March 5th, 2021.  Is that the date that Mr. Jenkins was

7  arrested here in Houston, Texas?

8  **A.**  That is correct.

9  **Q.**  Were you a part of the team that arrested and searched

10:43:31  10  the residence of Mr. Jenkins?

11  **A.**  No.  I was not.

12  **Q.**  Have you spoken with the Houston field agents who were

13  a part of that takedown?

14  **A.**  Yes, I have.

10:43:41  15  **Q.**  So on the morning of March 5th, 2021, did the agents

16  arrive at Mr. Jenkins' residence?

17  **A.**  Yes, they did.

18  **Q.**  Do you know what kind -- who owns that residence or

19  anything about that specific residence?

10:43:59  20  **A.**  From what I understand, it's owned by a prison

21  ministries type organization.  I don't know -- I do not

22  recall the specific name at this time.

23  **Q.**  Okay.  And do other people live there along with

24  Mr. Jenkins?

10:44:12  25  **A.**  From what I understand, that is correct.

1   **Q.**   Was Mr. Jenkins present when agents and officers

2   arrived?

3   **A.**   Yes, he was.

4   **Q.**   And was he taken into custody based on the federal

10:44:24   5   arrest warrant?

6   **A.**   He was.

7   **Q.**   Did agents also search the residence pursuant to a

8   federally-issued search warrant?

9   **A.**   Yes, they did.

10:44:34   10   **Q.**   Were there items of evidentiary value or of note that

11   were seized -- found and seized by the agents?

12   **A.**   Yes, there was.

13   **Q.**   All right.  If you'll take us through those items that

14   appear to be the items that he used in Washington, D.C.

10:44:52   15   **A.**   So the items that were seized within -- specifically

16   inside the closet of Mr. Jenkins included a Nautica red

17   beanie; a blue, hooded sweatshirt; a blue and black hooded

18   jacket; a black balaclava; as well as a matching-type

19   camouflage trousers; dark, black-colored backpack.  Also

10:45:21   20   retrieved and located was a phone, a laptop, as well as

21   two tomahawks.

22   **Q.**   And these tomahawks, did they appear to be the same

23   type of the one that was used to smash the U.S. Capitol

24   window?

10:45:39   25   **A.**   Yes, they do.

1  **Q.**  And the clothing you described that was found in

2  Mr. Jenkins' closet, did that appear to be the same

3  clothing that was seen being worn by Mr. Jenkins at the

4  U.S. Capitol on January 6th?

10:45:53  5  **A.**  Yes.

6  **Q.**  And while the agents arrested him, did Mr. Jenkins

7  make any statement to the agent?

8  **A.**  He made a statement that he did fly to D.C. on

9  American Airlines -- to Washington, D.C. via American

10:46:12  10  Airlines.

11  **Q.**  And is that consistent with your investigation of the

12  flight that he took to Washington, D.C. on January or

13  prior to the January 6th capitol riot?

14  **A.**  It is.

10:46:28  15  MS. WINTER:  Your Honor, there is nothing else at

16  this time.  I'll pass the witness.

17  THE COURT:  Mr. Hester.

18  MR. HESTER:  Yes, Your Honor.  Thank you.

19  THE COURT:  By the way, Mr. Hester, FYI, I know

10:46:38  20  you have that hearing in front of Judge Lake; and

21  Mr. Bostic is reaching out to Judge Lake's chambers.  So

22  I'll let you know as soon as we hear something.  Don't

23  worry.  I'll make sure, if we don't hear anything, you

24  tell me what time you need to go to get over there; and

10:46:54  25  we'll make sure we accommodate you.

Cross-Examination of SA Jeffrey Johannes

1    MR. HESTER:  Thank you, Your Honor.  And I'm also

2  working on getting coverage for that hearing, if that's

3  necessary, with another attorney from my office.

4    THE COURT:  Just feel free to stop me if you need

10:47:05   5  to take a break or to coordinate on that.  I do not mean

6  to in any way, shape or form cause you heart palpitations

7  over that.

8    MR. HESTER:  I appreciate it, Your Honor.

9                  **CROSS-EXAMINATION**

10:47:14  10  BY MR. HESTER:

11  **Q.**  Agent Johannes, good morning, sir.

12  **A.**  Good morning.

13  **Q.**  No one was harmed in this case, right?

14  **A.**  Could you be more specific, please.

10:47:23  15  **Q.**  You haven't talked to an officer who says that

16  Mr. Jenkins inflicted any injury on him, right?

17  **A.**  I have not spoken to a specific officer and, as well,

18  to let you know, a lot of the officers were injured on

19  that day.

10:47:39  20  **Q.**  Yeah.  I'm not talking about what other people did.

21  I'm talking specific to Mr. Jenkins.  Have you spoken to a

22  single officer who was hurt by anything you allege

23  Mr. Jenkins did?

24  **A.**  I have not had a conversation with any of the -- any

10:47:54  25  officers that specifically were injured by Mr. Jenkins.

Cross-Examination of SA Jeffrey Johannes

1  **Q.**  Do you even know if any officer was injured by

2  Mr. Jenkins?

3  **A.**   In the context of that question, though -- and this is

4  something that has come up several times in our

10:48:10  5  investigation -- is that the officers do -- a lot of these

6  officers do not know specifically who harmed them, due to

7  the chaos, for lack of a better term, that was occurring

8  at that time.

9      So I cannot honestly say I do not know if there were

10:48:22  10  any officers that were specifically hurt by Mr. Jenkins,

11  due to the number of assailants and the number of violence

12  and due to the number of acts that were committed that

13  day, if that helps answer your question, sir.

14  **Q.**  Not really.  My question is whether you have spoken to

10:48:37  15  an officer who has identified Mr. Jenkins and said, yes,

16  that man inflicted an injury upon them.

17  **A.**  I have not.

18  **Q.**  Yes or no?

19  **A.**  No.

10:48:50  20  **Q.**  No.  There is no evidence he ever entered the actual

21  capitol building, is there?

22  **A.**  Not at this time.

23  **Q.**  Have you spoken, law enforcement or otherwise, to any

24  single witness who actually saw Mr. Jenkins in Washington,

10:49:09  25  D.C.?

Cross-Examination of SA Jeffrey Johannes

1  **A.**   I have not personally.

2  **Q.**   So the evidence in this case that he was there, if I'm

3  correct, are the photos in your complaint.  That's part of

4  it, right?

10:49:25  5  **A.**   Correct.

6  **Q.**   Okay.  Many of which were taken off of social media,

7  right?

8  **A.**   Yes, sir.

9  **Q.**   Okay.  Specifically, the photograph of the person

10:49:40  10  breaking the window with the hatchet was taken off of

11  Twitter, right?

12  **A.**   From my understanding, yes.

13  **Q.**   Was that taken off of Mr. Jenkins' alleged Twitter

14  account?

10:49:53  15  **A.**   No, sir.

16  **Q.**   Okay.  Have you talked to the person who posted that

17  image?

18  **A.**   No, I have not.

19  **Q.**   Have you talked to the person who took that picture?

10:50:07  20  **A.**   I have not.

21  **Q.**   And you agree with me, it's in your complaint, the

22  picture of the individual actually breaking the window

23  doesn't show a face, right?

24  **A.**   From the angle that -- from the video that we have at

10:50:26  25  that time -- at this time, it does not show a specific

Cross-Examination of SA Jeffrey Johannes

1   face; but you can see facial features.

2   **Q.**   Okay.   Other of these pictures that do show his face

3   were also taken from social media, right?

4   **A.**   Correct.

10:50:47   5   **Q.**   Have you tracked down the people who created those

6   social media accounts?

7   **A.**   No.   We have not.

8   **Q.**   Have you talked to any one of them?

9   **A.**   I -- I personally have not.

10:50:59   10   **Q.**   Okay.   Now, this case against Mr. Jenkins, these

11   charges, from what I understand, initiated with a person

12   who we will call witness one; and that's how they are

13   referred to in your complaint, correct?

14   **A.**   Correct.

10:51:19   15   **Q.**   And this person, you testified, claimed not to know

16   Mr. Jenkins, right?

17   **A.**   That is correct.

18   **Q.**   Okay.   What investigation have you done to confirm or

19   deny that claim that this person doesn't know Mr. Jenkins?

10:51:34   20   **A.**   I don't understand your question, sir.   Are you asking

21   us have we investigated the tipster?

22   **Q.**   Right.   And the claim that -- specifically, have you

23   investigated the claim that this tipster doesn't know

24   Mr. Jenkins or has no history with him?

10:51:51   25   **A.**   No, we have not.

1    **Q.**  Okay.  So if that person has some ax to grind with

2    Mr. Jenkins, you wouldn't know that, right?

3    **A.**  No, sir.

4    **Q.**  And you agree someone can -- anyone can create a

10:52:11    5    social media profile under anybody's name, right?

6    **A.**  I can't attest to every social media platform.

7    **Q.**  Well, I mean, do you use -- do you use Twitter or

8    Facebook?

9    **A.**  No, I do not.

10:52:26    10    **Q.**  And your court --

11         MS. WINTER:  Judge, I need to object.  Judge, I

12    think we get the point.  And Mr. Jenkins has waived

13    identity for purposes of this hearing.  It's only the

14    detention.

10:52:37    15         THE COURT:  Objection is overruled.

16         MS. WINTER:  Thank you, Your Honor.

17         THE COURT:  You may proceed, Mr. Hester.

18    BY MR. HESTER:

19    **Q.**  Certainly you have investigated other cases involving

10:52:49    20    Twitter and Facebook, right?

21    **A.**  I have.

22    **Q.**  Okay.  And in the course of your investigations are

23    you saying you haven't learned that anyone can create a

24    Facebook profile under anybody else's name?

10:53:04    25    **A.**  I'm sure it can be done, but I can't -- I can't

Cross-Examination of SA Jeffrey Johannes

1    100 percent say for every -- again, for every social media

2    platform and for every individual I have investigated that

3    they created a fake platform.

4    **Q.**   So what steps have you taken, as of today, to confirm

10:53:21    5    that these social media profiles actually belong to

6    Mr. Jenkins?

7    **A.**   The ones that are attributed to his name?

8    **Q.**   Yes, sir.

9    **A.**   The investigation is ongoing.  But we have abilities

10:53:34   10    of determining the location of where those items were

11    posted.

12    **Q.**   Okay.  But as of today, all you have done is look at

13    the profiles, right?

14    **A.**   Correct.

10:53:53   15            THE COURT:  I just want to be clear.  The photos

16    that come from an alleged Facebook account or Twitter

17    account for Mr. Jenkins are simply the two photos on

18    Page 2 of Exhibit 1, correct?  I mean, all the other pages

19    -- all the other photos, as I understand it, come from

10:54:12   20    other sources, third parties or whoever, but aren't from

21    those specific Twitter and Facebook pages, whoever the

22    creator of those is, correct?

23            THE WITNESS:  From my understanding, yes, Your

24    Honor.

10:54:31   25            MR. HESTER:  Sorry, Your Honor.  I was following

1  along with the complaint.

2  BY MR. HESTER:

3  **Q.**  Let's talk about the window damage.  Okay.  You

4  testified that an architect at the capitol testified that

10:54:44  5  the replacement value of that window is $1,500?

