**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 21-CR-245-APM** |
| **SHANE JENKINS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant's motion to revoke detention order dated May 13, 2021 (DE 13). The government opposes the motion and seeks the defendant's continued detention pending trial.

**Procedural History**

On March 2, 2021, the District Court for the District of Columbia issued an arrest warrant pursuant to the filed complaint charging the defendant Shane Jenkins with one felony count of Obstructing Law Enforcement Incident to Civil Disorder in violation of 18 U.S.C. § 231(a)(3), three counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. § 111(a)(1) and (b), one count of Destruction of Government Property (in violation of 18 U.S.C. § 1361), three felony counts related to his unlawful and disorderly conduct at the U.S. Capitol Grounds and U.S. Capitol Building, and two misdemeanor counts related to violent entry and disorderly conduct on U.S. Capitol Grounds. These charges stemmed from his actions on January 6, 2021, during the timeframe a joint session of the United States Congress had convened to certify the vote count of the Electoral College of the 2020 Presidential Election.

1

On March 5, 2021, defendant was arrested in the Southern District of Texas.  On March 11, 2021, U.S. Magistrate Judge Andrew M. Edison ordered the defendant detained, finding by clear and convincing evidence that no combination of release conditions would reasonably assure the safety of the community.  The magistrate judge stated he did "not think this is a close call" in light of the defendant's lengthy criminal history and the fact that defendant "actively participated in a violent insurrection aimed at overthrowing our democracy" and tried to hurt law enforcement officers "for doing their job and trying to protect the symbol of our great democracy and those public servants inside."  Finally, the magistrate noted that defendant has already had his parole revoked previously, demonstrating a clear inability to comply with instructions and follow supervision (DE 6, at 19).

On March 24, 2021, a federal grand jury in the District of Columbia returned an eleven-count indictment charging the defendant with felony obstruction of law enforcement during a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); three felony counts of Assaulting Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111, a felony count of Destruction of Government Property, in violation of 18 U.S.C. § 1361, three felony counts relating to disorderly conduct and violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752, a misdemeanor count of Theft of Government Property, in violation of 18 U.S.C. § 641, and two misdemeanor counts relating to disorderly conduct and violence in a Capitol Building or Grounds in violation of 40 U.S.C. § 5104(e)(2) (DE 7).

On April 15, 2021, the defendant was arraigned on the above charges.  On April 21, 2021, the defendant appeared for a status conference and the matter was continued until May 25, 2021. On May 13, 2021, the defendant filed the instant motion (DE 13) to revoke the magistrate judge's order of detention.

2

**Applicable Authority**

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "the court having original jurisdiction over the offense." 18 U.S.C. § 3145(b).  The court's review of the magistrate judge's order of release is *de novo*.  *United States v. Little*, 235 F. Supp. 3d 272, 277 (D.D.C. 2017).  The reviewing court has discretion to call witnesses, review transcripts, or proceed by proffer. *Id.*

If a defendant is eligible for a detention hearing, the Bail Reform Act provides that the court "shall" order pretrial detention if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  § 3142(e).

To determine whether conditions exist that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the court must consider four statutory factors: (1) "the nature and circumstances of the offense  charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).  A finding that a defendant poses a risk of flight must be supported by a preponderance of the evidence. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).  A finding that a defendant poses a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(e).

**Factual Background**

**I.     The Attack on the United States Capitol on January 6, 2021**

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session,

elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m.  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of

Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

## II.    Conduct Specific to the Defendant

On or about January 18, 2021, the FBI received a tip that defendant, Shane Jenkins, was seen on publicly available footage of the Capitol Riots pulling a "small crowbar" out of his bag and smashing a window to the left of the tunnel in the Lower West Terrace area of the U.S. Capitol. The tip described defendant as having a red/blonde beard, a shaven head, a tattoo under his right eye, a large tattoo across his neck, and hand tattoos.  The tip also provided a Facebook page and Twitter account this individual.

In response to this information, the FBI examined the social media accounts.  On the Twitter account, the FBI found that the user of the account self-identified as Shane Jenkins and publicly posted a photograph of the Capitol Riots from a location near the Lower West Terrace area of the U.S. Capitol.  The user of the account also posted a "selfie" showing an individual with a tattoo under his right eye, wearing a blue hoodie, a black jacket, and a fur hat.  A screenshot from this Twitter account is shown below.



