**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-CR-245-APM** |
| **v.** | : | |
| | : | |
| **SHANE JENKINS,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE

Defendant Shane Jenkins, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved "for change of venue or, in the alternative, to allow expanded examination of prospective jurors before and during voir dire." [ECF No. 47; hereinafter, "Motion"] The defendant fails to establish that he "cannot obtain a fair and impartial trial" in this district[1], or that extraordinary jury selection procedures are necessary, and, therefore, this Court should deny his Motion. Fed. R. Crim. P. 21(a)

---

[1] Every judge of this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the same. *See, e.g., United States v. Gillespie,* No. 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Bender, et al.*, No. 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (Nov. 18, 2022) (TFH); *United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (Nov. 9, 2022) (TJK); *United States v. Eicher*, No. 22-cr-38, ECF No. 34 (D.D.C. Oct. 20, 2022); *United States v. Nassif*, No. 21-cr-421, ECF No. 42 (D.D.C. Sep. 12, 2022) (JDB); *United States v. Brock*, No. 21-cr-140, ECF No. 58 (D.D.C. Aug. 31, 2022) (JDB); *United States v. Jensen*, No. 21-cr-6 (Aug. 26, 2022) (Minute Entry) (TJK); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn, et al.*, No. 21-cr-303 (July 21, 2022) (Minute Entry) (ABJ); *United States v. Bledsoe*, No. 21-cr-204 (July 15, 2022) (Minute Order) (BAH); *United States v. Calhoun*, No. 21-cr-116 (July 11, 2022) (Minute Order) (DLF); *United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 176 (D.D.C. June 28, 2022) (APM); *United States v. Williams*, No. 21-cr-377 (June 10, 2022) (Minute Entry) (BAH); *United States v. McHugh*, No. 21-cr-453 (May 4, 2022) (Minute Entry) (JDB); *United States v. Hale-Cusanelli*, No. 21-cr-37 (Apr. 29, 2022) (Minute Entry) (TNM); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States*

**BACKGROUND**

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

The defendant participated in the riot on January 6, 2021.  Having entered into restricted areas of the Capitol grounds, he joined other rioters in their substantial efforts to gain entrance to the Capitol Building via the Lower West Terrace Tunnel.  At that location, and as part of that effort, he threw (9) different objects into the Tunnel at Capitol Police and Metropolitan Police Department officers who were attempting to block the rioters' access to the Building.  These objects included a drawer, a flagpole, and various other pole-like objects.  He also attempted to break out a window of the Capitol Building not far from the Tunnel entrance.  He used a metal tomahawk to do so.

Based on his actions on January 6, 2021, the defendant was charged in a Superseding Indictment filed on November 10, 2021 with the following offenses:

18 U.S.C. § 231 (Civil Disorder)

18 U.S.C. § 1512 & 2 (Obstruction of Congress)

18 U.S.C. § 111(a)(1) & (b) (Assaulting, Resisting, or Impeding Certain Officers

---

*v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

Using a Dangerous Weapon**)**

18 U.S.C. § 1361 & 2 (Destruction of Government Property)

18 U.S.C. § 641 & 2 (Theft of Government Property)

18 U.S.C. § 1752(a)(1) & (b)(1)(A) (Entering and Remaining in a Restricted
Building or Grounds with a Deadly or Dangerous Weapon)

18 U.S.C. § 1752(a)(2) & (b)(1)(A) (Disorderly and Disruptive Conduct in a
Restricted Building or Grounds with a Deadly or Dangerous Weapon)

18 U.S.C. § 1752(a)(4) & (b)(1)(A) (Engaging in Physical Violence in a
Restricted Building or Grounds with a Deadly or Dangerous Weapon)

40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in the Capitol Grounds or Building)

40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or
Buildings)

The defendant now moves for a change of venue.  Fed. R. Crim. P. 21(a).   He contends that prejudice should be presumed in this district for several reasons: (1) the pretrial publicity surrounding the events of January 6; (2) the size and characteristics of the D.C. jury pool; (3) the proximity between publicity and trial; (4) the effect of the wording of pre-trial release orders in other cases; (5) the results of a survey of potential jurors; and (6) the results of a media analysis. Each of the defendant's arguments is without merit, and the Motion should be denied.

