**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Case N. 21-CR-245 (APM)** |
| | : | |
| **SHANE JENKINS,** | : | |
| **Defendant.** | : | |

**SENTENCING MEMORANDUM ON BEHALF OF SHANE JENKINS**

Shane Jenkins ("Mr. Jenkins") submits this sentencing memorandum in support of his request for a sentence of 54 months' incarceration. Although his conduct is indeed serious, it is significant to note that Mr. Jenkins' actions were not motivated by any desire for personal financial gain or any other type of benefit. Rather, his actions were motivated by a misunderstanding as to the facts surrounding the 2020 election. Indeed, Mr. Jenkins knew next to nothing about the 2020 election and listened to sources of information that were clearly false. Mr. Jenkins has learned valuable life lessons from this incident, and he will never repeat the actions that bring him before the Court in this case. For the reasons set forth in greater detail below, we request a 54-month sentence because we believe it to be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

As explained in greater detail below, Mr. Jenkins was one of thousands of protestors who walked to the U.S. Capitol Building on January 6, 2021, after former U.S. President Donald J. Trump asked his supporters to march towards the U.S. Capitol Building in protest of the 2020 presidential elections and "fight" on his behalf. This represents one of the saddest episodes in

American history.  There remain many grifters[1] out there who remain free to continue

propagating the "great lie" that Trump won the election, Donald Trump being among the most

prominent.  Mr. Jenkins is not one of these individuals; he knows he was wrong.

      Mr. Jenkins' sentencing guideline range, as calculated by the Probation Officer, is 210

months to 262 months.  However, this is a case where the guidelines themselves should be

discarded since they fail to take into account Mr. Jenkins' unique personal attributes.  The

defense argues that pursuant to all of the 18 U.S.C. 3553(a) factors, a sentence of 54 months'

incarceration would be appropriate in this case.

## I.        FACTUAL BACKGROUND

      Mr. Jenkins' life prior to the instant offense was characterized by caring for his children,

giving back to his community and a focus on his religious beliefs and moral values.

      Prior to his detention, Mr. Jenkins had lived in Texas his whole life and he intends to

return to Houston after serving his sentence in this matter.  Mr. Jenkins centered his life around

community, family, and religion.  The letters appended hereto demonstrate how he has impacted

their lives.

### A.        Shane Jenkins' Family Background

      Mr. Jenkins was born on June 3, 1977, in Fort Worth, Texas. PSR ¶ 79.  Mr. Jenkins'

biological mother, Tamy Hillard, was 16 years old when she was pregnant with Mr. Jenkins. *Id*.

¶ 80.  His biological father, Jeff Bates, was 19 years old and a busy rodeo producer. *Ibid*.

---

[1] It is noteworthy that Steve Bannon was convicted of two counts of Contempt of Congress.
After his conviction, he used his Podcast to call for 4,000 "shock troops" to "deconstruct" the
Government.  Mr. Bannon is a far more dangerous individual than Mr. Jenkins; however, he was
sentenced to four (4) months in prison. *See* DOJ Press Release, available at:
*https://www.justice.gov/usao-dc/pr/stephen-k-bannon-sentenced-four-months-prison-two-counts-contempt-congress* (October 21, 2022).

Neither Ms. Hillard nor Mr. Bates were able to raise Mr. Jenkins and decided to place him for adoption. *Ibid.*  Mr. Jenkins was then adopted by Billy Bob Jenkins and Sandra Jenkins. *Id.* ¶ 79. In 2012, Mr. Jenkins' biological grandmother, Dorothy Dodd, contacted Mr. Jenkins for the first time. *Id.* ¶ 80.  He learned that his father was 65 years old, and a truck driver and that his biological mother passed away when she was 18 years old. *Ibid.*  Ms. Dodd told Mr. Jenkins that Ms. Hillard was murdered by Billy Bob Jenkins' employees after she became a state informant to turn him to the authorities. *Ibid.*  Her death, however, was ruled a suicide. *Ibid.*

Mr. Jenkins' upbringing was "tumultuous" to say the least. *Id.* ¶ 82.  His father, Billy Bob Jenkins, was a drug dealer who frequently smuggled drugs from Mexico into the United States. *Ibid.*  He was also physically abusive towards him, his mother, and his siblings, and would regularly beat Mr. Jenkins with a belt or other items from an early age. *Ibid.*  He passed away when he was in his late 70s in 1992, from complications with throat and lung cancer. *Id.* ¶ 79. The abuse Mr. Jenkins had to endure, combined with his feelings of abandonment after learning that he was adopted when he was 13 years old, left Mr. Jenkins feeling alone and vulnerable.  He met friends who took advantage of Mr. Jenkins' vulnerability, and it was not long after that he began breaking the law.  When he was only a teenager, not more than 14 or 15 years old, Mr. Jenkins found himself in a vehicle with gang members when three of them were shot, and one killed.  As a result, Mr. Jenkins went to a juvenile facility.

