## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-245 (APM)** |
| **SHANE JENKINS,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Shane Jenkins to 236 months of imprisonment, at the mid-point of the applicable Guideline range, three years of supervised release, $5,176 in restitution, a fine of $118,888 and a $720 special assessment.

### I. INTRODUCTION

The defendant, Shane Jenkins, actively participated in the January 6, 2021 attack on the United States Capitol, a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

The defendant's conduct was, in a word, egregious.  He planned for violent insurrection long before his arrival in Washington, D.C., bringing a dangerous weapons to the Capitol.  During the riot, he was the first to smash a window next to the Lower West Terrace tunnel, paving the way for further attacks, and ultimately resulting in rioters creating a new breach point and allowing them to ransack additional rooms of the Capitol building.  He tried to forcibly enter the Capitol through the tunnel, getting pepper-sprayed several times in the process.  When his efforts to enter were rebuffed, he repeatedly hurled dangerous projectiles at officers for simply doing their job.  Upon his return home, he took to social media to revel in his violent conduct.  Far from expressing remorse, he continues to spread lies and misinformation, and has been profiting financially from his criminal conduct.

As discussed below, the defendant's acts of violence and use of dangerous weapons, his history of violent criminal conduct, and his utter lack of remorse for his crimes warrant a significant sentence of imprisonment.  Accordingly, the government recommends that the Court sentence the defendant to 236 months in custody, at the mid-point of the Sentencing Guideline range as calculated pursuant to the analysis set forth herein.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

***Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building***

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  (Image 1); "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Image 1- Lower West Terrace tunnel*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows in the first set of doors, and police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, assaulting police with batons, poles, chemical spray, bottles and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC

4

spray.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.

Despite the mob's efforts, the officers in the LWT tunnel held the line with commendable restraint, and through personal sacrifice and valor.

As MPD Officer Aaron Hunter, who was present in the tunnel and nearly hit by the drawer thrown by Jenkins recalled,

> At one point, the officer in front of me was being pulled.  Somebody grabbed his leg, and I was holding on to him to keep him from getting pulled into the crowd.
>
> There was constant debris flying in – poles, wooden objects.  I got hit in the head with a brick or cinderblock or something like that.

(Trial transcript, March 27, 2023 at p. 53-54).

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including members of Congress.

### B.   Shane Jenkins' Role in the Attack on the Capitol

#### 1.   Pre-January 6 Social Media

The defendant, Shane Jenkins, refused to accept the outcome of the 2020 presidential election.  He embraced the false premise that the election had been stolen through widespread fraud.  Well-aware of the nature and purpose of the certification of the electoral vote that would take place in Congress on January 6, 2020, and the role that Vice President Mike Pence would play in the certification process, he traveled to Washington, D.C., in order to prevent the certification and ensure that Donald Trump would remain president.  In a text message on December 28th, he stated,

> **"The electoral college certifications are opened by Mike pence, people are gonna object, Senators and congressmen and it could get cray cray"**
>
> **"Potentially fights, riots"**

(Trial Exhibit 201.1)

Before traveling, he posted on social media about his plans for violence and specifically contemplated bringing deadly weapons.  He envisioned that the events at the Capitol on January 6th would resemble a medieval melee style battle.  Accordingly, he talked about bringing axes and knives and going "full brave heart."[2]  (Trial Exhibit 204.8)  His language invoked imagery of war

---

[2] This is a reference to the movie Braveheart, the story of Sir William Wallace, a 13th Century

and violent retribution, and his goal was to intimidate and retaliate against a government that would not install his preferred candidate.  In the days leading up to the riot, Jenkins' social media posts included:

> **"I honestly wish we could drag ole Chuck Nancy and killary out and give em the what for"**
>
> **"I sent him the pic, and I have some sog tomahawks and tactical blades can I take those?"**
>
> **"Lol I don't like the idea of war popping off and all I can do is punch lol"**
>
> **"I'm taking tomahawks and knives"**

(Trial Exhibits 204.5, 204.8)

The defendant flew from Houston, Texas to Washington, D.C., on January 5, 2021.  As promised in his social media posts, he brought with him a "Sog" brand metal tomahawk axe, which he carried in his backpack the next day and brought to the Capitol.  (Image 2) (Trial Exhibit 122.10)

---

Scottish warrior.