6  **A.**  Correct.

7  **Q.**  Okay.  Does that include the cost of labor to actually

8  repair the window?

9  **A.**  I cannot answer that.

10:55:00  10  **Q.**  Or do you know?

11  **A.**  I do not know.

12  **Q.**  Okay.  Do you know -- do you know whether or not that

13  includes the cost to transport the window --

14  **A.**  I do not know that answer.

10:55:09  15  **Q.**  -- from where it's from to the capitol?

16  **A.**  I do not know, sir.

17  **Q.**  What is the value of the actual glass, the glass

18  itself that was broken?  Do you know?

19  **A.**  I do not know, sir.

10:55:28  20  **Q.**  You talked about the capitol grounds being restricted

21  that day.  At what time did that occur?

22  **A.**  At what time did the restriction begin?

23  **Q.**  Yes, sir.

24  **A.**  I -- I do not know the specific time, but I assumed it

10:55:47  25  would probably match up with the time of the beginning of

1    the proceedings for the certification of the electoral

2    college.

3    **Q.**   Okay.  That's your assumption?  You don't know

4    specifically when those barriers were put in place?

10:55:57  5    **A.**   I cannot give you an exact time, sir.

6    **Q.**   On a typical day are these areas open to the public?

7    **A.**   I can't -- I can't answer for every area of the

8    capitol.

9    **Q.**   Well, let's talk about the areas where this person

10:56:15  10    alleged to be Mr. Jenkins is seen on these photographs.

11    On a typical day, are those areas open to the public?

12    **A.**   Can you be more specific of which areas?

13    **Q.**   I'm talking about the capitol grounds -- the capitol

14    grounds that are in your photographs that you put in your

10:56:35  15    complaint.

16    **A.**   Are you talking about the grounds outside of the

17    building or the actual building entranceway, lower terrace

18    area?

19    **Q.**   Well, he didn't enter the building.  So I'm talking

10:56:46  20    about the grounds outside of the building.

21    **A.**   To the best of my knowledge, the area that -- where

22    the photos in the -- that are in the statement of facts is

23    a secure area.

24    **Q.**   At all times?

10:56:59  25    **A.**   I cannot --

1      MS. WINTER:  Your Honor, I'm going to object to

2  this because, again, we're only trying to establish

3  probable cause as to January 6th, 2021.

4      THE COURT:  Well, I'm going to give Mr. Hester

10:57:10  5  some leeway.  I'm going to overrule the objection.

6      Please proceed, Mr. Hester.

7  BY MR. HESTER:

8  **Q.**  So you don't know one way or the other whether those

9  areas on a typical day are restricted or not; is that

10:57:27  10  correct?

11  **A.**  I do not know.

12  **Q.**  Yes, sir.  Let's talk about the items that this person

13  alleged to be Mr. Jenkins is seen throwing on these

14  videos.  Any of those items recovered as evidence in this

10:57:44  15  case?

16  **A.**  Not that I'm aware of at this time.

17  **Q.**  Okay.  So when you testified that they appear to be

18  metal objects, you haven't actually held these items,

19  right?

10:57:57  20  **A.**  No, I have not.

21  **Q.**  And, to your knowledge, no law enforcement agency has

22  held these items, right?

23  **A.**  You are -- can you repeat that question again, sir?

24  I'm sorry.  You cut out.

10:58:09  25  **Q.**  No problem.  To your knowledge, no law enforcement

1  agent has held these items, correct?

2  **A.**   I cannot answer that.  There were many law enforcement

3  agencies present on that day.

4  **Q.**   I'm just asking within your knowledge, do you know of

10:58:28  5  any law enforcement agency that's recovered any of those

6  items as evidence?

7  **A.**   I know some items have been recovered, yes.

8  **Q.**   Some of the items that Mr. Jenkins was allegedly seen

9  throwing have been recovered?  Is that your testimony?

10:58:42  10  **A.**   I cannot answer that.

11  **Q.**   You can't answer that?

12  **A.**   No, sir.

13  **Q.**   I'm asking in your personal knowledge do you know if

14  any of those items have been recovered by law enforcement

10:58:53  15  agents?

16  **A.**   Not by my personal knowledge at this time.

17  **Q.**   Okay.  You have to agree with me -- I mean, a plastic

18  object can look like metal on a video, right?

19  **A.**   I cannot -- I can't answer that 100 percent.

10:59:18  20  **Q.**   Well, I mean, these are -- what is -- what do these

21  metal items look like?  They're a metal pipe or rod,

22  according to your complaint, right?

23  **A.**   Correct.

24  **Q.**   Okay.  What color is it?

10:59:33  25  **A.**   There is white.  There is black.  We see what appear

1  to be wooden color.  There were other items.  Just to add,

2  to maybe help answer your question, on all the other

3  videos, the numerous other videos that I reviewed related

4  to this violence, I have seen similar objects that were

10:59:51  5  used by other rioters that day that appear to be metal and

6  matching that description.  I cannot say it's the same

7  one, but the perception would be that a lot of these that

8  were being thrown were metal objects.

9  **Q.**  And, Agent Johannes, I'm not talking about what you

11:00:07  10  have seen anybody else do other than Mr. Jenkins.  Is that

11  fair?

12  **A.**  That is fair.

13  **Q.**  Okay.  And so what other people do is really not

14  relevant.  Okay?  Do you agree with me?

11:00:21  15  **A.**  I agree, yes, sir.

16  **Q.**  Okay.  And so specific to any of these items that you

17  saw allegedly Mr. Jenkins use, you haven't recovered them,

18  right?

19  **A.**  To the best of my knowledge, I personally do not know

11:00:39  20  that they have not been recovered.

21  **Q.**  Okay.  And a white rod could be plastic, couldn't it?

22  Isn't that in the realm of possibility?

23  **A.**  I can't answer for every rod, plastic rod in the

24  country, sir.  I'm sorry.

11:00:56  25  **Q.**  I'm not asking you to.  I'm asking you to answer as to

Cross-Examination of SA Jeffrey Johannes

1   the ones you see in these photographs.  Isn't it

2   possible --

3   **A.**  I cannot answer that.

4   **Q.**  -- that those could be plastic?

11:01:05    5   **A.**  It is possible.

6   **Q.**  You talked about the gear that the officers were

7   wearing in these photographs in your complaint.  Do you

8   agree with me that it appears -- and let me refer to a

9   specific page for you on Government's Exhibit Number 1.

11:01:45    10       Looking at Page 4, sir, on Government's Exhibit

11   Number 1 --

12   **A.**  Okay.

13   **Q.**  -- does it appear to you that all of the officers in

14   that photo are wearing helmets?

11:01:55    15   **A.**  Yes.  It does appear that way, but I cannot --

16   **Q.**  And you could even --

17   **A.**  I was going to say that every officer is wearing a

18   helmet --

19   **Q.**  Okay.

11:02:08    20   **A.**  -- but there are other videos at the same time where

21   officers are not wearing helmets.

22   **Q.**  Well, do you see any in this photograph in your

23   complaint that were not wearing helmets?

24   **A.**  Due to the damage that was received upon that camera,

11:02:21    25   I can't give you 100 percent that not -- that not

Cross-Examination of SA Jeffrey Johannes

1   everybody is wearing a helmet.

2   **Q.**   But you don't see anybody not wearing one, do you?

3   **A.**   I can't -- again, I cannot -- it's a possibility that

4   there were officers that were not wearing helmets that

11:02:35   5   day.  I cannot tell you every officer from that video or

6   from that image.

7   **Q.**   I'm simply asking you what you see in this photograph.

8   **A.**   I see several officers wearing several helmets.

9           THE COURT:  Hey, I'll let you go on as long as

11:02:47   10   you want.  I mean, I can see the photo, too.  I mean, it's

11   pretty clear everyone in the picture that I can see has a

12   helmet.  Whether that's relevant or not, I guess we'll

13   figure out.  I mean, I don't think you need to --

14           MR. HESTER:  Yes, Your Honor.

11:02:59   15           THE COURT:  I'm going to give you leeway, but I

16   don't think we need to belabor the obvious.

17           MR. HESTER:  Thank you, Your Honor.  I'll move

18   on.

19   BY MR. HESTER:

11:03:06   20   **Q.**   And the same as to the following page, Page 5.  It

21   appears those officers are wearing helmets, correct?

22   **A.**   Yes.

23   **Q.**   In the course of this investigation, did you speak

24   with a parole officer who knew Mr. Jenkins?

11:03:32   25   **A.**   I did not personally.  An agent out of the FBI Houston

Cross-Examination of SA Jeffrey Johannes

1   office did.

2   **Q.**   All right.  Did you learn that Mr. Jenkins was on

3   parole from June 2018 to December 2019 and successfully

4   completed that term of parole?  Are you aware of that?

11:03:50  5   **A.**   From my understanding, yes.

6   **Q.**   At the time of his arrest --

7        THE COURT:  Mr. Hester.

8        MR. HESTER:  Yes, Your Honor.

9        THE COURT:  Mr. Hester, let me interrupt you real

11:03:57  10  quick.  I just received a message from Mr. Bostic that I

11  think Mr. Austin was going to cover that hearing before

12  Judge Lake for you.  So I just wanted to make sure that

13  you were at ease and you can proceed with this hearing.

14       MR. HESTER:  Thank you, Your Honor.

11:04:13  15  BY MR. HESTER:

16  **Q.**   And we're almost done, Agent Johannes.  But at the

17  time of arrest was -- do you have any information that

18  Mr. Jenkins tried to flee?

19  **A.**   I do not have any information.

11:04:29  20  **Q.**   And you mentioned that he actually spoke with

21  officers.  Do you have any information that he was

22  anything less than cooperative with the agent?

23  **A.**   I do not have that information.

24  **Q.**   In fact, have you heard that he completely submitted

11:04:45  25  to their authority?

1   **A.**   From what I understand, yes.  Again, I was not

2   present.  But from what I understand, there was no violent

3   confrontation, if that helps answer your question.

4   **Q.**   Yes, sir.  Thank you.

5                   MR. HESTER:  And I'll pass the witness, Your

6   Honor.

7                   THE COURT:  Ms. Winter, any further questions

8   with this witness?

9                   MS. WINTER:  Just briefly, Your Honor.

10                      **REDIRECT EXAMINATION**

11  BY MS. WINTER:

12  **Q.**   Agent Johannes, regardless of whose social media posts

13  are on the ones that -- or whoever posted on the Facebook

14  and Twitter accounts associated with Mr. Jenkins, are the

15  images from the capitol, as well as those social media

16  posts, clear and visible for you to observe?

17  **A.**   Yes, they are.

18  **Q.**   And do they depict the person that was arrested on

19  March 5th, 2021, that being Mr. Jenkins?

20  **A.**   Yes, they do.

21  **Q.**   Did Mr. Jenkins, on the date he was arrested, admit to

22  flying to Washington, D.C.?

23  **A.**   Yes, he did.

24  **Q.**   And to be clear, as of 1:00 p.m. on January 6th, 2021,

25  do you -- do you know that barriers and restrictions were

1    in place and the capitol was closed to the public?