On the Facebook account, the FBI found that the user of the account self-identified as Shane Jenkins and publicly posted what appears to be a video of himself taken at the Capitol Riots. In the video, defendant could be seen with a red/blonde beard, wearing a red beanie, blue hoodie and black jacket, and a tattoo under his right eye. A screen capture from the video is shown below.



The FBI located a publicly posted video showing defendant, wearing a red Nautica beanie, blue hoodie, black jacket, and camouflage pants, with a tattoo under his right eye. In the video, which is attached as Exhibit 3 to defendant's motion, defendant removes a metal tomahawk out of his backpack, puts on black gloves, and uses the tomahawk to repeatedly strike a window to the left of the Lower West Terrace tunnel. After several strikes at the window, another rioter tugs at

defendant's pants, and defendant stops his attack in order to confront this rioter just as the clip ends.  Two screenshots from this video are below.  The one on the left matches the screenshot provided in the January 18 tip.  According to information received from the Architect of the Capitol, the cost to repair this window is approximately $1,500.



The FBI confirmed its identification of defendant by showing his photographs to a parole officer with the Texas Department of Criminal Justice who was assigned to defendant for several years and had regular in-person contact with him, by reviewing defendant's driver's license photo and by comparison with a 2014 photograph of defendant from the Texas Department of Criminal Justice file.  The government agency photographs showed that Shane Jenkins has a tattoo under his right eye and a tattoo of the words "MAMA TRIED" across his neck.  Defendant was also seen in body-worn camera footage from the evening of January 6, 2021, wearing the same distinctive clothing, outside a Washington, D.C. hotel, when defendant attempted to leave the hotel in violation of a city-wide curfew that had been imposed.  A screenshot from that body-worn camera footage is shown below.



The FBI also obtained travel records from American Airlines showing that defendant flew from Houston to Washington, D.C. on January 5, 2021, and returned to Houston on January 7, 2021.

Having identified defendant, his unique tattoos, and the unique clothing he was wearing that day, the FBI was able to locate evidence of defendant's conduct after his attack on the Capitol window. This evidence came from publicly posted videos as well as security camera footage from the Capitol and body-worn camera footage from Metropolitan Police Department ("MPD") officers located within the Lower West Terrace Tunnel.

Government Exhibit 1 is clip from Capitol security video from inside the LWT Tunnel at approximately 4:03 p.m. This clip shows that at this time, defendant was at the front line of the rioters, taking a leading role in pushing against the USCP and MPD officers inside the LWT Tunnel, and attempting to take a riot shield from the officers, resulting in him being pepper-sprayed.

Defendant was undeterred, and continued his assault against law enforcement. Government Exhibit 2A is a clip from publicly available video showing that at approximately 4:26 p.m., defendant took hold of a police riot shield and approached the officers in the LWT Tunnel.

He then hurled sticks and other objects at the officers in conjunction with attacks by other rioters. Government Exhibit 2B shows the same conduct from the perspective of a security camera located inside the LWT Tunnel.

Government Exhibit 3 is a clip from publicly available video from approximately 4:28 p.m. showing defendant on the steps leading to the LWT Tunnel. In this clip, defendant can be seen gritting his teeth as he shoves another rioter towards the person taking the video.

Government Exhibit 4 is a clip composed of publicly available video and Capitol security video from approximately 4:31 p.m. showing defendant, still on the steps leading up to the LWT Tunnel. In this clip, defendant can be seen throwing a flagpole like a javelin at the officers inside the Tunnel, and the pole can be seen landing among the officers from the perspective of the LWT Tunnel security camera.

Government Exhibit 5A is a clip from publicly available video taken at approximately 4:32 p.m., showing defendant throwing a wooden desk drawer at the officers, followed by several stick-like objects, all while these officers are being attacked by other rioters. Government Exhibit 5B shows the same conduct from the perspective of the LWT Tunnel security camera.