## **ARGUMENT**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).   Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United*

*States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## I.     The Pre-trial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.

The defendant contends that a change of venue is warranted based on pretrial publicity. [Motion at 8-12]  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived

notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155

(2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

### A.     Nature of the pre-trial publicity

The defendant argues that prejudice should be presumed based on statements by the Vice President. [Motion at 9-10] But harsh condemnation of a defendant's actions is not uncommon

in high-profile criminal cases, and it does not suffice to establish prejudice.  In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382.  And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations."  *Haldeman*, 559 F.2d at 61.  The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.*  The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Jenkins.  And, again, statements by Vice President are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

The defendant asserts that a fair trial cannot be had in D.C. because of the volume of negative news coverage of January 6.  [Motion at 8]  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small percentage of the news coverage of January 6 has focused on Jenkins.  Unlike most cases involving pre-trial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 900 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559

F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).  Indeed, many of the news stories that the defendant cites were published by media organizations with wide national circulation, not purely local outlets.  [Motion at fn. 7, 8, 9]  As the Select Litigation poll demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washington, D.C. (33%) and Atlanta (30%).  [Motion, Exhibit A, Appendix A at 14 (Question 8)]  Therefore, by the defendant's own reasoning, it would be impossible for him to get a fair trial not only in this district, but *any other* district in the country. He fails to show that the nature and extent of the pre-trial publicity support a presumption of prejudice and justify a transfer to another Federal district.

### B.    Passage of time before trial

The Supreme Court has clearly indicated that the passage of time can reduce the prejudicial effect of pretrial publicity.  *See Skilling*, 561 U.S. at 383; *Patton*, 467 U.S. at 1034 ("That time soothes and erases is a perfectly natural phenomenon, familiar to all.").  In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383.  In this case, 24 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat,"

*Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned Jenkins himself, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

While seeming to acknowledge that the passage of time would normally mitigate the risk of prejudice, the defendant contends that the events of January 6 continue to receive nationwide press coverage and remain in the public eye.  [Motion at 12-13]  Furthermore, he asserts, the focus of media coverage and public discourse has shifted from the facts of what happened at the riot to "diagnosing protestors' motives." [2]  [Motion at 12]   The defendant provides no support for this sweeping assertion.  Nor does he explain how such a shift in coverage, if indeed it had come to pass, would necessarily influence prospective jurors.  An assessment the defendant's intent will be made in this case – as in any other case – based on his statements, conduct (personal, and in relation to others), and outward demeanor.

### C.    The jury verdict

Because Jenkins has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

---

[2] It appears that such focus on the "collective motives" of the rioters is of concern to him because his theory of defense for trial will be that the United States is unable to prove that the defendant possessed the requisite *mens rea*.  [Motion at 10, 12-13]

**II**     **The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue.**

The defendant also contends that a D.C. jury cannot be impartial because of the size and characteristics of the District's jury pool.  None of these claims has merit.

**A.     The District of Columbia's political makeup**

The defendant contends that he cannot obtain a fair trial in the District of Columbia because more than 90% of its voters voted for the Democratic Party candidate in the 2020 Presidential Election.  [Motion at 8]  The *en banc* D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims.  But whether individual prospective jurors have

such disqualifying biases can be assessed during voir dire.  This Court should not presume that every member of a particular political party is biased simply because this case has a political connection.  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895).  The same is true here.  The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial.  *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, Roger Stone, and Steve Bannon have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020); *United States v. Bannon*, No. 210-cr-670 (CJN).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-31.  Similarly, here, it does not follow from the fact that most District residents voted against Donald Trump that those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

**B.    The impact of January 6 on Washington D.C.**

The defendant contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard and the Mayor's declaration of a state of emergency.  [Motion at 6]  But January 6 is now nearly two years in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation omitted).  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