After his father's death, in 1992, Mr. Jenkins' mother remarried his stepfather, Wesley Selman, who was also abusive towards his mother. *Id.* ¶ 70.  His mother confided in Mr. Jenkins that she was terrified of Mr. Selman.  On August 19, 1997, the abuse had become so bad that Mr. Jenkins found himself in an altercation with Mr. Selman wherein Mr. Selman approached Mr. Jenkins with a shot gun pointed at him, shouting death threats.  Mr. Jenkins feared for his life

3

and for his mother's life, and shot Mr. Selman in self-defense, killing him.  Because Mr. Jenkins acted in self-defense a grand jury declined to indict him.  After this incident, Mr. Jenkins' life spiraled out of control completely, and he began to use drugs to numb his feelings. *Id*. ¶ 94.

Mr. Jenkins' mother passed away on July 11, 2012, at the age of 72, from an accidental overdose. *Ibid.*  After his mother's death, Mr. Jenkins' drug abuse became more serious, and he began to smoke marihuana and use cocaine. *Ibid*.  In 2014, he began to use heroin and methamphetamine, as well as LSD, Xanax, and benzodiazepines. *Ibid*.  His usage of drugs later resulted in his selling drugs. *Ibid*.  With the help of substance abuse treatment programs as well as a religious program, Mr. Jenkins was finally able to better his life in 2016; however, he continues to struggle due to the abuse and the losses he has suffered in his life and finds solace in his faith and in prayer. *Ibid.*

Mr. Jenkins has two adoptive siblings, Marc Brin Vanwinkle and Keyla Miller.  *Id*. ¶ 81. Mr. Vanwinkle resides in Decator, Texas, and is currently unemployed. *Ibid.*  Mr. Jenkins' sister, Keyla Miller, passed away in 2019, at the age of 58, after she suffered a cardiac arrest brought on by an extensive drug history. *Ibid.*

Mr. Jenkins has five children with almost all of whom he maintains a good relationship. *Id*. ¶ 83.  In 2011, he was in a relationship with Brittany Allsup with whom he has a 14-year-old daughter. *Id*. ¶ 83.  Ms. Allsup and their daughter reside in Ardmore, Oklahoma. *Ibid*.  Mr. Jenkins does not maintain communication with Ms. Allsup or their daughter. *Ibid.*  From late 2011 until July of 2016, Mr. Jenkins was married to Brittani Nobles. *Id*. ¶ 84.  They have one daughter together who is now 13 years old. *Ibid*.  Ms. Nobles and their daughter reside in Haslet, Texas. *Ibid*.  She remarried and works alongside her husband in their electronic cigarettes company. *Ibid*.  Mr. Jenkins' and Ms. Nobles' daughter is in good physical and mental health.

*Ibid.*

Mr. Jenkins also has a 23-year-old son, Teyton Smith, who resides with Mr. Jenkins'
grandmother in Fort Worth, Texas, where he works as a machinist. *Id*. ¶ 86.  Teyton Smith and
Mr. Jenkins maintain a good relationship and speak regularly. *Ibid.*

Mr. Jenkins has a 16-year-old daughter who resides with her mother in Fort Worth,
Texas, and who he speaks with regularly about school and driving. *Id*. ¶ 87.  Finally, Mr. Jenkins
has a 15-year-old son who also resides with his mother in Forth Worth, Texas. *Id.* 88.  Mr.
Jenkins is in regular contact with his son who leans on his father for advice on how to handle the
pressures he faces with marijuana and girls. *Ibid.*

## B.     Shane Jenkins' Educational and Professional Background

In 1996, Mr. Jenkins graduated salutatorian from Gainesville High School. *Id*. ¶ 97. He
participated in his High School's chess club and sports such as football, baseball, basketball, and
track. *Id*. ¶ 82.  Mr. Jenkins was also a member of The Decca Group, an agricultural
organization. *Ibid.*  After graduating from high school, Mr. Jenkins enrolled in college classes at
North Central Texas College in Gainesville, Texas. *Id*. ¶ 97.  Mr. Jenkins majored in emergency
planning. *Ibid.*  After his stepfather's death, Mr. Jenkins discontinued his classes at North Central
Texas College. *Ibid.*  In 2014, Mr. Jenkins enrolled in classes at the Trinity Valley Community
College in Palestine, Texas. *Ibid*.