7



*Image 2 - tomahawks found during search of residence (Trial Exhibit 122.10)*

### 2.  Jenkins' Attack on the Capitol Building

The defendant attended the Rally at the Ellipse and then went to the Capitol.  He arrived at the West side of the Capitol around 2:40 p.m. and joined the rioters amassing on the West Plaza. At around 3:00 p.m., the defendant climbed up to the Lower West Terrace and moved towards the composite window to the left of the LWT tunnel.

Jenkins climbed up to stand on the windowsill, recording the scene with his cellphone.  He stood there, watching the violence taking place at the mouth of the LWT Tunnel, and recording the crowd chanting.  (Image 3) (Trial Exhibits 108 at :20, 108.1, 109.6)



*Image 3 - Screenshot from Trial Exhibit 108 at :20*

Having watched the rioters fail in their effort to enter the Capitol through the LWT Tunnel, Jenkins took matters into his own hands. At approximately 3:45 p.m., Jenkins retrieved the tomahawk from his backpack and put on protective gloves, making it clear that he was about to try to break into the Capitol through the windowpane behind him. Recognizing the significance of what Jenkins was about to do, one rioter, recording Jenkins's conduct, called out that the rioters should first "take a vote" before breaking into the Capitol. (Trial Exhibit 106 at :48)[3]

---

[3] The version of this exhibit admitted at trial featured redactions of the graphically displayed commentary.

9

Jenkins was undeterred.  Yelling, "are we going in or not?", Jenkins struck the windowpane six times with the spike end of the tomahawk (because that would afford the best chance of piercing the shatter-resistant glass), causing pulverized glass to spray with every strike.  (Trial Exhibit 106 at :30-39)  While he was striking the window, another rioter interrupted him by pulling at his pant. Jenkins shouted angrily to the crowd, "are we going in or not?"  (Trial Exhibit 106 at :54)  Jenkins then stepped down from the window ledge.  Even after he descended from the ledge, he continued to assist indirectly in the effort to destroy the window.  When another rioter was attacking the window, a second rioter pulled the first rioter away.  Upon seeing this, Jenkins, who is of large physical stature, grabbed the second rioter from behind and held him back so that the attack on the window could continue.  (Trial Exhibit 103)  Jenkins continued to rile up the crowd, telling other rioters, "Bro, we're going in that fucking building one way or another" and "we paid for it, it's our fucking building." (Trial Exhibit 105 at :35)

It is difficult to overstate the significance of Jenkins' actions at this location.  As the first to attack this window, Jenkins crossed a line that had previously not been crossed at the LWT—he had attacked the Capitol itself.  In doing so, he also inspired others to do the same, and to make further progress on the job he had started.  Ultimately, the success of this effort would considerably exacerbate the level of violence around the tunnel, as well as the amount of theft and property destruction in multiple hideaway offices behind the window.

Following Jenkins' lead, rioters eventually succeeded in destroying the window, clearing the way for access into the conference room behind, referred to as ST-2M.  (Image 4) (Trial Exhibit 109.2)  Other rioters entered this room and, among other things, disassembled the wooden furniture that was inside so that parts and pieces could be used as weapons.  (Image 5)

10



*Image 4 – rioters entering ST-2M through smashed-out window (Trial Exhibit 109.2)*

(Trial Exhibit 109.2 at 1:22)



*Image 5 – desk being disassembled, missing drawer (Trial Exhibit 106.5)*

The rioters inside ST-2M fed these makeshift weapons out the window to the mob.  (Trial

Exhibit 109.2 at :0-53)  These items included a floor lamp, a chair, a tabletop, table legs, and a drawer.  Jenkins and other rioters used these items to savagely attack the officers attempting to block entrance to the LWT Tunnel.  (Images 6, 7); See Sentencing Exhibit 1 (weaponization of table leg and floor lamp).[4]



*Image 6 – rioter using table leg like a club (Trial Exhibit 114 at 8:13-30 & 10:30-11:30)*

---

[4] This an open source video entitled "266N-HO-3485259_1_5165697148473311580_serial 34.MOV".



*Image 7 – Rioter heaving table top into tunnel (Trial Exhibit 8:54-11:30)*

### 3. Direct Attempt To Enter LWT Tunnel

At around 3:55 p.m., the defendant moved from the window towards the mouth of the LWT Tunnel, wading and jockeying slowly through the tightly packed crowd.  Once he arrived at the tunnel entrance, he waived other rioters forward as the crowd attempted to push a large flag into the tunnel  (Sentencing Exhibit 2).[5]  When this effort failed, Jenkins pressed forward, shouting "Push," as the rioters around him used pepper spray on the officers.  Jenkins continued to press against officers and force his way into the tunnel for over ten minutes, leaving only after being pepper-sprayed directly in the face and head multiple times.  (Image 8) (Trial Exhibit 111 at :01-56)

---

[5] This an open-source video entitled "Push Push 10000000_237863764448144_.mpg4".