2    **A.**   Yes, they were.

3    **Q.**   And they remained that way for the rest of the day?

4    **A.**   Correct.

11:06:20   5    **Q.**   And whether or not -- and again, the Court can observe

6    the photographs in Government's Exhibit Number 1.  Whether

7    or not a flagpole or a rod is metal or plastic, if the

8    pointed end is thrown towards an officer, does it have the

9    ability to seriously injure or maim that officer?

11:06:41   10            MR. HESTER:  Objection.  Calls for a conclusion.

11    Objection.

12            THE COURT:  Overruled.

13            MS. WINTER:  Nothing further, Your Honor.

14            THE COURT:  Okay.  Mr. Hester, anything further

11:06:50   15    with Agent Johannes?

16            MR. HESTER:  No, Your Honor.

17            THE COURT:  Agent Johannes, you can step down

18    from the proverbial witness stand.

19        Ms. Winter, do you have any additional witnesses or

11:07:00   20    proffers at this time?

21            MS. WINTER:  No, Your Honor.  We rest.

22            THE COURT:  Okay.  Mr. Hester, on behalf of the

23    defendant, do you have witnesses or proffers to make at

24    this time?

11:07:07   25            MR. HESTER:  Yes, Your Honor.  I have one

Direct Examination of David Trickett

1    witness.  I call David Trickett, who is on the line.

2          THE COURT:  Mr. Trickett, if you could turn on

3    your video, please, sir.

4          MR. TRICKETT:  Yes, sir, Your Honor.

11:07:27  5          THE COURT:  Will you raise your right hand, sir.

6          MR. TRICKETT:  (Complying.)

7          THE COURT:  Do swear that the testimony you are

8    about to give in this court proceeding, even though we are

9    doing it by video, will be the truth, the whole truth, and

10   nothing but the truth just the same as if you were in a

11   courtroom live and in person so help you God?

12         THE WITNESS:  Yes, sir, I do.

13         THE COURT:  You may proceed, Mr. Hester.

14                     **DAVID TRICKETT,**

15   having been first duly sworn, testified via video link as

16   follows:

17                     **DIRECT EXAMINATION**

18   BY MR. HESTER:

19   **Q.**  Mr. Trickett, introduce yourself, please.

11:07:41  20  **A.**  My name is David Trickett.

21   **Q.**  And I don't think you need to spell your name for the

22   court reporter because it's on the screen, but what do you

23   do for a living, sir?

24   **A.**  My profession is I am the founding director of Christ

11:07:57  25  Hope, a reconciliation ministry also known as CHARM Prison

Direct Examination of David Trickett

1  Ministry.  I'm also a chaplain and player development

2  coach at the high school and also hold a real estate

3  license in Houston, Texas.

4  **Q.**   Okay.  And in connection with your work with CHARM

11:08:14  5  Prison Ministries, do you mentor individuals coming out of

6  prison?

7  **A.**   Yes, sir, I do.

8  **Q.**   And how many individuals at any one time do you

9  mentor?

11:08:28  10  **A.**   Oh, over the course of the ministry and the life-span

11  of the ministry we have had probably at least -- several

12  hundred men have come out of the prison system and through

13  our transitional living facility.  But on the inside, I

14  have the responsibility and the privilege of mentoring and

11:08:46  15  discipling men on the inside of prison as well.

16  **Q.**   And what is your general success rate with these men,

17  would you say?

18  **A.**   Well, there is not an actual number that has been

19  quantified yet; but to tell you of the men that have gone

11:09:01  20  through our transitional facility, we are less than a

21  10 percent recidivism rate of men returning back to prison

22  as opposed to a state rate of 65 to 70 percent.

23  **Q.**   And how do you know Shane Jenkins?

24  **A.**   I met Shane Jenkins at a ministry event on the inside.

11:09:21  25  I got to know him individually.  I witnessed his

Direct Examination of David Trickett

1    conversion, along with his transformation over a year

2    period while he was still incarcerated.  And then he would

3    eventually come to one of our transitional facilities and

4    come to live for a couple of years here.

11:09:40   5    **Q.**   And today or prior to his arrest, where did

6    Mr. Jenkins live?

7    **A.**   He currently lived at the 8526 address on High Crest

8    in one of our facilities.

9    **Q.**   Okay.

11:09:53   10   **A.**   I say "facilities" but that's really not a good term.

11   They are homes.  We don't want anything to be identified

12   really with a facility.  It really is a home.  We're

13   teaching men coming out of prison how to -- how to live

14   this life that they proclaim to -- to be walking in now in

11:10:08   15   a home atmosphere so that they can then translate that to

16   their home with their children and with their wives and

17   with whatever family they intend to make.

18   **Q.**   Yes, sir.  And how close do you live to where

19   Mr. Jenkins was living prior to his arrest in this case?

11:10:24   20   **A.**   I live one block away.

21   **Q.**   Okay.

22   **A.**   All eight of our transitional facilities are within --

23   within a mile of my residence.  I feel it's very important

24   that myself and the other staff members, the men that are

11:10:36   25   managers in the houses, are all in close proximity because

Direct Examination of David Trickett

1    from day-to-day you have got questions that need to be

2    answered.  When you really want to disciple someone, you

3    really need to be hands on and walking alongside them.

4    **Q.**   And at his home does Mr. Jenkins live alone or with

11:10:53    5    other people?

6    **A.**   He -- he has six other roommates at the home he is

7    living at currently.

8    **Q.**   And have you observed his relationship with those

9    roommates?

11:11:02    10    **A.**   Yeah.  I observe everybody's relationship.  That's

11    what we base a lot of our discipleship on.  Can they carry

12    out relationships with people and be serving and be

13    loving; and it's part of their growth, their new growth in

14    Christ.

11:11:19    15    **Q.**   And inside of your program, what is Mr. Jenkins like

16    with his roommates and with other participants in the

17    program?

18    **A.**   You know, he has definitely shown himself to be --

19    prior to him living at this address, he lived at an

11:11:35    20    address across the street for the first year he was here.

21    And he exemplified extraordinary leadership, extraordinary

22    serving leadership because we don't qualify a leader based

23    on what he can tell someone else to do.  We qualify that

24    on what he is willing to do himself and if he is willing

11:11:50    25    to get down and get dirty and love his brothers and serve

1    them in that capacity.

2         And he has exemplified that for a year while living

3    there.  And then we -- we felt that it would be good in

4    our -- and in our best interest to hire him on staff, in

11:12:02   5    which then he did that on a daily basis as a staff member

6    for another year.

7    **Q.**   Okay.  So he started out as a resident and then moved

8    up as a staff member; is that correct?

9    **A.**   Correct.  That's correct.

11:12:21  10    **Q.**   And at some point did he begin mentoring others?

11    **A.**   He did.  That's part of the role as a big brother, as

12    a -- as a house leader.  Before he even came on staff,

13    that was what we witnessed in his life that gave us the --

14    you know, hey, this guy would be a great staff member.

11:12:37  15    And, you know, he understood the dynamic of servant

16    leader, of leading by example so that others might follow,

17    instead of pointing the finger and making them do it.

18    So --

19    **Q.**   Did he -- did you observe a difference he made in some

11:12:54  20    of the residents' lives?

21    **A.**   I mean, absolutely.  I mean, he was a mentor to many.

22    I mean, obviously, he also worked at a -- what would you

23    call it?  A partnership ministry with our church, Houston

24    First Baptist, where he worked with the youth there.

11:13:12  25         I watched several of the boys that he mentored.  We

Direct Examination of David Trickett

1    watch -- these are kind of at-risk youth that would come

2    in and, you know, only really come over to the church to

3    play basketball.  And I watched him over a time of six

4    months to a year just really walk alongside these kids.

5    All three of these boys, which I would have told you

6    several years, from knowing those kids three or four

7    years, they probably would not have graduated.  Graduated

8    high school.  One went on to college.  Another went into

9    the Marine Corps.  I'm not sure what the other boy did.

10   But I just watched him serve them.

11   He has also come to the high school in which I coach,

12   done bible studies there, shared his -- his testimony of

13   what not to do.  I tell people all the time there is two

14   types of wisdom.  There is man's wisdom, which we learn

15   from our mistakes, and God's wisdom, which we learn from

16   others.  He is trying to teach them, obviously, to do it

17   God's way; not to do it the way he did it in his younger

18   years because it wasn't fruitful.

19   **Q.**   Yes, sir.  If Mr. Jenkins is released on bail, will he

20   be allowed to live back in that house?

21   **A.**   He will.

22   **Q.**   And was that solely your decision, or did you have to

23   run that by a board?

24   **A.**   I had to ask all of our ten board members; but also, I

25   felt like it was -- I had the responsibility, also, not to

Direct Examination of David Trickett

 1    just ask the board but to ask the men that he lived with.

 2    Obviously, that arrest that morning caused a little bit of

 3    trauma to the men that live there.

 4         Although, I will say that every single one of them --

11:14:30  5    and this was the words of the arresting officer, the lead

 6    arresting officer, because I was there talking with him

 7    throughout the whole process, that he has never seen a

 8    bunch of guys so respectful and so helpful in an arrest,

 9    which I think there was -- there was probably more of an

11:14:44 10    expectation of resistance, including Shane.

11         And I think that everything they asked for, we gave

12    them.  We gave them exactly what they wanted, what they

13    asked for.  We're not trying to be against the law.  We

14    are trying to work with the law.  I mean, it's part of

11:14:58 15    being -- part of that walk with Christ.

16         So in asking his roommates and the board, there was a

17    resounding yes from everyone.  We want to continue to have

18    Shane a part of our team and love him and walk him through

19    this season.

11:15:12 20    **Q.**   So if I have your testimony correct, on the date of

21    his arrest he and others in the house all cooperated with

22    the FBI and allowed them to do what they needed to do?

23    **A.**   Absolutely.

24    **Q.**   Okay.

11:15:26 25              MR. HESTER:  And, Your Honor, if I could have

Direct Examination of David Trickett

1  permission -- or I believe I already have permission to

2  share my screen.  I would like to introduce a few

3  photographs through Mr. Trickett.

4          THE COURT:  That's fine.  If you would also

11:15:40  5  forward a copy of those to Mr. Bostic so we could enter

6  those in the record.

7          MR. HESTER:  Yes, sir.  I may be having some

8  technical difficulties here because I'm not seeing them.

9          THE COURT:  I have given you the right.

11:16:07  10          MR. HESTER:  Yes, sir.  One moment.  Okay.

11  BY MR. HESTER:

12  **Q.**  And, Mr. Trickett, can you see my screen here?

13  **A.**  I can, sir.

14  **Q.**  Okay.  Do you see this first photograph?

11:16:24  15          MR. HESTER:  And, Your Honor, I have provided

16  these to Ms. Winter; and my understanding is there is no

17  objection to their admission.

18          THE COURT:  Ms. Winter, is that correct?

19          MS. WINTER:  That's correct, Your Honor.

11:16:34  20          THE COURT:  Have you provided them to Mr. Bostic?

21          MR. HESTER:  I will provide them to Mr. Bostic

22  immediately, Your Honor.