On March 5, 2021, defendant was arrested in Houston, Texas, and search warrant was executed at his residence. At the time of his arrest, defendant admitted to having flown to Washington, D.C. via American Airlines. During the search, law enforcement found the Nautica red beanie, blue hoodie, black jacket, camouflage pants, and dark backpack seen in the videos taken on January 6. In addition, law enforcement found two metal "SOG" brand tomahawks matching the one defendant used to smash the Capitol window, pictured below.



A search warrant was obtained for defendant's Facebook account. The results demonstrated that defendant planned to bring his tomahawk to the Capitol on January 6 because he anticipated violence. In a conversation dated January 3, 2021, defendant mentioned to a friend that he had "some sog tomahawks and tactical blades" and asked if he could bring them. When his friend suggested that he not bring these weapons to the Capitol, defendant said "I don't like the idea of a war popping off and all I can do is punch lol."



In a conversation dated January 5, 2021, defendant told a different friend that he was flying to Washington, D.C. the next day, and that he was "taking tomahawks and knives."



The Facebook results also showed that instead of remorse for his actions on January 6, defendant continued to believe he was justified in assaulting the police and attacking the Capitol. In a conversation dated January 7, 2021, defendant falsely stated that the events at the Capitol were "peaceful" and said that his experience at the Capitol "was amazing" and that he wanted "them" to know "we are deadly serious."

| | |
|---|---|
| **Author** | Shane Jenkins (Facebook: 100001069741577) |
| **Sent** | 2021-01-07 11:36:12 UTC |
| **Body** | It was peaceful , we wanted to be heard. I've heard antifa did it , but antifa is pussies. We wanted them to know we are deadly serious honestly. It was cray I got beat , pepper sprayed, tear gassed, it was amazing lol |

Later that day, defendant told a friend that the conduct at the Capitol was "a message" and that if "they" did not hold an "audit" of the election, then "we the people can take further measures." Defendant also committed to further action, telling his friend that "people bled and died serving this country I'll be damned if I stand silently by while we are bought by China."

**Time** 2021-01-07 12:58:36 UTC
**Type** Comments
**Summary** Shane Jenkins replied to your comment on a post from January 6.
`@[100000628665133:2048:█████████] I get it , I believe when they evacuated the Vice President and senators and congressmen the understood we are tired of it. We demand an audit. That's it , if they refuse well then we the people can take further measures. It wasn't vandalism, it was a message. Don't let the media spin it , think about it. You have to break eggs to make and omelette , don't think "omg those poor eggs" , it's deadly serious when people said "give me liberty or give me death" people bled and died serving this country I'll be damned if I stand silently by while we are bought by China. `
**Object Id** S:_I100001069741577:3668993286479627:86

Later in the conversation, defendant admitted "it got insane for a bit as well" and committed to continuing to "fight by God, right or wrong if I feel like it's being stolen or sold out" and that "senators and congress people better know that a reckoning will occur."

**Time** 2021-01-07 13:11:59 UTC
**Type** Comments
**Summary** Shane Jenkins replied to your comment. `@[100000628665133:2048:█████████] we were peaceful to an extent , it got insane for a bit as well , police were removed and not harmed multiple times , they are humans country men. I saw people beaten sprayed , hurt thrown , bloodied. But is this country not the best In the world? Is it not worth my blood , our tears? Then I'll fight by God , right or wrong if I feel like it's being stolen or sold out and senators and congress people better know that a reckoning will occur. `
**Object Id** S:_I100001069741577:3668993286479627:91

In a post dated January 8, 2021, defendant likened the attack on the Capitol to the American Revolution, and suggested that violence can be an appropriate solution to "political problems."

**Time** 2021-01-08 00:59:02 UTC
**Message** "Violence is never a solution to political problems." — Politicians, speaking from a town named after a guy who lead a war to start his own country.
□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□

And in a conversation on January 15, 2021, he described his experience in DC as "awesome."

**Author** Shane Jenkins (Facebook: 100001069741577)
**Sent** 2021-01-15 17:01:05 UTC
**Body** I got to go to dc it was awesome

## Argument

The government respectfully submits that there are no conditions or combinations of conditions that can effectively ensure the safety of any other person and the community or the defendant's appearance in court.