**C.  The size of the District**

The defendant suggests that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000.  [Motion at 5-8]  Although this District may be

geographically smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont) and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals."  *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled."  *Id.*

### D.        The Effect of Language in Pre-trial Release Orders

The defendant claims that the language of pre-trial release orders in January 6 prosecutions have rendered any prospective Washington D.C. jury pool "irredeemably biased."  [Motion at 13] He asserts that the District Court views the people of Washington D.C. as victims, and that the people themselves see themselves in this way.  [Motion at 13]  He further reasons that people who see themselves as victims of the January 6th riot can't be unbiased jurors.  [Motion at 13]  He provides no basis for his claim about how the people of Washington D.C. see themselves.  This is an unfounded assertion.  He does not explain why he thinks the average resident of Washington, D.C. would be *aware* of the language of these pre-trial release orders, much less comprehend its significance.  He also ignores the fact that there are very sound reasons for wanting January 6th defendants to stay out of the District pending trial – namely, to ensure they do not come back to Washington, D.C. to engage in additional trespass, obstruction, and violence.  This is not an academic concern, given that a large percentage of January 6 defendants still claim that the election

was "stolen," and the President is not legitimate.  Therefore, their original motivation for the commission of these offenses remains.  But even if the residents of the District did see themselves as victims in some abstract sense because the riot occurred in their city, the defendant fails to explain how such a self-image would necessarily affect a prospective juror so as to render him or her incapable of fairness and objectivity.

### III.    The Poll Submitted by the Defendant Does Not Support a Change of Venue.

The defendant relies on a poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia in connection with other January 6 cases.  [Motion at 10-11]  Select Litigation conducted a telephone poll of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions.  That poll does not support the defendant's request for a venue transfer.

### A.    Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.

The defendant argues that this Court should find a presumption of prejudice based on a poll of prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

14

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that

99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are

16

poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls. And the defendant has not offered any reason to depart from that usual practice here. Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice. But, as explained below, the poll submitted by the defendant does not support a presumption of prejudice in any event.

## B.     The Select Litigation poll does not demonstrate pervasive prejudice in the District of Columbia.

Contrary to the defendant's contention, the Select Litigation poll does not support a presumption of prejudice in this District. As an initial matter, the Select Litigation poll selected only one comparator jurisdiction - the Atlanta Division of the Northern District of Georgia. The defendant has not asked to be tried in Atlanta. Instead, he asks this Court for a transfer to "another district." [Motion at 1] The Select Litigation survey tells the Court nothing about the views or media exposure of prospective jurors in any other district. The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in some other district. *See United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (*en banc*) (*per curiam*) (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District

of Columbia to other districts, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C.  The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error. [Motion, Exhibit A, Appendix A at 14 (Question 8)].  The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of coverage was not significantly different (28% in D.C. versus 20% in Atlanta). *Id.* at 14.  The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta.  *Id.* at 14.  This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

The defendant points out that 71% of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them.  [Motion at 11; Exhibit A, Appendix A at 14 (Question 4)]  The survey failed, however, to identify (much less define) any of the charges brought against the defendant.  It also failed to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area.  *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion.").  The survey instead gave respondents a binary choice between "guilty or not guilty."  [Motion, Exhibit A, Appendix A at 14 (Question 4)]  Yet, even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused."  *Id.*  This shows that, even in response to a poorly worded question, more than a quarter of the District's residents

realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the *en banc* D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here. *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion." *Id.* at 178 n.2. The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know." *Id.* Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty." *Id.* Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty." [Motion, Exhibit A, Appendix A at 14 (Question 3,4)]