Hard work is a pillar in Mr. Jenkins' upbringing and values.  At the time of his arrest, Mr.
Jenkins was employed as a sales representative for Moss Roofing Company, earning
approximately $5,000 monthly, however due to his arrest in the instant case, Mr. Jenkins'
employment with Moss Roofing Company was terminated. *Id*. ¶ 99.  From March 2020 to
November 2020, Mr. Jenkins worked as a laborer for a construction company in Forth Worth,

Texas, earning $15 an hour. *Id*. ¶ 100.  From July 2019 to March 2020, he was employed as a

laborer for Select Energy in Odessa, Texas, earning $1,800 a week. *Id*. ¶ 101.  Prior to his

employment with Select Energy, Mr. Jenkins was employed as a ministry assistant from July

2018 to July 2019, in Houston, Texas, and earned $2,000 a month.  *Id*. ¶ 102.

### C.  Shane Jenkins' Arrest

In March 2021, Mr. Jenkins was arrested for the present offense.  On January 6, 2021,

Mr. Jenkins travelled to the District of Columbia in order to attend a rally in support of former

U.S. President Donald J. Trump.  During these demonstrations, President Trump asked his

supporters to march towards the U.S. Capitol Building in protest of the 2020 presidential election

and "fight" on his behalf.  Alongside thousands of other members of the crowd, Mr. Jenkins

walked to the U.S. Capitol Building.  Mr. Jenkins had no larger role in the planning or

organization of the protests or the rioting that ensued in and around the Capitol Building.

### D.  Shane Jenkins is a Pillar in his Community

Mr. Jenkins is a staple member of his family.  He has been a caring father, son, grandson,

uncle, and cousin to many.  He has always exhibited values of loyalty, honesty, faith, and love

for his family and others, as attested by his family. *See* Exhibit "A".

Mr. Jenkins' 16-year-old daughter, K.H., explains that Mr. Jenkins has been a "loving

and positive presence in [her] life", despite the "difficult circumstances he has endured in his

life". *Id.* at 1.  She describes her father as a "goofball" at heart whose "incredible sense of humor

… has been a constant source of joy and laughter in [her] life, even during the toughest of

times." *Ibid.*  K.H. recalls the "many wonderful nights" she and her brothers used to spend at Mr.

Jenkins' house before his incarceration. *Ibid.*  "Those moments were precious to [K.H.], and

[she] treasure[s] them deeply.  Especially now that [Mr. Jenkins] has been away for more than

two years." *Ibid*.  They would "stay up late playing video games, cooking delicious meals together, watching movies, and sharing lots of giggles." *Ibid*.  Even while in prison, Mr. Jenkins has "continued to demonstrate his love and devotion" to K.H. *Ibid*.  On her birthdays, Mr. Jenkins "never failed to surprise [K.H.] with flowers and a heartfelt card, reminding [K.H.] of his love." *Ibid*.  Mr. Jenkins calls K.H. "every weekend, ensuring [they] have [*sic*] meaningful conversations."  "During those calls, he offers [K.H.] valuable advice and guidance that [she] hold[s] close to [her] heart." *Ibid*.  K.H. "firmly believe[s] that [Mr. Jenkins] has the capacity for change and growth." *Ibid*.  K.H. is proud to call Mr. Jenkins her dad because of his love and care and his "unwavering commitment to self-improvement and personal growth":

> Throughout his life, he has encountered numerous obstacles and adversities, each of which he has met with remarkable strength and grace. These experiences have not only shaped his character but have also inspired significant transformation. He has learned from his past, making conscious efforts to grow and evolve as an individual. … His story is one of resilience, redemption, and the pursuit of a better life.