13



*Image 8 – Jenkins being sprayed in face and head by officer (Trial Exhibit 111 at :31)*

### 4. Attacks On Police

Jenkins took a short break to recover from the effects of the pepper spray, but soon returned to the battle with even more vigor. At approximately 4:27 p.m., he grabbed one of the riot shields other rioters had stolen from officers and carried it with him as he climbed the steps leading to the LWT Tunnel. From that position, he joined other rioters in a concerted assault on the officers defending the LWT Tunnel entrance. As other rioters also attacked, Jenkins hurled 9 different objects at the officers. Among these objects was a solid wooden desk drawer (Image 9) from ST-2M. (Trial Exhibit 119)

In addition to the desk drawer, Jenkins threw a flagpole, a metal walking stick, and a broken wooden pole with a spear-like point on one end which he launched like a javelin. (Image 10) (Trial Exhibits 114.1, 114.2, 114.3, 117, 117.1) The jury specifically found that all of these items, except

14

the flagpole, were "dangerous weapons."



*Image 9 – desk drawer throw (Trial Exhibit 114.2)*



*Image 10 – broken flagpole throw (Trial Exhibit 117.1)*

After his ninth attack, the defendant returned to the window ledge where he had been standing earlier, retrieved his backpack, and left the area. His had spanned approximately an hour and half.

That evening, at around 9:49 p.m., he confronted MPD officers enforcing the curfew imposed due to the riot and had to be ordered back inside his hotel.

### 5. Post-Riot Social Media

In the days and weeks after the riot, the defendant took to social media to brag about his conduct at the Capitol, call the police "trash," and confirm that his motive had been to interfere with the certification of the election. (Trial Exhibit 204.25) He posted a video of himself showing a head wound he received at the Capitol. (Image 11) (Trial Exhibit 204.26)



Image 11 - *selfie pic of head wound (Trial Exhibit 204.26)*

On January 7th, he made the following statements in social media posts and text messages:



**We stormed the capital!**

(Trial Exhibit 204.17)

**I've heard antifa did it, but antifa is pussies. We wanted them to know we are deadly serious honestly. It was cray I got beat, pepper sprayed, tear gassed, it was amazing lol**

**We the people demand to be heard, when they evacuated the senators and congressmen and the Vice President I'm pretty sure they got the message. It wasn't frivolous it wasn't for fun.**

(Trial Exhibit 204.19)

**It wasn't vandalism, it was a message. Don't let the media spin it, think about it. You have to break eggs to make an omelette, don't think "omg those poor eggs" It's deadly serious when people said "give me liberty or give me death"**

(Trial Exhibit 204.21)

**But is this country not the best in the world? Is it not worth my blood, our tears? Then I'll fight by God, right or wrong if I feel like it's being stolen or sold out and senators and congress people better know that a reckoning will occur.**

**For me the sentiment was we elect you slimey little creatures you better freaking hear us and it's deadly serious! They built a gallows outside, we the people . . . . . . For me I want an audit to authenticate every vote, throw**

**the dead ones out and figure out how many more voted than were registered, if trump loses then fine, but until then we burn it down**

(Trial Exhibit 204.23)

On January 8th, he summed up how he felt about the experience of participating in the riot.



## III.    THE CHARGES

On March 29, 2023, a jury convicted the defendant, Shane Jenkins, of all Counts in a trial before this Court.  The Counts were as follows:

- **Count One**, Civil Disorder, 18 U.S.C. § 231(a)(3);

- **Count Two**, Obstructing an Official Proceeding, or Aiding and Abetting the Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2), 2;

- **Count Three**, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b);

- **Count Five**, Destruction of Government Property, 18 U.S.C. § 1361;[6]

- **Count Six**, Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

---

[6] Count Four was dismissed during trial upon the motion of the United States.

- **Count Seven**, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- **Count Eight**, Engaging in an Act of Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- **Count Nine**, Disorderly and Disruptive Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D);

- **Count Ten**, Engaging in an Act of Physical Violence in the Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F).