23          THE COURT:  How many photos are there?

24          MR. HESTER:  There are five.

11:16:49  25          THE COURT:  Exhibits 1 through --

Direct Examination of David Trickett

1       MR. HESTER:  Exhibits 1 through -- Defendant's

2  Exhibit Numbers 1 through 5, Your Honor.

3       THE COURT:  Are you going to have any other

4  exhibits entered in?

11:16:57  5       MR. HESTER:  This is all, Your Honor.

6       THE COURT:  Okay.  We'll do -- just so the record

7  is clear, previously we had Exhibits 1 and 2.  One being

8  the statement of facts, and two being the pretrial report.

9  We'll just call those the Government's Exhibit Numbers 1

11:17:17 10  and 2.  And now I'm admitting Defendant's Exhibit Numbers

11  1 through 5.

12       MR. HESTER:  Thank you, Your Honor.

13  BY MR. HESTER:

14  **Q.**   Mr. Trickett, in Defendant's Exhibit Number 1 will you

11:17:32 15  describe to me what is happening in this photograph?

16  **A.**   So we have -- as part of the ministry, obviously, to

17  help the men grow in their knowledge of more -- so more

18  than their knowledge of the word but just the putting it

19  into -- into practice.  We do more than just teach them

11:17:47 20  the bible.  We want to actually show them how to live it

21  out.

22       And, you know, many of you are familiar with the

23  scriptures in which John:13 where Jesus washed the

24  disciples' feet just showing them the fact that he wasn't

11:17:59 25  above them.  That he was with them.  And if any man was

1    worthy of the kingdom, he needed to first be a servant.

2        So we have as part of a practice in our ministry about

3    once every few months we -- where the leadership of the

4    ministry washes the feet of the residents, just in

5    reflection, obviously, of Jesus but also it is just a

6    representation of this is what we're about.  We are here

7    to serve you.

8        What we don't want them ever to confuse is what

9    they've confused all their life, this issue of authority

10   over them as opposed to serving with them because,

11   obviously, with -- you know, with inmates, obviously,

12   there is this us and them kind of deal.

13       And, hopefully, in their walks with Christ they have

14   grown to understand that authority is on their side and

15   for them.  The boundary lines are -- have fallen in

16   places, but the law is good, for our good, not for our

17   bad.

18       So just this is, again, a picture of us as staff and

19   ministry leaders in the ministry washing our residents'

20   feet.

21   **Q.**   And is this Mr. Trickett -- if you can see my mouse --

22   wearing the bluish-green T-shirt here?

23   **A.**   No.  That's Mr. Jenkins.  Mr. Trickett is next to him

24   in the white hat.

25   **Q.**   I'm sorry.  I apologize.  You are Mr. Trickett.  You

Direct Examination of David Trickett

1   are right next to Mr. Jenkins here, correct?

2   **A.**   I have a little bit more hair.  Not much more but a

3   little bit.

4   **Q.**   I apologize for that.

11:19:22   5   **A.**   That's okay.

6   **Q.**   Defendant's Exhibit Number 2, my understanding, is

7   Mr. Jenkins with his Sunday school class; is that correct?

8   **A.**   That's correct.  All of our men not only attend our

9   bible studies throughout the week, we all attend Houston

11:19:35  10   First Baptist Church in which the men are, based on their

11   age and where they fit in, whether married or not married,

12   fit in with the Sunday school class there.  This is his

13   Sunday school group, probably a lunch outing or an outing

14   they were all at; but this is the members of his Sunday

11:19:52  15   school class.

16   **Q.**   And Defendant's Exhibit Number 3, is this Mr. Jenkins

17   with his two daughters?

18   **A.**   Yes.  Yes, sir, it is.

19   **Q.**   And what do you know about Mr. Jenkins as a father?

11:20:08  20   **A.**   Well, I know that he takes the responsibility very,

21   very seriously.  He takes care of all his financial

22   responsibilities.  He visits the children that he can.

23   It's my understanding that he has a couple of children

24   that the -- you know, that the reconciliation process is

11:20:24  25   still in the works, you know.

1    And again, that's part of the ministry that we do

2  here.  First, obviously, reconciliation with God and then

3  reconciliation with family.  And, you know, sometimes that

4  takes time.  You know, there are sometimes, you know,

11:20:35  5  things there that prohibit it.

6    But these are two of his daughters that he visits

7  regularly and financially supports and, yes.

8  **Q.**  And, Mr. Trickett, are you a father yourself?

9  **A.**  I am.  I have two children, a senior in high school at

11:20:51  10  Houston Christian and a 14-year-old about to become a

11  freshman at Houston Christian High School.

12  **Q.**  Has Mr. Jenkins been around your children?

13  **A.**  Mr. Jenkins, since the time he was here, really has

14  become part of our family.  Again, not just the CHARM

11:21:06  15  family but my personal family.  He has watched my

16  children.  He has picked them up from school.  He and my

17  son have a very, very strong relationship, in which I

18  trust.

19    Let me just tell you.  We do prison ministry.  Me and

11:21:22  20  my wife are very guarded at times.  You know, obviously,

21  we know that at any time a man coming out of prison can,

22  you know, show the face but not walk the walk.  That's

23  why, you know, it takes a little time before trust is

24  granted and freedom to pick up my children is granted.  So

11:21:37  25  we certainly trust him on all counts.

Direct Examination of David Trickett

1  **Q.**  And Defendant's Exhibit 4, my understanding is that

2  this was a wedding that Mr. Jenkins served as the best man

3  in?

4  **A.**  That's correct.

11:21:51   5  **Q.**  And is this you in the photograph, Mr. Trickett?

6  **A.**  It is.  We co-facilitated and did the wedding together

7  with two of the -- that's another staff member that's

8  reading his part.  We co-did the wedding of Mr. Bryan

9  Townsend, who has been Shane's -- Shane's -- I don't want

11:22:13  10  to call it roommate, but they have been together since

11  prison.

12     I met them two together in prison.  And they were

13  tight as a glove then.  They've held each other

14  accountable.  And they are really close.  Even when they

11:22:24  15  came out, they were roommates at one point, lived in the

16  same house; and it's just been an iron sharpening iron

17  relationship between the two of them.

18  **Q.**  And when was this wedding?

19  **A.**  This was, oh, I guess, three or four months ago maybe.

11:22:45  20  I can -- November.  November?  I think November.  The

21  first week in November.

22  **Q.**  Okay.  And Defendant's Exhibit 5, is this Mr. Jenkins

23  down here in the bottom left corner wearing the Dallas

24  Cowboys hat?

11:23:02  25  **A.**  Yeah.  Yes.  That's him.

Direct Examination of David Trickett

1  **Q.**   And who are these people he is with?

2  **A.**   They are residents and staff of our bible study.  This

3  was a -- we took a photo of us gathering together.  Part

4  of our church -- part of a series in our church was

11:23:21  5  difference makers and they highlighted our ministry and

6  these men for the difference they were making in the

7  community and making in the church and just their walk.

8  That's definitely been highlighted.

9      So it's staff and residents of our -- of our house at

11:23:33  10  that time.  That was a couple of two years ago.  So,

11  obviously, we were about half of what -- what we are now.

12  At that time, we had five houses; and now we have eight.

13  **Q.**   So this is when Mr. Jenkins would have first joined

14  you and the group of men that he was with, correct?

11:23:51  15  **A.**   He was -- he was already on staff at this point.  So

16  he had been there a little over a year at that time.

17  **Q.**   Mr. Trickett, have you ever observed Mr. Jenkins be

18  violent with you or with any of his fellow residents?

19  **A.**   Absolutely not.

11:24:12  20  **Q.**   Have you had any behavioral problems with him in this

21  time?

22  **A.**   Very submissive.  Very humble.  He is very confident

23  in the Lord, but he is very humble.  He takes correction

24  very well.

11:24:28  25  **Q.**   And what does Mr. Jenkins do for income?

Direct Examination of David Trickett

**A.**   Well, like I said, I mentioned he was on staff with us
for a year.  He went back to Dallas to tie up loose ends
with his family.  He had a home in Dallas that he -- that
he thought he was going to go back and live in.  And in
11:24:44 the interim, he worked in the oil field.  He just realized
that his house was in Dallas, but his home was here in
Houston with his family at CHARM.  So he sold that house
and returned back.

And so -- now, since being back, he worked with a
11:24:56 roofing company for several months and made a very good
income there.  But one of our guys on staff here takes a
lot of our guys with entrepreneurial skills and helps them
start their own business.  So they basically branched off
of that roofing company and started their own roofing
11:25:13 company, which was just recently started prior to this --
prior to this incident.

**Q.**   What do you know about Mr. Jenkins' work ethic?

**A.**   Does it -- does it hard, does it unto the Lord, does
it in half the time as most people.  He is a hard worker.
11:25:31 He really is.

**Q.**   So you mentioned he is a partial owner --

**A.**   With attention -- with attention to detail and
always -- what I have noticed about him is a lot of our --
a lot of our work here in the ministry is with others,
11:25:44 church members and different things.  There is always a

1    phone call back of how pleasant and how -- how genuine and

2    how thankful they are, not just for the mood but just for

3    the change in behavior.

4    **Q.**   Do you also know Mr. Jenkins' business partner with

5    that job?

6    **A.**   I do.  Again, as I said, he was -- he was on staff

7    with prison fellowship for 20-plus years in the prison.

8    He was also a parole officer for a number of years.  And

9    then, we hired him on staff, I guess, four to five years

10   ago; and he has been on staff with us ever since.  He

11   handles public relations and also helps grow these men

12   from the business side of things.

13   **Q.**   And would Mr. Jenkins be able to immediately start

14   working if he were released?

15   **A.**   After speaking with Mr. Dorsett, absolutely.  Every --

16   all the -- all the contacts are in place and the things

17   that he was doing before are still there.  Yes, he would

18   have immediate employment.

19   **Q.**   And, Mr. Trickett, have you and I discussed what a

20   third-party custodian is and what that means?

21   **A.**   We did.

22   **Q.**   And what does that mean to you?  Would you explain

23   that to the Court?

24   **A.**   Well, if I have got it correctly -- if I have got it

25   correct, it will be my job to oversee his day-to-day

Direct Examination of David Trickett

1    events, make sure that he is not only doing what we

2    require of him here at the ministry but what the law

3    requires of him, what the courts require of him, which is

4    kind of my role I have now, obviously, with many of these

11:27:05    5    men being on parole, making sure they make it to their

6    appointment, make sure they make it to parole, make sure

7    none of them are late, and just making sure of that.

8         And then, also, then my civic duty is if any of them

9    do get out of line -- and I'm very clear with all the men

11:27:16    10   here.  If you get out of line, I'm not your friend

11   anymore.  I have got an obligation, per scripture, to --

12   now, don't get me wrong.  If it's -- if it's small sin

13   that we're dealing with, it's not breaking the law, then

14   we deal with it from that level.  But if it's breaking the

11:27:32    15   law, obviously, I have got a duty to the public to -- to

16   make sure that they are reported to their parole officer

17   and the police.

18   Q.   And would you familiarize yourself with any conditions

19   of release that this Court placed on Mr. Jenkins?

11:27:47    20   A.   Well, yes.  I mean, obviously, I would have to.