## There is a Rebuttable Presumption in Favor of Detention

Pursuant to 18 U.S.C. § 3142(e)(3)(C), there is a rebuttable presumption in favor of detention if there is probable cause to believe that the defendant committed, *inter alia*, an offense listed in 18 U.S.C. § 2332b(g)(5)(B) with a maximum term of imprisonment of 10 years or more.

In Count Six of the Indictment, the Grand Jury indicted defendant for the felony offense of Destruction of Government Property in excess of $1,000, in violation of 18 U.S.C. § 1361, which is punishable by a maximum of 10 years imprisonment.  This Court may rely on the grand jury's indictment to establish probable cause, *see United States v. Williams,* 903 F.2d 844, 844 (D.C. Cir. 1990), and Section 1361 is one of the offenses listed under Section 2332b(g)(5)(B).  Accordingly, a rebuttable presumption in favor of detention applies.[1]

Once a rebuttable presumption has been triggered, the presumption operates at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption.  *See United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).  Even if the defendant offers evidence to counter the presumption, it does not disappear, but remains as a factor to be considered by the court.  *See United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011).

---

[1] During defendant's initial detention hearing in the Southern District of Texas, the Government represented that this was not a presumption case.  That position was incorrect, and under *de novo* review, this Court may consider the statutory provisions which mandate the rebuttable presumption.

For the reasons discussed below, defendant has not rebutted this presumption, and even absent such a presumption, detention would be appropriate.

<u>**Nature and Circumstances of the Offenses**</u>

The first factor the Court must consider is the nature and circumstances of the offenses charged, "including whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1).  Chief Judge Howell has set forth a number of considerations to differentiate the severity of the conduct of the hundreds of defendants connected to the events of January 6.  *See United States v. Chrestman*, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021).  These considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses"; (2) "engaged in prior planning before arriving at the Capitol"; (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot"; or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct"; and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged or attempted to damage federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot." Id. at *7–8.  Under the *Chrestman* factors, defendant is clearly among the most serious offenders.

First, defendant has been charged with multiple serious felonies, including crimes of violence and using dangerous weapons.

Second, defendant went to the Capitol on January 6 fully expecting to engage in violence. As the magistrate judge observed, there is no other explanation for having brought his metal tomahawk to the Capitol.  Evidence from defendant's Facebook account, which was not available at the time of the detention hearing, confirms that defendant deliberately brought this weapon to

the Capitol because he anticipated a "war" and wanted to be able to do more than just "punch." As Chief Judge Howell noted, "any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear, suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process," and that such "motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole." *Id.* at *8.

Third, defendant not only carried the tomahawk, he used it in an attack on a Capitol window. Defendant's suggestion that the video (Defense Exhibit 3) shows him exercising any kind of restraint (Mot. at 7) is inaccurate. The video shows that defendant needed no provocation from other rioters to take out his tomahawk and violently attack the window. The video also shows that defendant stopped, not out of restraint, but because he turned to confront another rioter who had grabbed the leg of his pants.

While it is fortunate that defendant does not appear to have used this tomahawk elsewhere, the fact remains that defendant used other dangerous weapons – sticks, flag poles, a desk drawer – against the officers in the LWT Tunnel. Defendant faults SA Johannes for not providing "support" for his assertion that the objects actually struck the officers (Mot. at 7). But Government Exhibits 2A, 2B, 4, 5A, and 5B show not only that the objects did strike the officers, but more importantly that it was defendant's *intent* that the objects strike the officers, which is what matters for purposes of evaluating the nature of defendant's offenses.

Fourth, in addition to defendant's planning for violence, once defendant got to the Capitol, he did not act alone.  His attacks were made more dangerous precisely because they occurred in conjunction with attacks by other rioters on the same officers.

Fifth, Defendant was among the leaders who took an affirmative role in trying to dislodge the USCP and MPD officers defending the LWT Tunnel.   Defendant was one of the first rioters to attack the window to the left of the LWT Tunnel, paving the way for other rioters who finished the job.  As shown in Government Exhibit 1, defendant was at the front line of the rioters at approximately 4:03 p.m.  And Government Exhibits 2A, 2B, 4, 5A and 5B show that defendant was at the front line of the attacks on the officers at around 4:30 p.m.