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty." Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty." [Motion, Exhibit A, Appendix A at 14 (Question 5)] In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused." *Id.* Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly

half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

Nor should prejudice be presumed because a substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election and keep Donald Trump in power" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying to overthrow the U.S. government" (72%).  [Motion at 10-11, Exhibit A, Appendix A at 15 (Question 11)]  For one thing, this question asked specifically about those who "forced their way into the U.S. Capitol," which suggests a higher degree of culpability than simply entering the Capitol.  For another, the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions.  *Id.*  Nor did the question define the offenses of "insurrection" or advocating the overthrow of government, *see* 18 U.S.C. §§ 2383, 2385, offenses with which no defendant has been charged in connection with January 6.  And, most importantly, the poll did not answer the key question: whether a sufficient number of prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court."  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box").  In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C.  *Skilling*, 561 U.S. at 382.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases.  But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses.  As in *Haldeman*, there is "no reason for concluding that the population

of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively
to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of
venue is required.  *Haldeman*, 559 F.2d at 62.

## IV.  The Select Litigation Media Analysis Does Not Support a Change of Venue.

The defendant also attaches to his Motion a media analysis conducted by Select Litigation
supports a change of venue, in an apparent effort to show the difference in the amount of publicity
the riot received in Washington, D.C. and that received in Atlanta, Georgia.   [Motion, Exhibit A,
Attachment B]

For several reasons, these numbers do not demonstrate that media exposure was
significantly different in Atlanta than in Washington, D.C.  First, the comparison fails to account
for the comparative sizes and circulations of the two newspapers.  It should not be surprising that
a large national newspaper would print more articles on the same topic than a regional newspaper.
Second, the analysis does not account for the fact that many Americans receive their news from
national sources such as CNN or Fox News, often filtered through social media.  Thus, prospective
jurors in both Washington, D.C. and Atlanta are not limited to their local newspapers and television
broadcast stations and may well have been exposed to much of the same media coverage.  Third,
simply counting the number of news articles in a given source is not a good way to measure
prospective jurors' media exposure.  Indeed, the Select Litigation poll shows comparatively small
variations in media exposure between Washington, D.C. and Atlanta.  According to that poll, 99%
of D.C. respondents were aware of the January 6 demonstrations, compared to 93% in Atlanta, and
33% of D.C. respondents had seen "A lot" of coverage, compared to 30% in Atlanta.  [Motion,
Exhibit A, Attachment A (questions 1,8)]  Like the Watergate scandal at issue in *Haldeman*, the
storming of the Capitol on January 6, 2021, was "not a local crime of peculiar interest to the

residents of the District of Columbia" but one that generated national interest.  *Haldeman*, 559 F.2d at 64 n.43.

The Select Litigation analysis also concludes that "the number of hits from internet sites based in the District of Columbia area was four times higher than the comparable number of hits from sites based in the Atlanta area."  [Motion, Exhibit A, Attachment A at 9]  But the analysis includes no information about where these hits came from.  Many of the hits on D.C.-based news sources likely came from readers outside the District itself, such as readers in the Northern Virginia and Maryland suburbs or readers from other parts of the country who were directed to D.C.-based news reporting on social media.  A reader in California, for example, would be far more likely to read about January 6 on the Washington Post than on the Atlanta Journal-Constitution.  Without additional information, this analysis of Internet hits is essentially meaningless.

The Select Litigation analysis is also unhelpful because it considered only the coverage of January 6 in general, as opposed to the coverage of Jenkins.  Jenkins is one of more than 900 defendants charged in connection with January 6, and only a fraction of the media coverage has focused on him.  Indeed, the coverage of Jenkins is less significant than in *Skilling*, where the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name."  *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).

Finally, the media analysis fails to support a presumption of prejudice because mere exposure to pretrial publicity does not disqualify a potential juror.  "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*."  *Skilling*, 561 U.S. at 381.  The Supreme Court has found no presumption of prejudice even when 98% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an

opinion into the jury box." *Patton*, 467 U.S. at 1029.   The mere fact that Washington, D.C. news outlets have run more stories about January 6 (and received more hits) than have Atlanta outlets does not suggest that an impartial jury cannot be selected in Washington D.C.