*Ibid*.  Teyton Smith, Mr. Jenkins' eldest son, echoes his sister's loving sentiments for their father in his letter, stating that he "attributes much of [his] success and personal growth to the wisdom and guidance [he] has received from [his] father over the years." *Id*. at 2.  Mr. Smith explains that his relationship with his father has always been "exceptional, regardless of the challenges life has thrown [their] way." *Ibid*.  Mr. Smith states "[n]o matter the circumstances, be it rain, snow, sleet, or hail, nothing has ever come between me and my father.  I would go to the ends of the Earth to support and assist my dad, just as I know he would do the same for me." *Ibid*.  Mr. Smith describes his father as having "a unique ability to brighten [a room] with his mere presence and authenticity.  His innate charisma and genuine nature draw people towards him, and his unwavering support and loyalty make him someone you'd want on your side in any

situation." *Ibid*.  It is Mr. Smith's "heartfelt belief that [his] dad has the capacity to be an

extraordinary influence and a loving presence in the lives of his children", stating that:

> My younger siblings are at a pivotal stage in their lives where they
> need their father more than ever.  They require his wealth of life
> experiences, his unwavering respect, his invaluable guidance, and,
> perhaps most importantly, the undeniable love that only a father can
> provide.  Having experienced the profound influence of my father's
> presence in my own life, I firmly believe that he can make an
> immeasurable difference in the lives of our younger siblings.

*Ibid*.  Mr. Jenkins' 15-year-old son, S.J., describes his father as "one of the nicest, most caring,

and funniest people [he] know[s]". *Id.* at 3.  He is "caring and selfless" and "respectful to

others"; he is "always polite and uses his manners, and he's taught [S.J.] to do the same." *Ibid*.

Most importantly, S.J. states that his father has been "through some tough times in the past, but

he's always encouraged [him] to learn from his mistakes and make better choices". *Ibid*.  As S.J.

says: "he's a changed man, and I'm really proud of him." *Ibid*.

Bethany Holcomb, Mr. Jenkins' friend, former romantic partner, and mother of their

daughter, K.H., also expresses her high regard for Mr. Jenkins in her letter. *See id*. at 4.  Mr.

Jenkins, in her words, "possesses an innate ability to find the silver lining in challenging

situations and provides words of encouragement that can uplift anyone's spirits.  Even though we

are currently miles apart, [Mr. Jenkins] manages to put a smile on my face and helps me

maintain a positive perspective on life." *Ibid*.  She continues: "[Mr. Jenkins] is an individual of

unwavering honesty and determination.  He is always willing to lend a helping hand to others

whenever the opportunity arises.  His willingness to assist those in need showcases his

compassionate and selfless nature." *Ibid*.  Ms. Holcomb further details Mr. Jenkins' crucial and

supportive role in their daughter's upbringing. *Ibid*.  She states, "his commitment to her well-

being and happiness knows no bounds.  He consistently strives to provide the best possible

support and guidance to ensure that [K.H.] is growing up in a loving and nurturing environment. Her happiness and success are of paramount importance to him, and he goes above and beyond to ensure her needs are met." *Ibid.*

Brenna Lancaster, Mr. Jenkins' niece, further describes Mr. Jenkins's commitment to his community and his family: "[Mr. Jenkins] is an outstanding member of his community. *Id.* at 5. He has found GOD and joined a mission group called C.H.A.R.M.  He would play basketball, and teach the word of GOD to at risks youth [*sic*] in his community." *Ibid.*; *see also id.* at 6, letter from Tanner Lancaster ("he is a public speaker for a Christian outreach program, also a mentor for at risk youths through the same organization.").  For Ms. Lancaster, Mr. Jenkins "is a father figure to the children of Houston, Texas.  He is a father figure to all, [herself] included." *Ibid.*; *see also id.* at 6 ("I don't have much of a family of my own and I have grown to love [Mr. Jenkins] and I am proud to be able to call him my uncle, my family.").  "[Mr. Jenkins] has never met a stranger.  He smiles at everyone he sees, always asking if they are doing okay." *Ibid.*; *see also id.* at 7, letter from Mark Brynn Vanwinkle ("[Mr. Jenkins] stands out as being the best citizen, father, brother, person [he has] ever known.").

In addition to members of his family, Mr. Jenkins' numerous friends submitted letters emphasizing his overall good character and the positive influence he has had on each of them.

Mr. Jenkins' lifelong friend, Christi Skiles, states that Mr. Jenkins "has been an integral part of [her] life for almost thirty years." *Id.* at 8.  She expresses that Mr. Jenkins is a "valuable member of our society who makes a positive impact on those around him." *Ibid.*  Ms. Skiles further explains that "what makes [Mr. Jenkins] the happiest … is his faith and helping others." She describes him as a "trustworthy, hardworking and intelligent" friend who is "a man of God, a good Father and son, and most of all someone that [she] can depend on." *Ibid.*; *see also id.* at 9,

9

letter from Courtney Ashley ("[Mr. Jenkins] has consistently dedicated his time and effort to support those who are less fortunate than others.").