## IV.    STATUTORY PENALTIES

The defendant, Shane Jenkins, now faces sentencing on all of  the above-stated charges.

The statutory maximum penalties for those offenses are as follows:

- **Count One** (18 U.S.C. § 231(a)(3)):  5 years of imprisonment, a term of supervised release of not more than 3 years, a fine of up to $250,000, and a mandatory special assessment of $100.

- **Count Two** (18 U.S.C. § 1512(c)(2)): 20 years of imprisonment, a term of supervised release of not more than  years, a fine up to $250,000, and a mandatory special assessment of $100.

- **Count Three** (18 U.S.C. § 111(a) and (b)): 20 years of imprisonment, a term of supervised release of not more than 3 years, a fine up to $250,000, and a mandatory special assessment of $100.

- **Count Five** (18 U.S.C. § 1361): 10 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- **Count Six** (18 U.S.C. § 1752(a)(1) and (b)(1)(A)): 10 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- **Count Seven** (18 U.S.C. § 1752(a)(2) and (b)(1)(A)): 10 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- **Count Eight** (18 U.S.C. § 1752(a)(4) and (b)(1)(A)): 10 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- **Count Nine** (40 U.S.C. § 5104(e)(2)(D)) 6 months of imprisonment, a fine up to $5,000,  and a mandatory special assessment of $10.

- **Count Ten** (40 U.S.C. § 5104(e)(2)(F)): 6 months of imprisonment, a fine up to $5,000,  and a mandatory special assessment of $10.


### V.    GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  That Guidelines analysis is as follows:

### A.    Analysis for each count

### Count One:  18 U.S.C. § 231(a)(3) – Obstructing Police during a Civil Disorder

No specific guideline section specifically lists this statutory violation as within its coverage; nor is the statutory violation linked to a guideline section in the Statutory Index of the Guidelines.  In these circumstances, the Guidelines provide that "the most analogous guideline" applies.  USSG § 1B1.2(a).  The United States submits that the most analogous guideline is USSG § 2A2.4 because the defendant obstructed and impeded police officers.

| Base offense level: | 10 | U.S.S.G. §2A2.4  (Obstructing or Impeding Officers) |
|---|---|---|
| Special Offense Characteristic | +3 | Pursuant to § 2A2.4(b)(1): "the offense involved physical contact, or a dangerous weapon (including a firearm) was possessed and its use was threatened." <br><br> Here, the offense involved *both* the use of a dangerous weapon (the stick-like objects, poles, and desk drawer) *and* physical contact (by causing those objects – put into |

| | | motion by the force of his throws - to hit the officers in the tunnel). |
|---|---|---|
| Cross Reference | applied | Pursuant to U.S.S.G. §2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |
| Offense Level (adjusted) | OL 26 (from Count Three) | (see analysis for Count Three) |
| Total | 26 | |

**Count Two: 18 U.S.C. § 1512(c)(2) and § 2 — Obstructing an Official Proceeding and Aiding and Abetting the Obstruction of an Official Proceeding**

| | | |
|---|---|---|
| Base offense level: | 14 | U.S.S.G. §2J1.2(a)  (Obstruction of Justice) |
| Special Offense Characteristic | +8 | Pursuant to U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." <br><br> For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which, in the Capitol riot cases, refers to a "proceeding before the Congress," § 1515(a)(1)(B). <br><br> This enhancement applies because: <br><br> *First*, the defendant damaged a window next to the LWT in an effort to provide access into the building where the proceeding was taking place. <br><br> *Second*, the defendant assaulted officers defending the LWT tunnel from the mob of rioters trying to force entry into the building. |
| Special Offense Characteristic | +3 | Pursuant to U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |

21

|  |  | This enhancement has been applied to all January 6 defendants convicted of violation of Section 1512(c)(2). Congress's Joint Session for the Certification of the Electoral Vote, an official proceeding mandated by the Constitution and federal statutes, had to be halted/suspended for many hours while legislators were physically evacuated for their own safety. |
|---|---|---|
| Adjustment (Official Victim) | +6 | Pursuant to U.S.S.G. § 3A1.2(c)(1): "in a manner creating a substantial risk of serious bodily injury, the defendant . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense."<br><br>The officers in the LWT wore uniforms and riot gear, were clearly identified as police officers, and were engaged in police duties at the time the defendant assaulted them. The objects that he threw, including a broken wooden pole with a sharp point and a solid wooden desk drawer, and the force with which he threw them, created a substantial risk of serious bodily injury to those officers. |
| Total | 31 | |