21   Q.   And you are willing to act as a third-party custodian

22   and report his violation of any of those conditions to the

23   Court?

24   A.   Yes, sir.

11:28:00    25   Q.   Having said that, are you confident that Mr. Jenkins

1  will follow any conditions the Court places on him?

2  **A.**   I do.

3  **Q.**   Okay.  Why?

4  **A.**   Just watching his character over the years.  I mean,

11:28:14   5  just watching anything that we have asked of him, he has

6  done it.  Again, I wasn't -- I wasn't present in

7  Washington, D.C., and I'm not even going to try to get

8  into what happened and what didn't happen.

9       But all I can testify to is his character around me,

11:28:29   10  around my wife, around my children, around other staff

11  members here, around other, you know, church members,

12  different things that he has had the opportunity to be

13  engaged around; and it's been nothing but servant leader.

14          MR. HESTER:  Thank you, sir.

11:28:42   15      And I'll pass the witness, Your Honor.

16          THE COURT:  Ms. Winter, any questions?

17          MS. WINTER:  Yes, Your Honor.

18                    **CROSS-EXAMINATION**

19  BY MS. WINTER:

11:28:48   20  **Q.**   Mr. Trickett, first, I want to commend you for your

21  work.  It sounds like you do some really excellent work

22  with these men.

23  **A.**   Thank you.  It's an honor, and it's humbling.

24  **Q.**   I agree.  How long -- I want to be clear.  How long

11:29:01   25  have you known Mr. Jenkins both inside and outside of

Cross-Examination of David Trickett

 1  prison?

 2  **A.**   You know, again, I apologize that my -- my dates kind

 3  of run together.  Things seem like yesterday to me.  But

 4  it -- I guess I met him -- gosh, I can't -- I met him

11:29:20   5  maybe four years ago in prison at the Carol Vance Unit in

 6  Sugar Land, Texas.

 7  **Q.**   Were you aware of why he was in prison at the time?

 8  **A.**   Over time of getting to know him, I did know, yes.

 9  **Q.**   Okay.  And are you aware that he was released then on

11:29:44  10  -- or before I go there, were you aware in 2016 his parole

11  was revoked?

12  **A.**   No.  I did not know that.  I mean -- well, I mean, I'm

13  sure -- yes.  I mean, I have known most of his history

14  prior to him meeting us.  I mean, bits and pieces are

11:30:00  15  still a little bit in the air.  I mean, I don't know all

16  the details.  But I'm sure that that was --

17      I mean, because, here again, let me just testify to

18  this:  My parole was revoked numerous times, too, because

19  I didn't know how to follow the law.  I just didn't know

11:30:13  20  how to obey.  My identity was wrapped up in things of the

21  world versus the things of God.  And, you know, that was

22  22 years ago, and God has put me on a different path.

23      But learning to walk that over the 22 years has taken

24  some incredible accountability, some incredible mentors in

11:30:28  25  my life to show me, you know, this is what it looks like

 1    with skin on.

 2          So I'm aware to some degree but not fully.

 3    **Q.**   Okay.  But I guess my question is:  You met him after

 4    he was imprisoned after his parole was revoked?

11:30:40      5    **A.**   Yes, ma'am.  That's correct.

 6    **Q.**   Okay.  And he was then released in December of 2019?

 7    **A.**   That's correct.

 8    **Q.**   And he then went to live at your facility?

 9    **A.**   Correct.

11:30:52     10    **Q.**   Okay.  And so he has only been out of prison for

11    approximately 14 months?

12    **A.**   No.  That can't be right.

13    **Q.**   Well, if he was released in December of 2019 and he

14    was arrested in March of 2021, we have 12 months of 2020,

11:31:17     15    plus if you give him December --

16    **A.**   Ma'am, again, like I said, my dates do run together.

17    I'm just trying to backtrack on some photos that would

18    just verify what the dates were because I want to be sure

19    that I'm giving you right information.

11:31:33     20          THE DEFENDANT:  Could I clarify for the Court?

21          THE COURT:  No, not yet.  I'll leave you a chance

22    to talk to your attorney, and we'll take a break before we

23    go any further.

24    **A.**   I believe his parole ended -- his mandatory

11:31:45     25    supervision ended in '19.  But again, let me -- let me --

1      let me clarify just from photographs that I have.

2                 THE COURT:  Hold on.  Hold on.  Hold on.

3                 THE WITNESS:  Sure.

4                 THE COURT:  This is not rocket science.  I mean,

11:31:54    5      is there a date that he got let out?  Let me see the piece

6      of paper.

7                 MS. WINTER:  Yes, Your Honor.  Let me clarify.

8                 THE COURT:  There is no controversy.  There is a

9      date he got out.  What is it?

11:32:05    10                 MS. WINTER:  The date that he was released -- and

11      this is my -- this is my fault -- was July of 2018.  His

12      parole was --

13                 THE WITNESS:  That's correct.  That's correct,

14      ma'am.  Sorry about that.  Again -- and, believe me, these

11:32:19    15      dates -- a lot of these dates run together when you are

16      dealing with -- with 50 men at one time it is, you know,

17      like I said, to me I still remember things 20 years ago

18      like they were yesterday and I can't remember what

19      happened five minutes ago.

11:32:32    20                 THE COURT:  Here is what I want to do,

21      Mr. Trickett.  I want to let Ms. Winter ask the questions;

22      and if you would, let her ask the questions.  And then,

23      you please just respond to the questions.

24                 THE WITNESS:  Yes, sir, Your Honor.

11:32:42    25                 THE COURT:  If there are additional questions,

1    then Mr. Hester will ask them.

2              THE WITNESS:  Yes, sir, Your Honor.

3              MS. WINTER:  Thank you, Your Honor.

4    BY MS. WINTER:

11:32:48  5    **Q.**  When did Mr. Jenkins become a mentor or become staff

6    at CHARM?

7    **A.**  Again, exact dates -- well, he became -- he became --

8    like I said, he lived in the house for several months,

9    showed his leadership qualities.  He then moved to what we

11:33:06  10   call a house manager, house big brother, not being

11   employed by CHARM but -- and not being staff.  But I don't

12   know.  Anywhere between eight months and a year after he

13   was there he came -- came on staff.

14   **Q.**  And he has been mentoring others?

11:33:19  15   **A.**  Yes.

16   **Q.**  And the 10 percent recidivism that you mentioned

17   regarding your program, were they on the same programming

18   with respect to the worship and Sunday school and

19   bible-based type instructions?

11:33:39  20   **A.**  Yes.  Yes, they were.

21   **Q.**  Okay.  And with respect to how many men you were

22   overseeing at this time, you said -- how many houses do

23   you currently have of parolees?

24   **A.**  We currently have eight at the time.  When Shane was

11:33:53  25   living in the residence, we had six.

Cross-Examination of David Trickett

**Q.**   Okay.  And -- and so eight houses or eight residents in one house?

**A.**   No.  We had -- we had eight residences -- we have eight residences right now.  Eight individual homes.  In each house there is five or six, maybe seven guys.  There are two men --

**Q.**   So any -- you are supervising or working with approximately 40 men?

**A.**   Well, the ministry is working with 40 men.  I usually to my -- obviously, I couldn't -- I can't be responsible for the discipleship of 40 men.  What I do is I try to -- I have several staff members in which under the staff members have men that they work with.  And then, they work with -- you know, kind of the branch effect.

Now, obviously, I speak to the multitude.  I speak to all of them on bible study nights and group and, you know, as they -- as they move from their orientation house.  We have two houses, their kind of orientation, and it gets them on their feet for the first 30 days.  And we make sure that it's a fit.  Are they -- are they who they said they were when they were in prison?

I mean, we get some guys that come here that put on the mask real well when they are in prison.  And when they got out, we realized this may not be for you.  I mean, they don't want to follow rules.  They don't want to do

1    what we ask them to do.

2    **Q.**   Well, I want to -- I want to focus on your

3    interactions with Mr. Jenkins.  How frequently were you

4    with Mr. Jenkins?

11:35:08  5    **A.**   Me and Mr. Jenkins, from the time that he was here,

6    were pretty close, day-to-day activity.  I mean, he was

7    directly under my supervision and him, along with one

8    other guy, were under my supervision.

9    **Q.**   Okay.  And in January of 2021 did you know that he was

11:35:22  10   planning a trip to D.C.?

11   **A.**   I did know that.

12   **Q.**   Did he express any dissatisfaction or any discord with

13   the outcome of the election?

14   **A.**   I mean, he was -- he -- the person that he wanted to

11:35:39  15   win did not win.  Yeah.  So, I mean, that would be --

16   **Q.**   So he talked about going to D.C.?

17   **A.**   Yes.  He was going to go and stand in solidarity with

18   the people there that were, obviously, for the other

19   party.

11:35:52  20   **Q.**   Do you monitor the social media accounts of your

21   residents?

22   **A.**   We do up to a certain -- I mean, obviously, if there

23   is stuff that is -- that we believe is bad, we monitor.

24   Now, obviously, like I said, Shane had just come back to

11:36:10  25   the ministry here recently.  And, yes, I monitored his

Cross-Examination of David Trickett

1    stuff, yes.

2    **Q.**   What do you mean he had just come back to the ministry

3    recently?

4    **A.**   Well, like I said, he left and went to Dallas to live

11:36:21   5    and to take care with his home up in Dallas, sold his

6    house.  He was working in the oil fields at that time and

7    trying to work out the details with his ex-wife with his

8    house and trying to sell.

9         Well, he thought possibly at that time he was going to

11:36:35   10   work in the oil fields and live in that house.  But as he

11   quickly figured out that he really missed family and home

12   down here.  And so he sold that house and moved back to

13   Houston.

14        So when he moved back to Houston, he moved back in our

11:36:45   15   residence, which in and of itself shows a lot of humility

16   on his part for a guy that could have, like, said I had it

17   all together and I'm moving on.  Saw the need for --

18   **Q.**   How long -- how long was he separated from your

19   ministry, approximately?

11:37:00   20   **A.**   A few months, six months maybe.

21   **Q.**   Do you know how many children Mr. Jenkins has?

22   **A.**   Yes.

23   **Q.**   How many?

24   **A.**   I believe.  Five maybe.

11:37:12   25   **Q.**   Okay.  But you know that he interacts with two of his

Cross-Examination of David Trickett

1   daughters?

2   **A.**   Two of his daughters and one of his sons, yes.

3   **Q.**   Okay.  Now, with respect --

4   **A.**   Frequently.  I don't know if he talks to the other

11:37:23  5   ones or not.  I know that it was a process and something

6   he is trying to work through, for sure.

7   **Q.**   Did he express to you any intent with his trip to D.C.

8   to protest with any weapons or to confront law

9   enforcement?

11:37:38  10  **A.**   Absolutely not.

11  **Q.**   And have you seen the social media posts since January

12  of 2021 since the capitol riot?

13  **A.**   Well, obviously, since this was all brought to light,

14  I have seen several posts and different things; but at the

11:37:56  15  time, I hadn't seen anything that -- that he was breaking

16  the law.  No.  I did not see anything like that.