Sixth, defendant's movements during the riot reflect deliberate violent criminal behavior aimed at injuring the officers.  This conduct sets him apart from other rioters who engaged with law enforcement but have been granted pretrial release.  *See, e.g.*, *United States v. Klein*, No. CR 21-236, ECF No. 29 at 16, n.8 (distinguishing Mr. Klein's actions from rioters who "clearly sought to incapacitate and injure members of law enforcement").

The intent and result of defendant's conduct was to disrupt the peaceful and orderly transition of presidential power using violence. The nature and circumstances of defendant's offenses show a clear disregard for the law, an aversion to the fundamental tenets of democracy, and a willingness to act violently, especially when he believes he is solving "political problems," all of which indicate that he poses a danger to the community.

## **Weight of the Evidence**

The second factor also clearly weighs in favor of detention.  The evidence against the defendant is overwhelming.  As discussed above, defendant was observed on Capitol surveillance

cameras, body-worn camera, and social media videos attacking law enforcement in an effort to unlawfully enter the Capitol and stop the certification of the election.

There is also overwhelming evidence that defendant is the individual seen in these videos, as he was wearing distinctive clothing which was found at his residence at the time of his arrest, he has distinctive tattoos, and he has been positively identified by his former probation officer. Defendant's own social media posts confirm his presence at the riot, demonstrate his purpose in going there, and his lack of remorse for his violent conduct that day.

<u>**Defendant's History and Characteristics**</u>

Under the third factor, the Court must consider defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," 18 U.S.C. § 3142(g)(3)(A); and "whether, at the time of the current offense or arrest, [defendant] was on probation, on parole, or on other release, *Id.* § 3142(g)(3)(B).

The clearest indicator of defendant's character is his lengthy and often violent criminal history. A defendant's history of violence offers some of the strongest evidence of his future dangerousness. *See, e.g.*, *Maryland v. King*, 569 U.S. 435, 453 (2013) ("[A]n arrestee's past conduct is essential to an assessment of the danger he poses to the public[.]"). This defendant's history shows that defendant's actions on January 6, 2021, were not aberrational, but part of a long history of violent criminal conduct and disregard for law enforcement.

Putting aside any aspect of defendant's criminal history where the disposition is unknown, defendant's D.C. pretrial services report ("DC PSR") still shows: 1) 2014 convictions for resisting arrest and drug possession for which defendant was sentenced to 2 years' imprisonment; 2) a 2013

conviction for driving while intoxicated for which defendant was sentenced to 15 days' imprisonment; 3) a 2007 conviction for misdemeanor personal injury with an unknown sentence; 4) 2008 convictions for evading arrest and drug possession for which defendant was sentenced to 9 years' imprisonment; 5) a 2002 conviction for making a terroristic threat for which defendant was sentenced to 30 days' imprisonment; 6) a 2004 conviction for resisting arrest for which defendant was sentenced to 1 year's imprisonment; 7) a 2001 conviction for misdemeanor assault for which defendant was sentenced to 12 months' probation; 8) a 2000 conviction for drug possession for which defendant was sentenced to 10 years' probation; and 9) a 2001 conviction for drug possession for which defendant was sentenced to 10 years' probation (DE 9 at 4-7).

The PSR also shows that defendant has twice had his parole/probation revoked (DE 9 at 5,7). While defendant notes that defendant completed his most recent term of parole and credits the rehabilitation efforts of a Mr. David Trickett (Mot. at 6), defendant's willingness to assault police officers on January 6, in the full view of other officers, bystanders, and cameras, demonstrates that he remains a danger despite Mr. Trickett's efforts. As Mr. Trickett himself testified during defendant's original detention hearing, throwing objects at police is "against everything" that Mr. Trickett teaches and he would not support "anyone in his program using violence or weapons to demonstrate that they are not happy with the election." (Defense Exhibit 1, at 73-74).

Defendant's pre-January 6 criminal history shows that he lacks respect for the law and engages in violence even without political provocation. Government Exhibit 5 shows that

defendant's violence on January 6 was not limited to attacks on the police and the Capitol, but that he was aggressive even towards a fellow rioter.