## V.      Standard Voir Dire Is the Appropriate Means of Selecting an Impartial Jury.

If the Court is not inclined to grant his request for transfer of venue to another district, the defendant asserts that the implementation of three measures will be necessary to ensure that an impartial jury will be empaneled.   [Motion at 14]   These are: 1) the distribution and return of a questionnaire prepared by the Defense; 2) that the parties be present for any pre-screening questioning conducted by the Court before the beginning of formal voir dire; and 3) that the parties be permitted to question jurors individually during voir dire.   [Motion at 1, 14]   The United States submits that the Court's standard procedures for conducting voir dire in criminal cases will be adequate in this case.   There is nothing extraordinary about this defendant or this case, compared with other January 6 prosecutions.

A careful voir dire is adequate to ensure an impartial jury.   The Supreme Court and the D.C. Circuit have long made clear that a careful voir dire is the appropriate way to address prejudicial pretrial publicity, except in those extreme cases where prejudice is presumed.   *See Skilling*, 561 U.S. at 381-82.   The Supreme Court observed in *Skilling* that voir dire was "well suited to th[e] task" of probing the crime's "widespread community impact."   *Id.* at 384.   And the Court has said that "[i]t is fair to assume that the method we have relied on since the beginning"-*i.e.*, voir dire - "usually identifies bias."   *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (citing *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D. Va. 1807) (Marshall, C.J.)).   Similarly, the D.C. Circuit has said that "voir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner."   *In re*

*Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981); *see Haldeman*, 559 F.2d at 63 ("[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").

That having been said, the United States would have no objection to the parties being permitted to ask reasonable (in both nature and number) follow-up questions of individual prospective jurors.

### A.   A jury questionnaire is not necessary in this case.

The defendant also suggests that it will be necessary for the Court to utilize a jury questionnaire in order to ensure the selection of impartial jurors.  [Motion at 14]  He is incorrect. Although this Court has discretion to use a written questionnaire, it need not do so because it can select an impartial jury using only in-person voir dire.[3]  Issues of pre-trial publicity and potential prejudice are more meaningfully explored by in-person examination than by use of a jury questionnaire.  "[W]ritten answers [do] not give counsel or the court any exposure to the demeanor of the juror in answering the . . . questions." *Mu'Min*, 500 U.S. at 425.  A prospective juror's tone of voice and demeanor are important.  *See Rosales-Lopez*, 451 U.S. at 188 (observing that the court "must reach conclusions" based on its "own evaluation[] of demeanor evidence and of response to questions").  Indeed, "[h]ow a person says something can be as telling as what a person says." *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994); *see also Mu'Min*, 500 U.S. at

---

[3] Some judges in this District have used written questionnaires to aid in screening potential jurors in particular cases. *See, e.g., United States v. Stone*, --- F. Supp. 3d ---, 2020 WL 1892360, at *2-3 (D.D.C. Apr. 16, 2020); *United States v. Lorenzana-Cordon*, No. 03-CR-331, 2016 WL 11664054, at *1 (D.D.C. Feb. 22, 2016).  One judge used a questionnaire in a January 6 trial. *United States v. Alford*, 21-cr-263, ECF Nos. 46 at 15, 50 (D.D.C. Apr. 18, 2022) (TSC).  And in *United States v. Samsel*, 21-cr-537 (Dec. 15, 2022) (Minute Order) (JMC), the court has indicated that it plans to use a juror questionnaire in advance of the March 6, 2023 trial.  But the practice is not common in this District.  And judges in many January 6 cases have achieved the efficiency often served by questionnaires by using a hybrid voir dire in which the court initially asks questions of the entire venire, with prospective jurors noting their answers on notecards, followed by individual questioning.

433 (O'Connor, J., concurring) ("A particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused."). And even where a questionnaire is used, in-person follow-up questioning is important to give the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. A jury questionnaire would not materially assist jury selection in this case, since there is no suggestion that this particular defendant has received significant, unfavorable pretrial publicity, and any potential prejudice due to general media coverage of the events of January 6, 2021 can be adequately probed through in-person voir dire examination.