Patrick Kennedy has also known Mr. Jenkins for "most of [his] life". *Id.* at 9.  He states that Mr. Jenkins "has always been a reliable, loyal, trustworthy person". *Ibid.*; *see also id.* at 11, letter from Sharon Krahn (Mr. Jenkins has always demonstrated an "honorable and loyal" demeanor and is "always quick to serve and sacrifice for those around him."); *id.* at 12, letter from Anita DeBorde ("As I heard his story, I could feel the genuineness of his faith and his desire to be a godly man and live the kind of life that would be pleasing to God. I know he had a heart to serve other people and grow in his faith"); *id.* at 13, letter from Cory Mizell ("I have never known [Mr. Jenkins] to be anything other than a follower of Christ that was daily working to overcome the consequences of his past circumstances and choices."); *id.* at 14, letter from David Trickett ("[Mr. Jenkins'] example and his heart for others was such an asset and influence in the lives of the men we serve."); *id.* at 15, letter from John Morales ("[Mr. Jenkins] is a great man of God, he helped me learn about Christ. He was and is [a] positive influence"); *id.* at 16, letter from Justin Brownlee ("[Mr. Jenkins] has a heart for all peoples [*sic*] lives.  I've never seen him meet someone and not be willing to help them in any way he could. … He is a brother to many men, and will forever by my brother and someone I look up to."); *id.* at 17, letter from Tom and Lisa Slagle ("We have witnesses [Mr. Jenkins'] positive impact and the effect it has had on those around him.").

The desire to serve others goes to the core of Mr. Jenkins' character, as attested to by his friend Ann Dolbee:

> In April of 2019, Shane and another member of CHARM came to my high school English class to speak to my students.  That group of students was challenging.  I felt like they could potentially go

> down a bad path if someone didn't reach them soon. Shane and his friend Brian came and spoke to all six of my classes that day. The students listened attentively while Shane shared his testimony. He shared honestly with the students about what he had done in the past, from drugs to eventually taking the life of his stepfather. He didn't tell them this to shock them or to glamorize what he did. He explained to them that one thing in his life had been so devastating that it threw him drastically off course. He quickly wound up in prison and had been in and out since he was a teenager. Shane wanted the students to understand that bad things are going to happen in their lives, but it is up to them how they react to those things. They have to make wise choices and surround themselves with people who are lifting them up not tearing them down. Practically all of my students told me later that that day was the best day of the entire school year.

*Id.* at 18. In his letter, Mr. Jenkins' friend, Aimon Allouache captures Mr. Jenkins' essence of who he is as follows:

> To me, our friendship was especially meaningful because he became a trusted friend when I went through a period of depression and as I sought meaning in my life. [Mr. Jenkins] prayed for me on numerous occasions and was very instrumental in me eventually becoming a Christian. He would often share the stories from his past and his testimony, about the shame he felt in being adopted and the tough relationship he had with his stepfather, and the story of moving from brokenness to healing was very influential to me. It was amazing to see the juxtaposition of this person with tattoos all over his body that I would have assumed I'd have nothing in common with, yet such a gentle and caring person who was truly changed by his relationship with God and spent so much time caring for me as well.

*Id.* at 20; *see also id.* at 21, letter from Kara and Hunter Barrow ("Some chapters of [Mr. Jenkins'] life have been filled with sin, heartache, and bad decisions, but we do not believe those chapters define [Mr. Jenkins'] story or who he is."); *id*. at 22, letter from Melissa Highberg ("[Mr. Jenkins] has had to overcome many obstacles from his childhood, but he uses it as a motivator to give back and help others in need.").

Similarly, many of Mr. Jenkins' former colleagues and employers have submitted letters

on behalf of Mr. Jenkins describing his honesty and trustworthiness.  Franco Teffault, a former colleague of Mr. Jenkins and his friend, describes his character as one "marked by honesty, compassion, and a deep sense of responsibility." *Id.* at 23.  Further, Mr. Teffault states that Mr. Jenkins' "commitment to serving his community and advocating for the greater good is truly admirable." *Ibid.*

Mr. Jenkins' former employers, Michael Guilliano and Tiffiny Gregory, both explain how valuable Mr. Jenkins was to their business.  Mr. Guillano writes, "[Mr. Jenkins] has demonstrated an unwavering commitment to making a positive impact on the lives of those around him." *Id*. at 25.  Furthermore, Ms. Gregory writes what truly sets Mr. Jenkins apart is "his willingness to share his knowledge and expertise with others.  He willingly and selflessly assisted his colleagues, helping them improve their skills and excel in their roles." *Id*. at 27.  Ms. Gregory also made clear that Mr. Jenkins "will always have a place at Integrity Roofing." *Ibid.*