**Count Three:  18 U.S.C. § 111(a)(1) and (b) – Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon**

The defendant's conduct constituted aggravated assault because he assaulted officers at the Lower West Terrace tunnel by throwing objects at them.  In doing so, he committed a felonious assault involving a dangerous weapon with intent to cause bodily injury, and with the intent to commit another felony (*viz.* 18 U.S.C. § 1512(c)(2), 2).  *See* U.S.S.G. § 2A2.2, cmt n. 1.

| Base Offense Level: | 14 | U.S.S.G. §2A2.2 (Aggravated Assault) |
|---|---|---|
| Special Offense Characteristic | +4 | Pursuant to U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used." The defendant threw a variety of objects at the police inside the LWT, including a substantial wooden pole, broken on one end with a sharp point and a desk drawer, |

| | | which the jury expressly found to be deadly or dangerous weapons. |
|---|---|---|
| Special Offense Characteristic | +2 | Pursuant to U.S.S.G. § 2A2.2(b)(7): "the defendant was convicted under 18 U.S.C. § 111(b)." |
| Adjustment (Official Victim) | +6 | Pursuant to U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, . . . and the offense of conviction was motivated by such status, . . . and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." The officers in the LWT wore uniforms and riot gear and were clearly identified as police officers before the defendant assaulted them. The defendant attacked them because they were performing their official duty by preventing him and other rioters from entering the Capitol Building via that tunnel. The objects that he threw, which included a broken wooden pole with a sharp point, and a solid wooden desk drawer, were thrown with force at the officers and created a substantial risk of serious bodily injury to those officers. |
| Total | 26 | |

**Count Five:  18 U.S.C. § 1361 – Destruction of Government Property**

The defendant used a metal tomahawk to attack a window next to the LWT tunnel of the United States Capitol Building.  Based on (1) a reasonable reading of the statutory language of 54 U.S.C. § 300308 and its regulations in light of the Capitol's designation as a National Historical Landmark; and (2) the legislative history of the Capitol's statutory exemption from the NHPA, a court could reasonably find that the Capitol is a historic property under 54 U.S.C. § 300308, and therefore a "Cultural Heritage Resource" for purposes of 2B1.5, cmt n.1(A).  The United States submits that the applicable guideline for Count Four is USSG §2B1.5.  *See United States v. Rodean*, 21-cr-57-TNM, 10/26/22 Sentencing Tr. at 10.

| Base Offense Level: | 8 | U.S.S.G. §2B1.5(a) |
|---|---|---|
| Specific Offense Characteristic | OL14 | Pursuant to U.S.S.G. §2B1.5(b)(6): "If a dangerous weapon was brandished or its use was threatened, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14. |
| Adjustment (Terrorism) | OL 32 | Pursuant to U.S.S.G. § 3A1.4(a): "If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than 32, increase to level 32"<br><br>A "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5) and means an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of an enumerated statute, such as 18 U.S.C. § 1361. Judge Kelly recently held that this enhancement applied to the Offense Level calculation for violations of § 1361 in the Proud Boys cases *See, e.g., United States v. Nordean*, 21-cr-175 (TJK)<br><br>Jenkins committed his crimes on January 6 in an effort to stop or delay Congress from certifying the Electoral College vote, as charged in Count 2. The defendant's attack on the window and LWT tunnel entrance were specifically part of an effort to get inside the Capitol Building in order to stop or delay Congress from certifying the Electoral College vote. His intent was to intimidate members of Congress and the Vice President and thereby affect the conduct of the government. |
| Total | 32 | |

**Count Six:  18 U.S.C. § 1752(a)(1) and (b)(1)(A) — Entering and Remaining in a Restricted Area with a Dangerous Weapon**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense Characteristic | +2 | Pursuant to U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." |

24

|  |  | On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were present. *See* 18 U.S.C. § 1752(c)(1)(B). |
| --- | --- | --- |
| Special Offense Characteristic | +2 | Pursuant to U.S.S.G. §2B2.3(b)(2): "a dangerous weapon (including a firearm) was possessed." <br><br> The defendant possessed a metal tomahawk, as well as the dangerous objects such as poles, a flagpole, and a desk drawer, which he threw at police. |
| Cross Reference | applied | Pursuant to U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | OL 31 (from Count Two) | Pursuant to U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> The defendant entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding in violation of 18 U.S.C. § 1512—that is, stopping Congress from doing its work. The substantive offense is thus Count Two, and the base offense level for that offense (plus any adjustments from such guideline) should be applied. |
| Total | 31 |  |