17  **Q.**   And would you agree with me if a person was on the

18  west -- the capitol tunnel entrance at the lower west

19  terrace with a tomahawk breaking a capitol window that

11:38:16  20  that would be unlawful?

21          MR. HESTER:  Objection to relevancy.  Calls for a

22  legal conclusion as to --

23          THE COURT:  Overruled.

24          MR. HESTER:  -- the situation.

11:38:28  25  **A.**   Again, I'm not familiar with the lay of the land up

Cross-Examination of David Trickett

1    there.  So what the west is and where that is.  But -- but

2    I would definitely agree that breaking a window would not

3    be something that I would advise anybody to do.  I would

4    be strongly against that.

11:38:40    5    BY MS. WINTER:

6    Q.   Well, do you agree with me that taking issue with an

7    election and attending a peaceful protest, does that

8    require a tomahawk or weapon to take to the protest?

9    A.   I don't know his thinking on that.  Me, personally, I

11:38:58   10    wouldn't.  But I know several people that I know that

11    would take that just because if things got -- you know,

12    things -- things all start out to be peaceful, and that's

13    what I have said.  I have had this conversation with my

14    guys here.

11:39:10   15        You know, you can start something out to be peaceful.

16    But all it takes is one person to ignite a flame.  And

17    then you have got followers and you have got others that

18    do things.  And if going into a situation you know this to

19    be true, to have some kind of protection weapon, I can

11:39:24   20    maybe understand that.  Me, personally, I would not.

21    Q.   And, Mr. Trickett, you mentioned that you try to teach

22    your men about it's not us versus them, law enforcement is

23    not bad, that we all are --

24    A.   Yeah.

11:39:41   25    Q.   -- trying to sort of do this together.  Would you

Cross-Examination of David Trickett

```
         1  agree with me that throwing objects at police is against
         2  your teachings and against your programming?
         3  A.   Ma'am, again, I don't -- I don't -- I don't know all
         4  the witness in this case; but, absolutely, we would not
11:39:55 5  try to commit harm to any police officer.  That would be
         6  against everything that we teach.  We would stand in
         7  solidarity with them.  I mean, again, we work with police
         8  officers here, washing police cars, serving them in
         9  whatever way we can.
11:40:08 10 Q.   During Mr. Jenkins' role as a mentor or as a leader in
        11  your program, did he ever talk with his mentees about his
        12  dissatisfaction with the election?
        13 A.   No.  I try to keep that -- I try to keep politics out
        14  of our biblical teaching.  Obviously, every man has a
11:40:31 15 right to his opinion and a right to how he stands and what
        16  he wishes to be true or how he voted.  That's why we vote.
        17  But that's not in our biblical teaching.  We try to
        18  refrain from politics, so to speak, in that.
        19       Now, I do believe down the road, as you grow in your
11:40:49 20 faith, politics all ties into, you know, your walk with
        21  Christ.  I mean, there is a responsibility to both.
        22 Q.   Did Mr. Jenkins ever comment or make statements to you
        23  about his -- about a desire to overthrow the government?
        24 A.   No.  No, ma'am.
11:41:00 25 Q.   Did he ever make statements to his mentees about a
```

1    wish or a desire to overthrow the government?

2    **A.**   Not that I know of, ma'am.

3    **Q.**   Did he ever make statements to you about taking

4    violent means and -- because of his dissatisfaction with

11:41:19   5    the election?

6    **A.**   No, ma'am.

7    **Q.**   And would you support anyone in your program using

8    violence or weapons to demonstrate that they are not happy

9    with the election?

11:41:34   10    **A.**   No, ma'am.

11    **Q.**   Okay.  Did you know Mr. Jenkins to possess that

12    tomahawk or hatchet that was found at your residence that

13    morning?

14    **A.**   No, I did not, ma'am.  No, I did not.

11:41:49   15    **Q.**   Are residents allowed to have weapons of any kind,

16    knives?

17    **A.**   Yes, they are.  They are allowed to have -- I mean, as

18    long as they've exhibited, obviously, a behavior that is

19    -- that is not harming.  They are not allowed to have any

11:42:02   20    guns or anything like that.  I mean, it's -- it's -- I

21    guess a case-by-case basis as they grow in the ministry,

22    so to speak.  I mean, any new guy coming out, we really

23    monitor what they have in their possession and what they

24    don't have in their possession.

11:42:17   25        But if it's legal by the law standpoint to have a

1   knife, yes, they are allowed to have a knife.  I mean,

2   many of our guys are construction workers and workers and

3   they all have knives.

4   **Q.**   So would you agree with me that if the evidence shows

5   that Mr. Jenkins took a hatchet to the U.S. Capitol, broke

6   a window, threw metal objects at police officers and

7   violated a curfew, is that consistent with your ministry?

8   **A.**   No, ma'am.

9   **Q.**   Is that something that you would continue to support,

10  knowing now of Mr. Jenkins?

11  **A.**   Support?  Absolutely not.  But teach and help grow

12  through that, there is a better way and a different way to

13  handle your situation, absolutely.  This is what we are

14  called to do.  Walk through this season.

15  **Q.**   But you -- were you aware that he intended, planned or

16  committed any of these acts?

17  **A.**   No.

18              MS. WINTER:  Nothing further, Your Honor.

19              THE COURT:  Mr. Hester, anything further?

20              MR. HESTER:  No, Your Honor.

21              THE COURT:  Okay.  Mr. Hester, anything -- well,

22  first of all, Mr. Trickett, thank you very much.  You may

23  step down from the proverbial witness stand, sir.

24              THE WITNESS:  Thank you, Your Honor.

25              THE COURT:  Any further proffers or witnesses,

Proceedings

1    Mr. Hester?

2              MR. HESTER:  No, Your Honor.

3              THE COURT:  Okay.  So we are left with argument.

4         Ms. Winter, I will let you begin.  Are you ready now

11:43:32    5    or do you want to take a minute-or-two break?

6              MS. WINTER:  I'm ready.

7              THE COURT:  Let me do this.  I do want to make

8    sure I give Mr. Hester -- I know there was something that

9    Mr. Jenkins wanted to say.  I do want to make sure that

11:43:43   10    Mr. Hester has an opportunity to talk to him before

11    closing argument.  In fact, I'll re-open the testimony if

12    there is something else, after Mr. Hester has had an

13    opportunity to talk with his client.  So I'll go off the

14    record, and can you arrange to get the phone number there

11:43:58   15    and we can call and --

16              MR. HESTER:  Yes, Your Honor.  I'll call the cell

17    phone in the courtroom right now.

18              THE COURT:  Okay.  I'm going to mute -- put it on

19    mute so we can't, at least, hear the cell phone and what

11:44:12   20    is happening there.

21              MR. HESTER:  Thank you.

22              THE COURT:  And we'll go off the record for a

23    couple of minutes.  Mr. Hester, just let me know.  I'll be

24    here.  So let me know when you are ready to proceed, sir.

11:44:24   25    We are off the record for a moment.

1      (Recess from 11:44 a.m. to 11:47 a.m.)

2           THE COURT:  Let's go back on the record.

3      Mr. Hester, have you had an opportunity to talk to

4  your client?

11:47:17    5           MR. HESTER:  I have, Your Honor.  Thank you very

6  much.

7           THE COURT:  Is there anything additional, in

8  terms of proffer or testimony, that you would like to

9  make?

11:47:25   10           MR. HESTER:  No, sir.

11           THE COURT:  Hold on one second.  Let me make sure

12  in Houston that they -- can you hear me loud and clear in

13  Houston?

14           THE MARSHAL:  We can hear you loud and clear.

11:47:40   15           THE COURT:  Okay.  Then, Ms. Winter, let's have

16  argument, please, and proceed.

17           MS. WINTER:  Yes, Your Honor.

18           THE COURT:  Let's just do this.  Let's do one at

19  a time.  So let's start with probable cause.

11:47:50   20           MS. WINTER:  Your Honor, I think the evidence is

21  overwhelming as to probable cause with respect to the

22  testimony of Agent Johannes.  He has testified about the

23  tip that called in and specifically identified Mr. Jenkins

24  through additional investigation by FBI.

11:48:10   25      They found numerous videos, including social media

1    websites, affiliated with Mr. Jenkins showing exactly what

2    he wore on the day of January 6th, a very distinctive red

3    beanie, blue hoodie, gloves, the tattoos, the beard, the

4    shaved head.

11:48:30    5        Your Honor, I think the evidence certainly meets the

6    standard of probable cause that he was there on the

7    capitol that day and he retrieved the hatchet from his

8    backpack, smashed a capitol window, and was throwing

9    objects at police as they were trying to protect the

11:48:47  10    capitol that day.

11            THE COURT:  Mr. Hester, do you have any objection

12    on the probable cause?

13            MR. HESTER:  I do have argument on that, Your

14    Honor.

11:48:55  15            THE COURT:  Okay.  Proceed.

16            MR. HESTER:  So, first, on the damage to federal

17    property charge, the 1361, at best that's a misdemeanor

18    because you heard testimony that there was -- the

19    replacement cost is $1,500.  But the statute speaks to

11:49:15  20    damage, the actual damage.  So the replacement cost --

21            THE COURT:  Wait.  Say that again.  I thought you

22    went out for a second.  So I want to make sure that the

23    record is clear exactly what you are saying.

24            MR. HESTER:  Yes, Your Honor.  The statute speaks

11:49:28  25    to damage exceeding $1,000 to make it a felony.

1    So the testimony the Court heard is that the

2    replacement cost of the window is $1,500.  Not the actual

3    damage to the building.  So the damage would be the broken

4    glass.  The replacement costs includes labor, transporting

11:49:51    5    the window, and all of those additional costs.  And, at

6    best, the agent didn't even know what was included in the

7    replacement costs when I asked him.

8        So there is -- there is no evidence that damage caused

9    by whoever this was who broke that window exceeds $1,000.

11:50:10    10   So, at best, that's a misdemeanor.  So the government

11   hasn't shown probable cause for the felony offense charged

12   under 1361.

13       On the assault charge, Your Honor, an assault --

14   again, at best, this is a simple assault, a misdemeanor

11:50:31    15   assault that -- and the government hasn't proven that this

16   is a felony assault.  But I don't even think it's a

17   misdemeanor assault because an assault is a willful intent

18   to inflict injury upon another person.

19       The officers in those photographs are fully shielded,

11:50:53    20   wearing helmets.  No weapon has been recovered.  I know

21   the agent said that he believes they are metal.  Really,

22   that's just speculation because there is no weapon in this

23   case.  There is -- and in order to --

24           THE COURT:  I don't understand.  What do you mean

11:51:11    25   there is no weapon?  So the photos of him holding a

1 flagpole and to have whatever object it is, a drawer, over

2 his head is not a weapon?

3 　　　　MR. HESTER:  There is no weapon recovered is what

4 I should have said, Your Honor.  There is no weapon --

11:51:26    5 　　　　THE COURT:  So what?  I mean, who cares if a

6 weapon was discovered.  I mean, the fact that there is a

7 large gathering of people and he throws things -- I mean,

8 the photos speak volumes.  The fact that he throws things

9 at police officers, simply because you can't find them

11:51:41   10 means you can't prosecute?  Is that your position?