In addition, defendant's actions against the Capitol and law enforcement on January 6 warrant demonstrate that defendant remains prone to violence. That defendant was willing to engage in a brazen attack on law enforcement officers, despite his long experience with the criminal justice system, creates a great concern about the danger he would pose to the community, if released.

As *Munchel* recognized, courts may rely on defendants' violent actions undertaken on January 6 in determining their future dangerousness. *See* 2021 WL 1149196, at *8 (looking to violent conduct on January 6 as probative of future dangerousness). Defendant's actions on January 6 show that he is willing to allow his own personal beliefs to override the rule of law, which reflects poorly on his character. *See United States v. Sabol*, 2021 WL 1405945, at *15 ("That [the defendant] acted violently against law enforcement protecting the peaceful transition of power based on a belief that the 2020 Presidential Election was stolen is also very alarming [and] indeed raises concerns about [his] character and the danger [he] may present to the community if he were released.").

There is no evidence that defendant has expressed remorse for what occurred at the Capitol or renounced the beliefs that he thinks justified his violence. *See, e.g., Chrestman*, 2021 WL 765662, at *14 (analyzing such considerations); *Whitton*, 2021 WL 1546931, at *11 (same). To the contrary, his social media posts after the event suggest he is proud of his conduct on January 6 and remains willing to "fight" if he believes his country is being "stolen." Thus, there is no reason

to believe he will refrain from such violence when he determines that "further measures" are necessary.

Defendant's attempts to compare himself to other rioters who have been released (Mot. at 7) are misplaced.  There is no evidence that defendants Jones, Gossjankowski, or Leffingwell had as serious a criminal history as defendant, let alone shared any of the other factors warranting detention of this defendant.  Moreover, the fact that the Government may not have sought detention for a particular individual has no bearing on whether the Section 3142(g) factors warrant detention for this defendant.

### Nature and Seriousness of the Danger

The final factor is the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4).  Defendant's conduct in this case—assaulting police officers in an effort to undermine a presidential election—shows a disregard for the safety of others, the rule of law, and the democratic process.  Indeed, "if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does." *United States v. Fairlamb*, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021).

"It cannot be gainsaid that the violent breach of the [U.S.] Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community." *United States v. Munchel*, 991 F.3d 1273, 1284–85 (D.C. Cir. 2021). In *Munchel*, the D.C. Circuit remarked that "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Id.* at 1284.  Defendant's actions

on January 6 place in him squarely into *Munchel*'s more dangerous category and provide clear and convincing evidence that he "poses a concrete, prospective threat to public safety." *Id*. at 1280.

As discussed above, defendant's history reveals that he can be violent even when not surrounded by a mob.  This risk is compounded because defendant believes he is justified in using physical violence to advance his political objectives.  *See Sabol*, 2021 WL 1405945, at *18 (D.D.C. Apr. 14, 2021) ("[T]he Court is not persuaded that [conditions of release] would mitigate [the defendant's] continued danger to the community based on his demonstrated willingness to engage in violence in furtherance of his beliefs and in a perceived battle against tyranny."); *Chrestman*, 2021 WL 765662, at *16 ("[The defendant's] very actions on January 6 make apparent that this defendant will follow his beliefs . . . even when the laws designed to protect our democracy prohibit his conduct.").  At the same time, the lies and conspiracy theories that motivated defendant are still being touted publicly by the same people who defendant credited before January 6.  While defendant is entitled to his beliefs, because he has demonstrated a willingness to use violence to enforce those beliefs, and because those beliefs include the premise that the government of the United States is illegitimate, the threat of further violence by defendant is "present, concrete, and continuing." *Sabol*, at *18.

None of the conditions of release suggested by defendant are sufficient to address this concern.  In light of defendant's criminal record, his brazen actions in front of law enforcement officers, his belief that he did nothing wrong on January 6 and his continuing willingness to "take further measures" and "fight," this Court can have no confidence that he will conform his conduct to the law if released.

### **Flight Risk**

Though that the magistrate judge did not find it a basis for detention, the government

submits that on *de novo* review, defendant has not rebut the presumption, and the evidence supports a finding that defendant presents a risk of flight.