## VI.   The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, more than a dozen January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire"). Instead, the judges presiding over nearly all of those trials were able to select a jury in one or two days. *See United States v. Reffitt*, No. 21-cr-32, Minute Entries (Feb. 28 & Mar. 1, 2022); *United States v. Robertson*, No. 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, No. 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (May 23, 2022); *United States v. Anthony Williams*, No. 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022); *United States v. Herrera*, No. 21-cr-619, Minute Entry (D.D.C. August 15, 2022); *United States v. Jensen*, No. 21-cr-6, Minute Entries (Sep. 19 & 20, 2022); *United States v.*

*Strand*, No. 21-85, Minute Entry (D.D.C. Sep. 20, 2022); *United States v. Alford*, No. 21-cr-263, Minute Entry (Sep. 29, 2022); *United States v. Riley Williams*, No. 21-cr-618, Minute Entries (D.D.C. Nov. 7 & 8, 2022); *United States v. Schwartz*, No. 21-cr-178, Minute Entries (Nov. 22 & 29, 2022). The only exceptions have trials involving seditious conspiracy charges. *See United States v. Rhodes, et al.*, No. 22-cr-15, Minute Entries (Sept. 27, 28, 29; Dec. 6, 7, 8, 9, 2022). And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined). *See Reffitt*, No. 21-cr-32, ECF No. 136 at 121. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror. *Reffitt*, No. 21-cr-32, ECF No. 133 at 23, 30. The Court then followed up during individual voir dire. Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[4]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%). *See Thompson*, No. 21-cr-161, ECF No. 106 at 170, 172, 181, 190, 193. The court

---

[4] For those struck based on a professed inability to be impartial, see *Reffitt*, No. 21-cr-32, ECF No. 133 at 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046); ECF No. 134 at 41-42 (Juror 443), 43-47 (Juror 45), 71-78 (Juror 1747), 93-104 (Juror 432), 132-43 (Juror 514); ECF No. 135 at 80-91 (Juror 1484). For those struck for other reasons, see *Reffitt*, No. 21-cr-32, ECF No. 134 at 35-41 (Juror 313, worked at Library of Congress); ECF No. 134 at 78-93 and ECF No. 135 at 3 (Juror 728, moved out of D.C.); ECF No. 135 at 6-8 (Juror 1650, over 70 and declined to serve), 62-73 (Juror 548, unavailability), 100-104 (Juror 715, anxiety and views on guns), 120 (Juror 548, medical appointments); ECF No. 136 at 41-43 (Juror 1240, health hardship), 53-65 (Juror 464, worked at Library of Congress), 65-86 (Juror 1054, prior knowledge of facts).

asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire. *Id.* at 4-5, 35. Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[5]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson*, No. 21-cr-34, ECF No. 106 at 73. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Robertson*, No. 21-cr-34, ECF No. 104 at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15. The Court followed up on affirmative answers to those questions during individual voir dire. Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[6]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%).

_____

[5] For the three stricken for bias, see *Thompson*, No. 21-cr-161, ECF No. 106 at 51-53 (Juror 1242), 85-86 (Juror 328), 158-59 (Juror 999). For the six stricken for hardship or inability to focus, see *Thompson*, No. 21-cr-161, ECF No. 106 at 44 (Juror 1513), 45 (Juror 1267), 49-50 (Juror 503), 50-51 (Juror 1290), 86-93 (Juror 229), 109-10 (Juror 1266).

[6] For those struck based on a professed inability to be impartial, see *Robertson*, No. 21-cr-34, ECF No. 104 at 26-34 (Juror 1431), 97-100 (Juror 1567); ECF No. 105 at 20-29 (Juror 936), 35-41 (Juror 799), 59-70 (Juror 696), 88-92 (Juror 429); ECF No. 106 at 27-36 (Juror 1010), 36-39 (Juror 585), 58-63 (Juror 1160). For those struck for other reasons, see *Robertson*, No. 21-cr-34, ECF No. 104 at 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.); ECF No. 105 at 55-59 (Juror 1122, language concerns), 92-94 (Juror 505, work hardship); ECF No. 106 at 16-21 (Juror 474, work trip); 50-53 (Juror 846, preplanned trip).