## II.        ADVISORY GUIDELINE RANGE

Mr. Jenkins previously filed objections to the presentence investigation report which he incorporates fully herein.  In addition to the objections he previously raised, Mr. Jenkins submits that the probation officer, in her final presentence investigation report, erred in applying a victim related adjustment, pursuant to U.S.S.G. §3A1.2(a), on the basis that the offense is a felony that involved, or was intended to promote, a federal crime of terrorism. *See* PSR, ¶ 47.

Mr. Jenkins actions were not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct". 18 U.S.C. § 2332b(g)(5). "Calculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). Mr. Jenkins travelled to the District of Columbia alone, attended a rally in support of President Trump,

marched to the Capitol Building alongside thousands of other protestors, broke a window after other protestors urged him to do so, stopped breaking the window after other protestors told him to stop, then threw objects into the crowd as a sign of frustration before he left the Capitol Grounds and returned to his hotel room.  Mr. Jenkins' actions on January 6th were not premeditated. *See United States v. Stewart*, 590 F.3d 93 (2nd Cir. 2009) (defendant served as interpreter for a convicted terrorist who translated messages concerning the terrorist's support for the termination of a cease-fire and a return to violence between al-Gama'a, a terrorist organization in Egypt, and the Egyptian government. The court held that, despite the defendant's proximity to the messaging scheme and the scheme's role in benefiting al-Gama'a, the government failed to show that the defendant sought to influence or affect the conduct of government); *see also United States v. Alhaggagi*, 978 F.3d 693, 702 (9th Cir. 2020) (court found that the defendant's maintenance of social media accounts—even though they inured to the benefit of ISIS and its terrorist purpose in the long run—were not accompanied by the necessary mental state to trigger the enhancement).

For the same reasons, the probation officer's determination that Mr. Jenkins' criminal history category shall be VI, pursuant to U.S.S.G. § 3A1.4(b), is incorrect and should be rejected.

The Probation Officer has calculated an advisory guideline range of 210 months to 262 months, resulting from a total offense level of 32 and Criminal History Category VI.  The guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) would result in unwarranted disparity as compared with sentences for similarly situated Defendants; and (3) is far greater than necessary to promote the goals of sentencing in this case.  The guideline range, however, is only one of the factors the Court must consider under 18 U.S.C. 3553(a).

**III.     A SENTENCE OF 54 MONTHS' INCARCERATION WOULD BEST SATISFY THE GOALS OF §3553(a).**

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).  In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)-(7).

No workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *See United States v. Ovid, slip op*., 2010 WL 3940724, *1 (E.D.N.Y. 2010).  A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

**A.     The Guidelines are not Based on Empirical Evidence or National Experience and Fail to Promote any Purpose of Sentencing.**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the meeting of the purposes of sentencing, 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-

guidelines period as a "starting point". 28 U.S.C. § 994(m).  The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra  L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be fair to assume that the guidelines reflect a rough approximation of sentences that "might achieve § 3553(a)'s objectives."  First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past."  Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007).  When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role, because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Id*. at

15

109-10.

The guideline regarding offenses involving obstruction of official proceedings is not based on empirical data of past practice or on national experience since then.   Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2D1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

### B.     Need for Just Punishment in Light of Seriousness of the Offense.

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005).  The guidelines include none of the factors bearing on Mr. Jenkins' degree of culpability.

### C.     Need for Deterrence.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels ... reached that conclusion, as has every major survey of evidence." *Id*.; *see also* Zvi D. Gabbay, Exp*loring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict

Resol. 421, 447048 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al*., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*., at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id*. at 2.  The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  *Id*. at 1.

According to "the best available evidence, ... prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

### D.    Need for Incapacitation.

Mr. Jenkins' has a low risk of recidivism in the above matter.  Not only has Mr. Jenkins learned his lesson from his actions on January 6th, 2021, but the riots that occurred on January 6th, 2021, were a rare occurrence in American History and extremely unlikely to happen again. Mr. Jenkins will not have any opportunity to participate in similar conduct because the events that took place will almost certainly not take place again.