**Count Seven:  18 U.S.C. § 1752(a)(2) and (b)(1)(A) — Disorderly or Disruptive Conduct in a Restricted Area with a Dangerous Weapon**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| --- | --- | --- |
| Special Offense Characteristic | +3 | Pursuant to §2A2.4(b)(1), "the offense involved physical contact, or a dangerous weapon (including a firearm) was possessed and its use was threatened." <br><br> Here, the offense involved both a dangerous weapon (the |

25

| | | poles, flagpole and desk drawer) and aggravated assault involving physical contact (striking officers in the tunnel with thrown objects). |
|---|---|---|
| Cross Reference | applied | Pursuant to U.S.S.G. §2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |
| Offense Level (adjusted) | OL 26 (from Count Three) | (see analysis for Count Three) |
| Total | 26 | |

**Count Eight:  18 U.S.C. § 1752(a)(4) and (b)(1)(A) — Engaging in Physical Violence in a Restricted Area with a Dangerous Weapon**

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Special Offense Characteristic | +3 | Pursuant to §2A2.4(b)(1), "the offense involved physical contact, or a dangerous weapon (including a firearm) was possessed and its use was threatened."<br><br>Here, the offense involved both a dangerous weapon (the poles, flagpole and desk drawer) and physical contact (striking officers in the tunnel with thrown objects). |
| Cross Reference | applied | Pursuant to U.S.S.G. §2A2.4(c)(1): "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." |
| Offense Level (adjusted) | OL 26 (from Count Three) | (see analysis for Count Three) |
| Total | 26 | |

**Counts Nine and Ten:  40 U.S.C. §5104(e)(2)(D) - Disorderly or Disruptive Conduct in Capitol Building; 40 U.S.C. §5104(e)(2)(F)**

**– Engaging in an Act of Physical Violence in the Capitol Building or Grounds**

| Base Offense Level: | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply.  See 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. |
|---|---|---|

### B.  Grouping Analysis

The United States agrees with the Probation Officer's grouping analysis.  Under U.S.S.G. §3D1.2, "closely related counts" group if they "involve the same victim and two or more acts or transactions connected by a common criminal objective."  U.S.S.G. §3D1.2(b).   Therefore, all of the Counts should be placed into one group because they all involve the same victim (Congress), or because they embody conduct (assaulting federal officers, damaging property) that is treated as a specific offense characteristic in the guideline applicable to another count.

The highest offense level for the group is 32 (for Count Five).

### C.  Estimated Guidelines Range

The U.S. Probation Office calculated the defendant's criminal history as category VI, which is not disputed.  PSR ¶ 67.  At a Criminal History Category VI, his estimated Advisory Guidelines Range is 210-262 months.

Combined with the defendant's social media posts reflecting a lack of remorse and an attraction to conspiracy theories, as well as his blatant attempts to profit off his criminal conduct, this reliable information indicates that a CHC of IV underrepresents both the seriousness of the defendant's criminal history and the likelihood that he will commit other crimes.  An upward departure therefore may be warranted under U.S.S.G. § 4A1.3.

### VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  As described below, on balance,

the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A. Nature and Circumstances of the Offense

As shown in Section II of this memorandum, Jenkins' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Jenkins' conduct was both absolutely and relatively egregious. He did not merely advance with the mob or cheer from a distance. He repeatedly contributed to the breach of the building and the attack on the police guarding it in a very direct and personal way. He fully embraced the idea of taking violent action for political ends, and, accordingly, planned for and engaged in violence on January 6, 2021. His goal was to stop the certification of the vote and get a losing candidate installed by other means. Though cloaking himself in catchphrases about patriotism, he betrayed the fundamental principles of American democracy. During the riot, he  was an eager and enthusiastic protagonist. When he heard another rioter say, "Break a window!", no urging was necessary. He wanted to create access to the building, and the assaultive conduct that horrified the rest of the world was *enticing* to him.