11 　　　　MR. HESTER:  Well, let me explain what I -- what

12 I mean a little better and, hopefully, it will make better

13 sense, Your Honor.

14 　　　　In order to prove that this is a dangerous weapon, the

11:51:55   15 government has to prove that it's capable of inflicting

16 grave bodily harm.  That's what the case law says.  Okay.

17 I don't know how you do that based on photographs of items

18 that could very well be plastic items.  And there is no

19 videos of him slamming down items on officers that have

11:52:16   20 been submitted into evidence.

21 　　　　It seems to me that the photographs show the person

22 lobbing these items, which very well could be plastic,

23 which very well could be incapable of inflicting grave

24 bodily harm on officers who are in full riot gear, who are

11:52:35   25 wearing helmets, who have protective shields, who have

Closing Arguments

1    pads on their bodies.

2         So that's my argument as to why it's not a felony

3    assault, Your Honor; and at best, it's a misdemeanor

4    assault, which would be a willful attempt to inflict

11:52:52   5    injury upon the person of another.

6              THE COURT:  Okay.  Go ahead.  I'm sorry.

7              MR. HESTER:  As for the entering on restricted

8    buildings or grounds, the agent couldn't give us a time

9    when the -- when the capitol grounds became restricted on

11:53:08  10    that day.  I think that clearly, at some point, the

11    statute speaks to a place where the president or another

12    person protected by secret service is performing their

13    official duties and entering that area without permission.

14         Mr. Jenkins, though, didn't enter the capitol

11:53:33  15    building.  There is no evidence that he entered the

16    capitol building.  Is it grounds which, I admit, is

17    included in the statute?  Probably.  But -- but given the

18    fact that there is no testimony about the times that these

19    grounds became restricted, I don't think the government

11:53:51  20    has proven probable cause on that count either.

21         So we would ask the Court to dismiss all of these

22    counts because there is no probable cause for them.

23              THE COURT:  Okay.  Ms. Winter, I'll give you a

24    chance to respond.

11:54:07  25              MS. WINTER:  Yes, Your Honor.  I heard testimony

1    and you are the judge and can judge for yourself.  But we

2    specifically -- Agent Johannes specifically testified that

3    the cost to repair the damage that was inflicted on the

4    U.S. Capitol was valuated currently at $1,500.  It's

11:54:25   5    Mr. Hester who -- and, again, Mr. -- or Agent Johannes

6    didn't know the exact dimensions of how that number was

7    actuated.  But again, that's the figure that is the

8    testimony that is the damage that is currently for the

9    window at the U.S. Capitol, which Mr. Hester, who is

11:54:46   10   talking about labor and transportation, something that

11   Mr. -- that Agent Johannes did not testify to.  He

12   testified to the $1,500 figure.

13       As Your Honor mentioned, with respect to the objects

14   being thrown by Mr. Jenkins, these images were obtained

11:55:01   15   from body-worn camera of the officers that were there.

16   You can see Mr. Jenkins is at the forefront of those

17   protesters, has those objects that are being thrown at the

18   officers, certainly able to injure them, maim them in any

19   respect, metal or plastic, especially the flag poles and

11:55:23   20   the pipes that are pointed, elongated.  They are all being

21   thrown.  They are being overwhelmed by these protesters.

22       And Mr. Jenkins specifically, as the agent testified

23   to, threw nine objects, four of which you can see in those

24   photographs.  And they did, as the agent testified, have

11:55:42   25   the potential to seriously harm those officers.  And, in

1   fact, many officers were harmed.

2       As to whether or not it was Mr. Jenkins in particular,

3   again, the scene is a massive investigation, as the Court

4   knows.  But we know that Mr. Jenkins threw objects capable

5   of inflicting serious bodily harm.

6       And third, as to the restricted area, I followed up

7   with Agent Johannes on that.  At all times that

8   Mr. Jenkins is present and visible in the photograph, at a

9   timestamp at 4:33, at 2:00 when the protesters forced

10  their way through the barricades, at all times Agent

11  Johannes testified that was a restricted area.

12      So with respect to the arguments posed by the defense,

13  there is certainly sufficient and the government would

14  maintain overwhelming probable cause as to each of the

15  charges alleged in the complaint.

16          THE COURT:  Mr. Hester, I'll give you the last

17  word, if there is anything else you would like to add.

18          MR. HESTER:  Well, Your Honor, I think I have

19  said everything I need to say about the other charges.

20  I'll just remind the Court that you heard testimony about

21  the cost to repair that window, not about the cost of the

22  damage to that window.  And that was the government's

23  evidence to you, Judge.  They gave you no evidence about

24  the damage to that window and what that caused.

25          THE COURT:  Okay.  Well, thank you very much.

Closing Arguments

1    Let me say, based on the evidence that I heard today, that

2    I find that the government has demonstrated probable cause

3    that the defendant has committed the acts to which he has

4    been charged in the complaint.  So I'm going to find the

11:57:25  5    probable cause finding has been satisfied by the

6    government.  So now let's talk about the detention issue.

7         And, Ms. Winter, I'll let you begin and just walk

8    through for me.  First of all, let me start, is this a

9    risk of flight?

11:57:39  10        MS. WINTER:  Your Honor, primarily danger to the

11   community, but we would submit that evidence has been

12   shown that he is a risk of flight, just given his history

13   of evading, given the fact that he has now -- is now

14   facing six felony charges, up to 20 years in prison, and

11:57:59  15   just given that he is clearly at odds with the government,

16   does not believe in the outcome of the election, does not

17   agree with the current administration, and was willing to

18   commit violence in order to express those beliefs.

19        And so, while we recognize and I think that our

11:58:18  20   stronger position is that he is a danger to the community,

21   we are also moving under the risk that he -- that he could

22   flee, Your Honor, just given the very different change in

23   circumstances, his history, and just his position with

24   respect to our current government.

11:58:35  25        THE COURT:  Okay.  Is this a presumption case?

Closing Arguments

1          MS. WINTER:  It is not a presumption case, Your

2    Honor.

3          THE COURT:  Okay.  Let's talk danger to the

4    community.  Why do you think he needs to be detained

11:58:47    5    pending trial?

6          MS. WINTER:  Yes, Your Honor.  Again, consistent

7    with the pretrial services recommendations, Mr. Jenkins

8    has really led a life-long history, a life-long -- led a

9    life of crime, I should say.  He has been in and out of

11:59:03    10    the criminal justice system for the last 25 years.  He is

11    a 43-year-old man who was just released in 2018 and had

12    only been off of parole for barely -- for right over a

13    year when he committed these violent offenses.

14          I think you can see, from Mr. Jenkins' criminal

11:59:27    15    history, not only is he anti-authoritarian and resistant

16    to authority, police, and now the United States

17    government, but he has a long history of violence going

18    back to 1997.

19          It's only worth noting, although the disposition is

11:59:45    20    unknown, he was charged with felony murder.  He has

21    multiple assault charges, including assaults of public

22    servants, assaults of police officers.  He also, Your

23    Honor, even while in prison, refused to obey by the rules

24    and was convicted of a property crime while in prison in

12:00:07    25    2007.

Closing Arguments

1    In addition to his violent history, criminal history,

2    he also has a history showing an unwillingness and

3    inability to comply with supervision.  He was given ten

4    years deferred adjudication on an assault, on a drug

12:00:27  5    charge, and he was revoked.  He was revoked based on

6    another assault causing bodily injury in 2002.

7    And as recently as 2016, after being paroled for

8    evading and possession of a controlled substance, he was

9    revoked again for assaulting a public servant, resisting,

12:00:51  10   and possession of a controlled substance, Your Honor.

11   Again, I appreciate Mr. Trickett and his willingness

12   and efforts to try to reform and to work with these men;

13   but Mr. Jenkins is not one of his success stories, Your

14   Honor.  It's clear that he handles a lot of men, that he

12:01:13  15   was completely unfamiliar with Mr. Jenkins' plan to go to

16   D.C. and the purpose for his plan to go to D.C. and the

17   extent to which Mr. Jenkins went, which are very clear,

18   very obvious, overwhelming evidence that Mr. Jenkins was

19   at the capitol, that he had a backpack which contained at

12:01:35  20   least gloves and a weapon, a tomahawk or hatchet or

21   whatever you want to call it, a bladed weapon.

22   He put gloves on prior to pulling out the weapon and

23   shattering a window at the capitol after he had been --

24   after officers had attempted to hold him at bay in order

12:01:57  25   to maintain safety and security around the capitol on the

1    date that the election was being certified.

2        He made it past officials and, restricted or not,

3    which we have established it was fully restricted, he is

4    on a window, shattering it with a tomahawk.

12:02:17   5        You then see him throw, according to Agent Johannes,

6    approximately nine items at police who are being

7    overwhelmed by protesters that are in riot gear in order

8    to try to contain these protesters.  And Mr. Jenkins is

9    distinctively and clearly front and center at the head of

12:02:35   10   those protesters throwing objects and striking, as Agent

11   Johannes said, striking those officers.

12       Additionally, Your Honor, there is even more video

13   evidence that comes out of the body-worn camera later that

14   night.  After the curfew had already been imposed and

12:02:54   15   implemented, Mr. Jenkins is -- again, he is flagrantly

16   disobeying the law.  They are telling him it's a curfew,

17   to go in.  And there he is confronting officers, Your

18   Honor.

19       And given the fact that he has posted all of this, he

12:03:12   20   is clearly proud of it, he said it was a historic day for

21   America.  It's very clear that he is the person in the

22   videos and the person in these social media and is proud

23   of his behavior.

24       And as much as Mr. Trickett would like to help

12:03:27   25   Mr. Jenkins, he was totally unaware that he had planned

Closing Arguments

1    and premeditated and come prepared to violently protest in

2    Washington, D.C. on January 6th.  And he does not -- he

3    cannot fully say that he can manage Mr. Jenkins,

4    especially in light of the fact that he has 20 years --

12:03:51  5   25 years of significant violent felony convictions and

6    revocations under his belt.

7        And consistent with probation or pretrial services,

8    Your Honor, the government does not believe there are any

9    combination of conditions that can assure his appearance,

12:04:05  10  one, or that can protect the community in this case.

11            THE COURT:  Mr. Hester.

12            MR. HESTER:  Yes, Judge.  Every one of those

13   concerns can be addressed by conditions of release.  If

14   you believe the government's case and he went up to D.C.

12:04:23  15  and did these things, that's not Houston.  That was not at

16   the ministry that he is a part of.  That's not with

17   Mr. Trickett.

18        Where he -- where you heard testimony today, he makes

19   a huge difference in people's lives with Mr. Trickett,

12:04:37  20  with the residents there.  He is a positive influence on

21   them.  They are a positive influence on him.  He has never

22   exhibited any violent tendencies which -- at the ministry.

23        And Mr. Trickett is willing to be a third -- his

24   third-party custodian, willing to report him to the Court

12:04:59  25  if he violates any condition.

1       And all of the government's concerns, again, can be

2   addressed by conditions.  Keep him in Houston.  He can't

3   leave Houston.  Give him a curfew.  Give him an ankle

4   monitor.  He probably shouldn't go to any political

12:05:15    5   rallies or use social media.