As discussed above, the weight of the evidence against defendant is overwhelming. Moreover, due to his extensive criminal history, defendant is likely in Criminal History Category VI. The government estimates that a conviction on just one of the assault charges would result in an offense level of 26, yielding a sentencing range of 120-150 months. Defendant is therefore facing a substantial term of imprisonment, which gives him a motive to flee. Therefore, the "nature and circumstances of the offense" and the "weight of the evidence" favor pretrial detention. *See Sabol*, 2021 WL 1405945, at \*13–14; *see also United States v. Chansley*, 2021 WL 861079, at \*14 (D.D.C. Mar. 8, 2021). Moreover, defendant's repeated charges for evading or resisting arrest, his history of probation/parole violation, and his belief he did nothing wrong on January 6 create a serious risk of non-appearance.

Finally, according to the PSR from the Southern District of Texas (Government Exhibit 6), defendant has no ties to the District of Columbia, and very few ties even to the Southern District of Texas. Defendant has no close family members or significant others, does not live with any of his children, and at the time of his arrest was living in a group home run by a prison ministry. He has had sporadic employment, and thus has few financial ties to any particular area.

For the above reasons, the government submits that the defendant also poses a risk of non-appearance and should continue to be detained pending trial for this reason as well.

### The conditions at the D.C. Jail are not a basis for release

The defendant's remaining argument centers around the nature of incarceration during a pandemic. While the global pandemic continues to affect the world in drastic ways, the effect of the public health crisis on the D.C. Jail – in and of itself – does not warrant defendant's release in

light of the danger and risk of flight discussed above.  As this Court is well aware, the primary issue is the danger posed by defendant's release.  *See United States v. Lee*, 451 F. Supp. 3d 1, 7 (D.D.C. 2020) ("[T]he relevant statutory inquiry is *not* the benefits that a defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial).  Rather, the statute requires the Court to evaluate "*the danger*" that "*would be posed by the person's release*.") (citing 18 U.S.C. § 3124(g)(4)) (emphasis in original).

Defendant does not contend that he is at any particular risk from COVID-19, or that the conditions at the D.C. Jail have caused him any particular health issues.  Rather, defendant argues that there are harms that "may" be caused by prolonged isolation or that he will "likely" be detained for longer than the typical time.  Such speculation is insufficient to warrant defendant's release in light of the concrete risks discussed above.  Moreover, defendant concedes that there have been "promising developments" that may allow the return of a more normal schedule.  Indeed, D.C. Corrections officials recently announced a relaxation of the confinement restrictions that have been in place.  *See* Clarence Williams, "D.C. jail to relax coronavirus restrictions, end nearly 24-hour daily lockdown," *Washington Post*, May 13, 2021.  According to the most recent "Stay-in-Place" timeline of the D.C. Department of Corrections ("DOC") (Government Exhibit 7), in person education resumed on May 5, 2021, and in-person contact legal visits resumed on May 15, 2021. Among other changes, beginning May 24, 2021, the DOC will expand small group sizes consistent with social distancing, and beginning June 11, 2021, the DOC will offer pre-pandemic hours of weekly outdoor recreation to all residences, and fully vaccinated residents will have access to indoor recreation.  (*See* Government Exhibit 7, at 1, 5).

## **Conclusion**

For the above reasons, the Government submits that the presumption has not been rebutted, and that there is clear and convincing evidence that the defendant is a danger to the community, and that there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community or the integrity of this proceeding, if he were to be released. The government also submits that he is a risk of non-appearance by a preponderance of the evidence. The Court should therefore deny his motion.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By:     /s/ *Robert Juman*
        Robert Juman
        Assistant United States Attorney
        Bar No. NJ 033201993
        United States Attorney's Office, Detailee
        555 Fourth Street, N.W.
        Washington, DC 20530
        Phone: (786) 514-9990
        E-mail: Robert.juman@usdoj.gov

Date:  May 18, 2021

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading was served on all counsel of record via the Court's electronic filing service.

_/s/   Robert Juman_____
Robert Juman
Assistant United States Attorney

Date:  May 18, 2021