*Webster*, No. 21-cr-208, ECF No. 115 at 6, though it later excused one of those 35 based on

hardship, *Webster*, No. 21-cr-208, ECF No. 114 at 217-18.  The Court asked all prospective jurors

whether they had "strong feelings" about the events of January 6 or about the former President that

would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this

case." *Webster*, No. 21-cr-208, ECF No. 113 at 19.  During individual voir dire, the Court followed

up on affirmative answers to clarify whether prospective jurors could set aside their feelings and

decide the case fairly.  *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66.  Only 10 out of 53

prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be

impartial, as opposed to some other reason.[7]  The *Webster* Court observed that this number "was

actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue

transfer motion" in that case.  *Webster*, No. 21-cr-208, ECF No. 115 at 7.

  In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32

of them (or 68%).  *Hale-Cusanelli*, No. 21-cr-37, ECF No. 91 at 106, 111.  The Court asked

prospective jurors questions similar to those asked in the other trials.  *See Hale-Cusanelli*, No. 21-

cr-37, ECF No. 90 at 72-74 (Questions 16, 20).  Of the 15 prospective jurors struck for cause, 11

(or 23% of those examined) were stricken based on a connection to the events of January 6 or a

professed inability to be impartial.[8]

---

[7] Nine of the 19 stricken jurors were excused based on hardship or a religious belief.  *See Webster*, No. 21-cr-208, ECF No. 113 at 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster*, No. 21-cr-208, ECF No. 114 at 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262).  Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office.  *See Webster*, No. 21-cr-208, ECF No. 113 at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster*, No. 21-cr-208, ECF No. 114 at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

[8] *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 61-62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 91-94 (Juror 653); ECF No. 91 at 2-5 (Juror 1129), 32 (Juror 182), 36 (Juror

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728.  In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727.  The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803.  *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.*  As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

---

176), 61-62 (Juror 890), 75-78 (Juror 870), 94-97 (Juror 1111), 97-104 (Juror 1412).  For the four jurors excused for hardship, see *Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 77-79 (Juror 1524), 99 (Juror 1094); ECF No. 91 at 12 (Juror 1014), 31 (Juror 899).

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue, and for extraordinary jury selection procedures should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  _/s/ David J. Perri_
David J. Perri
WV Bar Number: 9219
Assistant United States Attorney Detailee
United States Attorney's Office
Northern District of West Virginia
1125 Chapline St., Suite 3000
Wheeling, WV 26003
(304) 234-0100

By: _/s/ Holly F. Grosshans_
HOLLY F. GROSSHANS
Assistant United States Attorney
D.C. Bar No. 90000361
U.S. Attorney's Office for the District of
Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6737
Email:  Holly.Grosshans@usdoj.gov

## CERTIFICATE OF SERVICE

I, David J. Perri, Assistant United States Attorney for the District of Columbia, hereby

certify that the foregoing UNITED STATES' OPPOSITION TO DEFENDANT'S

MOTION TO TRANSFER VENUE has been electronically filed with the Clerk of the Court

using the CM/ECF system, which will send notifications of such filing to the following:

> Dennis Boyle, Esq.
> Blerina Jasari, Esq.
> Boyle & Jasari,
> 1050 Connecticut Ave., NW
> Suite 500
> Washington, D.C. 20036

Dated: January 20, 2023.

By:  */s/ David J. Perri*
David J. Perri
WV Bar Number: 9219
Assistant United States Attorney Detailee
United States Attorney's Office
Northern District of West Virginia
1125 Chapline St., Suite 3000
Wheeling, WV 26003
(304) 234-0100

By: */s/ Holly F. Grosshans*
HOLLY F. GROSSHANS
Assistant United States Attorney
D.C. Bar No. 90000361
U.S. Attorney's Office for the District of
Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6737
Email: Holly.Grosshans@usdoj.gov