In *United States v. Munchel*, the United States Court of Appeals for the D.C. Circuit stated that "the specific circumstances that made it possible, on January 6, for [the defendants] to threaten peaceful transfer of power" no longer exist. Case No. 21-3010 (D.C. Circuit March 26,

2021).  Specifically, the court stated that the defendants "had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests.  Thus, [the defendants] were able to attempt to obstruct the electoral college vote by entering the Capitol together with a large group of people who had gathered at the Capitol in protest that day." *Ibid.*  It further noted that "[t]he District Court found that appellants were a danger to 'act against Congress' in the future, but there was no explanation of how the appellants would be capable of doing so now that the specific circumstances of January 6 have passed." *Ibid*.

In short, the circumstances leading up to January 6th no longer exist and there is no risk that Mr. Jenkins will engage in similar conduct in the future.

### E.    Need to Avoid Unwarranted Disparities and Unwarranted Similarities.

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, see *Gall*, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

The list attached hereto as <u>Exhibit "B"</u> includes a sample of January 6th cases in which defendants received sentences substantially below the guideline ranges applicable in those cases,

18

and substantially below the guideline range of 210 months to 262 months the probation officer

has calculated here.  This Court should take into account the sentencing trend exemplified by this

list.

In *Parris*, Judge Block in the Eastern District of New York took a similar collection of

cases into account in fashioning an appropriate sentence for two securities fraud offenders.  At

the court's request, each party submitted a sample group of cases to illustrate the sentences

imposed in other securities fraud cases. *Id*. at 752.  Based on these samples, the court concluded

that "[t]hose [Defendants] who were not cooperators and were responsible for enormous losses

were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses

were less than $100 million were generally sentenced to single-digit terms." *Id*. at 753.  The

court relied on this national pattern in arriving at a sentence of 60 months for the two Defendants

who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of

the applicable guideline range. *Id*. at 745.

Here, Probation is recommending a sentence between 210 and 262 months.  Mr. Jenkins'

conduct on January 6th and his unique circumstances, as compared to the sentences other

defendants have received, warrant a sentence in the lower range of sentences imposed. *See* Ex.

B.  The Court should impose a sentence of 54 months' incarceration.

Mr. Jenkins travelled to Washington D.C. to listen to former President Trump's speech

and walked to the Capitol Building alongside hundreds of other protestors.  Mr. Jenkins did not

come prepared to incite violence, attack the Capitol Building or any officers that day—none of

his actions on January 6th were planned in anticipation of his travels.  He did bring a hatchet

with him for self-defense, but he did not assault anybody with it.  If he intended to inflict any

injury on another person that day, he would have used it, but he did not.  Instead, video footage

captured Mr. Jenkins as he was using the hatchet to hit a window on the Lower West Terrace

tunnel.  Another video depicts Mr. Jenkins throwing debris at the crowd of USCP and MPD

officers.  By contrast, Defendant Matthew Ryan Miller, for example, repeatedly assaulted law

enforcement with beer cans, batteries, and spray, and was sentenced to 33 months' incarceration.

*See United States v. Miller*, No. 1:21-CR-00075-RDM.

Mr. Jenkins' conduct is in no way comparable to the conduct of many other

defendants in these cases who:

- brought firearms and other weapons to the Capitol. *See, e.g., Byerly*, No. 1:21-CR-00527-RDM (defendant used a stun gun on officers, received 34 months' incarceration); *United States v. Coffman*, No. 1:21-CR-00004-CKK (defendant traveled to D.C. with multiple firearms in his truck, received 46 months' incarceration); *United States v. Mazza*, No. 1:21-CR-00736-JEB (defendant traveled to D.C. with two loaded handguns, received 60 months' incarceration); *United States v. Sandlin*, No. 1:21-CR-00088-DLF (defendant traveled to D.C. with car full of weapons including guns, bear spray and knives, received 63 months' incarceration); *United States v. Khater*, No. 1:21-CR-00222-TFH (defendant arrived to D.C. with bear and pepper spray, received 80 months' incarceration); *United States v. Head*, No. 1:21-CR-00291-ABJ (defendant brought knife on to Capitol grounds, received 90 months' incarceration); *United States v. Webster*, No. 1:21-CR-00208-APM (defendant traveled to D.C. with bulletproof vest and revolver, received 120 months' incarceration).