### B. The History and Characteristics of the Defendant

Jenkins criminal history is extensive. It includes the following offenses for which no criminal history points were assessed:

- a 2006 conviction for Evading Arrest or Detention with a Vehicle for which he was sentenced to 180 days in custody (PSR ¶ 61);

- a 2001 conviction for misdemeanor Terroristic Threat for which he was sentenced to 30 days in custody (PSR ¶ 60);

- a 2001 conviction for Resisting Arrest for which he was sentenced to 365 days in custody

(PSR ¶ 59);

- a 2001 misdemeanor conviction for Assault Causing Bodily Injury for which he received a deferred adjudication and 12 months of community supervision.  (PSR ¶ 58);

- and a 1998 conviction for Aggravated Assault Causes Serious Bodily Injury for which the defendant initially received 10 years of deferred probation, but, after violating probation, was sentenced to 4 years in custody (PSR ¶ 55).

- several additional convictions for assault, threatening assault, and resisting arrest.

Jenkins also has several arrests for assaults and aggravated assaults that demonstrate a tendency towards violence even if they did not result in convictions.

In total, he has 5 prior convictions stemming from incidents involving physical violence or the threat of physical violence.   Two of the victims were police officers whom Jenkins violently resisted.  In addition, there are four other matters which were not prosecuted but likewise involved physical violence, including the killing of his stepfather.  His conduct at the Capitol is in keeping with his penchant for violence.  His prior sentences and other contacts with the criminal justice system have failed to deter him from engaging in violent crime.

Jenkins has even managed to engage in violence during his pre-trial detention.  It has come to the attention of the United States that he was involved in a Jan. 6th-related assault at the D.C. Jail.  According to the investigation into the incident, on July 10, 2023, the defendant and 11 other inmates are alleged to have entered the TV room of their pod and assaulted an inmate named Taylor Taranto because Taranto had been saying derogatory things about Ashli Babitt and her mother.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of

lengthy incarceration.  His conduct showed a complete lack of respect for the law.  He called law enforcement officers who were simply trying to do their duty "trash."  His conduct on January 6 and after demonstrates he has no respect for the Constitution, the law, or the peaceful transition of power.  On January 6, he sought to circumvent the electoral system by keeping the loser of the election in power, the epitome of disrespect for one of the defining aspects of our constitutional democracy.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C.§ 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

There is an overwhelming need for specific deterrence here.  During the riot, Jenkins demonstrated that he has the strength, stamina, and violent proclivity to attack armed police officers.  After January 6, he reveled in the memory and after-glow of what he considered to be an amazing experience.  He defended it as such on social media, pushing back on anyone who suggested that the conduct of the rioters on January 6th was wrong.  In doing so, he made clear what his intentions were for engaging in violence at the Capitol.

Just as his conduct is extraordinary, so his lack of remorse.  Far from contemplating the

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

harm he has caused, examining his conscience, feeling shame for his actions, and resolving to change, Jenkins has chosen to use his January 6 status to build a brand in order to garner money and attention.  He has created several January 6-inspired websites on which he invites like-minded individuals to follow him on social media, takes advantage of their sentiments, and requests monetary contributions.  He has a fundraising website on Give Send Go entitled "Shane January 6th" which has raised $66,175 to date.  He is separately raising money through another website, also on Give Send Go, entitled "love wins," which has raised an additional $52,713. Thus, to date, despite being incarcerated, the defendant has garnered at least $118,888 from his criminal conduct.

Far from being remorseful, Jenkins is actively trying to *profit from* his participation in the riot.  He advertises himself as the voice and face of "TherealJ6", a website he created which sells merchandise and seeks additional donations, generating an unknown amount of additional income. (Image 12)



*Image 12 - website*

In his organizational mission statement, Jenkins refers to himself as a "political prisoner." (Image 13)  The fact that he considers himself to be a political prisoner suggests that, even after having been prosecuted and convicted, he persists in refusing to accept any responsibility for his conduct or its wrongfulness.



## Who We Are

J6 Political Prisoner Shane Jenkins here. I went to the Capitol on January 6th to voice my First Amendment right as an American citizen and support President DJT. I have been housed in the DC Gulag since March 2021. We will bring awareness to our situation and engage the community. We want you to get to know us and see how the government treats dissenters. We might be bent but we **refuse** to break. Join us in the fight! Share our content and get to know The Sixers. God Bless!

*Image 13 – mission statement*

Significantly, Jenkins has chosen not to feature on the website any the images of himself engaging in violence on January 6th, instead using a still from body worn camera footage that shows him in front of his hotel in Washington, D.C. on the night of January 6, 2021, attempting to defy the curfew.