6       All of these will reasonably assure that he is not a

7   danger to the community.  And the government has to prove

8   that he is by clear and convincing evidence, not just a

9   preponderance, Your Honor.  So all of this can be

12:05:34   10   addressed by conditions.

11       Your Honor, you have to consider the strength of the

12   case.  I think there are some defenses that I have already

13   explained to the Court and argued in the probable cause

14   portion.

12:05:48   15       But what Mr. Jenkins needs to be doing now is getting

16   out.  He needs to be working.  He has a job waiting for

17   him.  He runs a business.  He supervises people.  He needs

18   to be working.  He needs to be earning money.  He needs to

19   be working with a lawyer he hires from D.C. to defend him

12:06:07   20   of these charges.

21       And he is ready to be out and focus on defending

22   himself on this case, to stay in Houston, to not attend

23   any political rallies, to not become involved in any

24   situation like this, and to follow the rules of the

12:06:27   25   ministry that has been offered to him.

Closing Arguments

1   And I think if you impose all those conditions, he is

2   not going to flee.  He is not a danger to the community.

3   I know his -- his criminal history is a little complicated

4   but he -- he was successful -- most recently successfully

12:06:48   5   completed parole, a year and a half term of parole from

6   July 2018 to December 2019.  So he has been out of prison

7   for over two years now without any incidents until this

8   arrest.

9       The pretrial report shows he successfully completed

12:07:08   10   drug treatment.  He hasn't used a drug or taken a drink of

11   alcohol in eight to nine years.  And that's in the

12   pretrial report, Judge.  So he completes programs that he

13   is involved in, and he has a history of doing that.

14       The criminal history is a little complicated; but his

12:07:28   15   last arrest, the last time he was arrested on the outside

16   was 2013.  So eight years ago.  And what happened, Judge,

17   with that was he was on parole on two different cases.  He

18   violated the parole on one case.  He went into custody.

19   And then I know the pretrial report shows that his parole

12:07:50   20   was revoked again in 2016.  He was actually in custody

21   when that parole actually got revoked for the 2013

22   offense.

23       So long story short, the last time he violated the law

24   was 2013.  So he has a history most recently of completing

12:08:15   25   a year and a half term of parole successfully.  He has

Closing Arguments

1    most recently a history of mentoring others and being a

2    positive influence on others, of working, of starting his

3    own business, of employing other people and being a value

4    to this community.  He is not a flight risk.  He is not a

12:08:31   5    danger.  You should release him on whatever conditions you

6    think are appropriate.  And Mr. Trickett is fully prepared

7    to know those conditions and enforce them if he has to.

8          THE COURT:  Okay.  Thank you very much,

9    Mr. Hester.

12:08:46   10         Anything further, Ms. Winter?

11         MS. WINTER:  Your Honor, just as a final word

12   with respect to Mr. Hester's argument that his last arrest

13   was in 2013, I would just like to point out the arrest was

14   for assault on a public servant, resisting arrest; and

12:09:06   15   again, given his history of violent behavior, anti-police,

16   anti-authority behavior, it's only clear that he is

17   escalating.

18         And that Mr. Trickett is -- he is basically leading

19   two separate lives, according to the difference between

12:09:25   20   his criminal history, his behaviors on January 6th, and

21   the planning that took place in order to do that and what

22   Mr. Trickett knows about him, Your Honor.

23         So I do think that we have shown that he is a danger.

24   His violence has escalated.  The evidence in this case is

12:09:43   25   overwhelming.  The nature of these offenses are very

Ruling of Court

1    serious, up to 20 years for at least six felony offenses,

2    Your Honor, and there are no conditions that are going to

3    make the community safe or for his appearance.

4        THE COURT:  Thank you very much for the

12:10:01    5    presentation of evidence and the argument.  I want to take

6    a minute to go off the record here for a second.

7        For those -- I know we are running a little late, and

8    I apologize to everyone.  Give me about a minute, minute

9    and a half, to let me get my ducks in a row and then let

12:10:15   10    me come back and give you my decision.  So we are off the

11    record for a second.

12        (Recess from 12:10 p.m. to 12:13 p.m.)

13        THE COURT:  We are back on the record.

14        Counsel, again, thank you for your argument.

12:13:33   15        This matter obviously comes to the Court today on the

16    government's request to detain the defendant, Mr. Jenkins,

17    pending the trial of this case.  And to be clear, at the

18    outset, let me say what happened at the United States

19    Capitol on January 6th was horrible.  It was unpatriotic.

12:13:53   20    I think on behalf of all Americans I could say it was

21    truly shocking to watch on television.  Absolutely

22    heart-breaking to think that there are those in society

23    that believe that storming the U.S. Capitol, the symbol of

24    our precious but fragile democracy, is somehow a good

12:14:12   25    idea.  That is not how Americans act.  That is not how

Ruling of Court

1    democracy works.  We do not participate in an insurrection

2    trying to overthrow our government simply because our

3    preferred candidate did not win.

4         Now, admittedly, I am not here today to decide whether

12:14:27  5    Mr. Jenkins is guilty or innocent of the charges that have

6    been brought against him.  In fact, Mr. Jenkins is fully

7    entitled to a presumption of innocence.  That is very

8    important to me and to our justice system as a whole.

9    But, of course, I am entitled to consider the strength of

12:14:45  10   the government's case against him in deciding whether or

11   not he should be released pending the trial of this

12   matter.  And to be clear, the government has sought

13   detention on two bases.

14        First, the government is asking that he be detained

12:14:58  15   because the government believes that he is a risk of

16   flight.  In order to show that, the government must

17   establish by a preponderance of evidence that no

18   conditions or combination of conditions will reasonably

19   assure the defendant's presence as required.

12:15:12  20        In a nutshell, I do not believe the government has met

21   its burden.  There is nothing that tells me, from the

22   evidence that I have heard, that he is a risk of flight,

23   other than these very serious charges, that he has lived

24   with his family and lived in the area for a considerable

12:15:29  25   amount of time.  So I do not find that the government has

Ruling of Court

1   shown by a preponderance of the evidence that -- and I

2   think there are conditions that could be imposed in

3   connection with -- on the risk of flight.

4       So that turns to the question of whether or not he is

12:15:45   5   a -- Mr. Jenkins is a danger to the community; and as we

6   are aware, on the danger to community issues the

7   government has a higher burden.  That is, it must show by

8   clear and convincing evidence that no conditions or

9   combination of conditions will reasonably assure the

12:16:03   10   safety of the community.

11       I don't think this is a close case.  Let's make sure

12   we are all on the same page.  Mr. Jenkins, from the

13   testimony I heard, admitted that he flew to D.C. on

14   January 6th or for the January 6th event.  Mr. Trickett

12:16:20   15   readily acknowledged that Mr. Jenkins had visited the D.C.

16   area on January 6th.  Based on the clear, unmistakable

17   photographs and videos from multiple sources, Mr. Jenkins

18   visited the capitol grounds on January 6th.

19       He apparently fully engaged to -- fully expected to

12:16:42   20   engage in violence of some sort.  How else do you explain

21   that he happened to have what has been labeled today as a

22   small crowbar, a hatchet, or a tomahawk in his backpack.

23   There is video evidence that he pulled the weapon out of

24   the bag, used it to smash a window at the United States

12:16:58   25   Capitol.

Ruling of Court

1       But even more alarming and telling is the evidence

2   that he threw items at law enforcement officers.  And the

3   evidence I have heard was that there were nine objects,

4   several poles -- metallic, wooden, a white flag pole with

12:17:16    5   flag -- and a desk drawer.  There is an old adage that a

6   picture tells a thousand words, and that is the case here.

7   This is not paper mache that was being thrown.  You can

8   tell from the photos that these look like objects that

9   could hurt someone.

12:17:30   10       And whether it's -- we don't ask judges or jurors to

11   leave their common sense at the door, and I'm not going to

12   do that either.  It is clear from looking at those

13   photographs that they -- that there was an intent or at

14   least -- yeah, an intent to cause harm or cause damage to

12:17:50   15   individuals.

16       And I understand that the officers might have been

17   wearing helmets, but that doesn't escape the fact that you

18   had these objects being thrown at them.  Officers were

19   simply trying to do their job, protect the symbol of our

12:18:04   20   great democracy in the U.S. Capitol, and trying to protect

21   the public servants who are inside.

22       Obviously, hurling words is permissible, if not

23   encouraged, in our free society.  But the nine items that

24   were thrown here, that is not right.  And to me, that

12:18:22   25   really indicates a threat of violence, of concern, by

Ruling of Court

1  putting the brave members of our law enforcement community

2  at significant risk of physical injury.

3      I heard the argument during the testimony that no one

4  was harmed here or that we don't know if any particular

12:18:39  5  officer was harmed.  I don't think that's relevant to the

6  inquiry.  Simply because someone shoots a weapon into a

7  group of people, simply because someone isn't hurt or

8  isn't hit doesn't mean that isn't a real danger, a real

9  threat to the community.

12:18:54  10      In my view, a person who actively participates in a

11  violent insurrection aimed at overthrowing our democracy

12  is indeed a danger to the community.  But as with the old

13  saying, "Wait.  There is more."

14      In addition, Mr. Jenkins here has a long criminal

12:19:10  15  history.  There are multiple assault charges over the

16  years, DWI, terroristic threat, drug charges, evading

17  arrest, assault on a public servant, resisting arrest.  He

18  has had his parole revoked previously.  Clearly

19  demonstrated, in my view, an inability to comply with

12:19:30  20  instructions and follow supervision.  He flagrantly has

21  disobeyed the law, whether it's from the previous criminal

22  prosecutions, which really is a laundry list over the

23  years, or ignoring the curfew that night of January 6th in

24  D.C.

12:19:46  25      In a nutshell, I have no assurance and I do not think

Ruling of Court

1   there are any conditions or combination of conditions that

2   I could impose here that would protect the safety of the

3   community.  And as a result, I find that the government

4   has met its burden to show by clear and convincing

12:20:01   5   evidence that no conditions or combination of conditions

6   will reasonably assure the safety of the community.  As a

7   result, I'm going to order that Mr. Jenkins be detained

8   pending the trial of this case.

9        With that said, is there anything else, Counsel, that

12:20:14   10   we need to address today?  Let me start with the

11   government, Ms. Winter.

12        MS. WINTER:  No, Your Honor.  Thank you.

13        THE COURT:  Mr. Hester, on behalf of the

14   defendant?

12:20:23   15        MR. HESTER:  No, Your Honor.

16        THE COURT:  Okay.  Well, thank you again very

17   much.  I wish everyone much health and safety.

18        Mr. Jenkins, I'm going to remand you to the custody of

19   the United States Marshal to be, I believe, transported up

12:20:35   20   to the District of Columbia for further proceedings and

21   find that you should be detained pending the trial of this

22   matter.

23        Thank you very much.  You all are excused.  Have a

24   good day, and I will call my next matter.

25        *(Proceedings concluded at 12:20 p.m.)*

Ruling of Court

1  Date:  May 2, 2021

2                    **COURT REPORTER'S CERTIFICATE**

3       I, Laura Wells, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6                              _____/s/ Laura Wells_____

7                         Laura Wells, CRR, RMR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25