- who engaged in extensive planning prior to their trips, *see, e.g., United States v. Mault*, No. 1:21-CR-00657-BAH (defendant planned for violence through pre-

riot text messages, received 44 months' incarceration); *United States v. Herrera*, No. 1:21-CR-619-BAH (defendant came prepared to Capitol, received 48 months' incarceration); *United States v. Denney*, No. 1:22-CR-00070-RDM (defendant used Facebook to recruit for his militia group called the Patriot Boys, received 52 months' incarceration); *United States v. Sandlin*, No. 1:21-CR-00088-DLF (defendant traveled to D.C. with others with a car full of weapons and equipment, received 63 months' incarceration); or

- who engaged in assaultive conduct which caused serious injuries on officers, *see, e.g., United States v. Head*, No. 1:21-CR-00291-ABJ (defendant repeatedly struck police officers with a stolen riot shield and dragged an officer into the mob where he was assaulted, received 90 months' incarceration); *United States v. Webster*, No. 1:21-CR-00208-APM (defendant dragged an officer by his helmet, pinned him to the ground, and tried to rip his gas mask off received, 120 months' incarceration); *United States v. Young*, No. 1:21-CR-00291-ABJ (defendant joined an attack on officers by restraining an officers wrist and attacking other officers, received 86 months' incarceration); *United States v. Rodriguez*, No. 1:21-CR-00246-ABJ (defendant drove a stun gun into an officers neck received 151 months' incarceration).

Furthermore, Mr. Jenkins was not a member of the Proud Boys, Oath Keepers, or any other anti-government organization. *See, e.g., United States v. Ochs*, No. 1:21-CR-00073-BAH (defendant who was a member of Proud Boys and threw smoke bombs at police received 48 months' incarceration); *United States v. Decarlo*, No. 1:21-CR-00073-BAH (defendant who was Proud Boy Member received 48 months' incarceration); *United States v. Pruitt*, No. 1:21-CR-

21

00023-TJK (defendant who was a Proud Boy member, tossed a chair at officers as well as coming face to face with then-Senate Minority Leader Chuck Schumer received 55 months' incarceration ); *see also United States v. Denney*, No. 1:22-CR-00070-RDM (defendant who was the founder of a militia group called the Patriot Boys of North Texas who assaulted law enforcement officers received 52 months' incarceration); *United States v. Wright*, No. 1:21-CR-00341-CKK (defendant who organized two full charter buses transporting over 100 people sentenced to 49 months' incarceration); *United States v. Rhodes*, No. 1:22-CR-00015-CKK (defendant who was the leader of the Oath Keepers group received 216 months' incarceration).

Based on the sentences mentioned above, Mr. Jenkins should receive a similar sentence to those who committed similar conduct, therefore a sentencing range of 210 to 262 months would not be a just sentence in Mr. Jenkins' case.  A sentence of 54 months' imprisonment would be consistent with other defendants who were found guilty of similar actions.

    F.    **Kinds of Sentences Available.**

This Court must consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence ... established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall*, 552 U.S. at 59 & n.11.  According to the Supreme Court's decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines.  Indeed, *Kimbrough* and *Gall* have returned sentencing courts to the "federal judicial tradition" of considering "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior

position to find facts and judge their import under § 3553(a) in the individual case.").

Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary" to comport with the goals of sentencing. *See United States v. Ollzovsky*, 562 F.3d 530, 552 (3d Cir. 2009). Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 9940).

Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Mr. Jenkins is not a "violent and serious offender" who "pose[s] the most dangerous threat to society". He had no intention of injuring any officer through his actions, and no officers were injured due to Mr. Jenkins' actions on January 6, 2021.

## IV.    CONCLUSION

At the time of Mr. Jenkins sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552 U.S. at 101. This bedrock principle of sentencing law cannot be fulfilled in Mr. Jenkins' case if he is sentenced at or near the range proposed by the Guidelines. Rather, as reflected by the data

and analogous case law above, a sentence of 54 months is more appropriate in this case.

Date: September 27, 2023                    Respectfully Submitted,

                                            */s/ Dennis E. Boyle*
                                            Dennis E. Boyle, Esquire
                                            Blerina Jasari, Esquire
                                            Boyle & Jasari
                                            1050 Connecticut Ave, NW
                                            Suite 500
                                            Washington, D.C., 20036
                                            Email:  dboyle@boylejasari.com
                                                    bjasari@boylejasari.com
                                            Phone: (202) 430-1900

                                            *Counsel for Defendant Shane Jenkins*

24

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September 2023, I electronically filed the

foregoing document with the Clerk of Court using the CM/ECF system, which will send an

electronic notification of such filing to all counsel of record.

_/s/ Dennis E. Boyle_
Dennis E. Boyle, Esquire