In building his brand, Jenkins prominently features a cartoon avatar of himself he calls "Skullet" and developed a logo that includes a silhouette of the U.S. Capitol Building with crossed tomahawks below, in apparent reference to and glorification of his crimes.  (Images 14, 15, 16)



*Image 14 - avatar*

33



*Image 15 – crossed tomahawks*



*Image 16 – avatar on political prisoner backpack*

Jenkins has also been active on a variety of social media platforms, continuing to post statements suggesting a willingness to circumvent constitutional processes in order to install his preferred candidate.  PSR ¶ 90.  Notably, he lied to the Probation Officer about whether he had

34

been active on social media.  PSR ¶ 90  As of September of 2023, he *continues* to be active on social media.  Jenkins, like every defendant, is entitled to believe and say whatever he wants and is not being punished for his words.  But his words are important because they show Jenkins still approves of political violence.  As a result of his self-promotion, which has earned him more than $100,000 from donors, the Court must take seriously the risk that he will engage in political violence in the future, and that he will use his prominence and brand to incite like-minded others.

Jenkins' extensive and violent criminal history also demonstrates the need for specific deterrence.  Despite having served multiple prison terms, he continues to break the law and engage in violent behavior.  Indeed, in this instance, he *sought out* trouble and traveled all the way from Texas to take advantage of an opportunity to be violent.  The fact that the defendant has engaged in Jan. 6-related violence while incarcerated pending sentencing is extraordinary.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."  *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).  Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how

36

other district courts might have sentenced that defendant." *Id*. at 1095.  "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

The government submits that Jenkins' conduct was far worse than that of the vast majority of January 6 defendants convicted of similar crimes in at least three respects: the level of premeditation and demonstrated intent to engage in violence for the purpose of intimidation of and retribution against members of Congress and the Vice President; the manner in which his actions facilitated other rioters access to materials they could utilize to perpetrate violence; and the determination displayed to persist in a violent course of conduct.  Few, if any, January 6 defendants have exhibited the combination of enthusiasm, personal commitment, and remorselessness shown by this defendant to wreak havoc at the Capitol.  Moreover, Jenkins' criminal history is far more extensive and violent than most January 6 defendants, a factor which alone requires a more

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

significant sentence than others have received.

The case of *United States v. Peter Schwartz*, Case No. 21-cr-178 (APM) bears many similarities to the instant case.  Like Jenkins, Schwartz took a weapon with him to the Capitol, a wooden tire knocker.  Like Jenkins, Schwartz threw an object at a police line – but only one object as compared to the nine thrown by Jenkins.  Like Jenkins, Schwartz made substantial efforts to create further access to the Capitol through violence.  He precipitated the breach of a police line which allowed rioters to reach the area of the Lower West Terrace.  Like Jenkins, he attacked officers trying to defend the LWT tunnel.  He did so by repeatedly spraying them with stolen cannisters of chemical agent.  He personally participated in the "Heave Ho" effort and was able to get part way into the tunnel.  Like Jenkins, he had a significant criminal  history.  Schwartz, however, did not have Jenkins exacerbating social media statements and activity or lie about that activity to presentence report writer.  Nor did he cause damage to the Capitol Building itself.  This Court imposed a sentence of 170 months.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).  But because Jenkins was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with  hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").  *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require the defendant to pay $3,176 in restitution for the damaged he caused to the upper right quarter-moon pane of the window (Trial Exhibit 513),

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

plus the standard $2,000 of restitution imposed in January 6th cases, for a total of $5,176. This amount fairly reflects his role in the offense and the damages resulting from his conduct.

## VIII.    FINE

Jenkins' convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As noted above, Jenkins has raised over $100,000 in an online campaign seeking to profit from his criminal conduct on January 6. Accordingly the government recommends the imposition of a fine of at least $118,888. That figure represents the publicly listed amount of donations Jenkins has received as a direct result of his notoriety from his crimes. This does not account, however, for profit he's made off of merchandise or from links on several of his websites that do not display the amount of donations he's received.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 236 months of imprisonment, three years of supervised release, $5,176 in restitution, a fine of $118,888 and a $720 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ David J. Perri*
DAVID J. PERRI
WV Bar No. 9219
Assistant United States Attorney (Detailed)
United States Attorney's Office
Northern District of West Virginia

HOLLY F. GROSSHANS
D.C. Bar No. 90000361
Assistant United States Attorney
U.S. Attorney's Office for the
District of Columbia

42